# EXHIBIT A

**VISA 2022/169798-6198-0-PC**
L'apposition du visa ne peut en aucun cas servir
d'argument de publicité
Luxembourg, le 2022-07-26
Commission de Surveillance du Secteur Financier

**PLACEMENT MEMORANDUM**

Relating to the offering and issue of Units in

**Luxembourg Life Fund**

an umbrella common fund
organised under the laws of the Grand-Duchy of Luxembourg
and subject to the law of 13 February 2007 on specialised investment funds, as amended

July 2022

This placement memorandum (the **Placement Memorandum**) is being furnished to prospective investors on a confidential basis to consider an investment in Luxembourg Life Fund (the **Fund**). This Placement Memorandum is highly confidential and has been prepared solely for use in connection with the offering of units (**Unit** or **Units**) in the Fund. The delivery of this Placement Memorandum shall not constitute an offer or solicitation to any person in any jurisdiction in which such an offer or solicitation is unlawful and, in a jurisdiction where lawful, shall constitute an offer only to the offeree. This Placement Memorandum is personal to each offeree to whom it has been delivered by the Fund's management company and alternative investment fund manager (the **AIFM**) and does not constitute an offer to any other person or to the public generally to subscribe for or otherwise acquire the Units. Each offeree agrees by accepting this Placement Memorandum that, except with the prior written consent of the AIFM, such offeree will not disclose the contents of this Placement Memorandum to any person other than such offeree's professional representatives in connection with such offeree's consideration of this transaction and will return this Placement Memorandum to the AIFM promptly upon reaching a decision not to invest in the investment offered hereunder. Distribution by any recipient of this Placement Memorandum, in whole or in part, to any person other than such prospective investors in the Fund or those persons, if any, retained to advise such prospective investors with respect thereto is unauthorised, and any divulgence of any of its contents, without the prior written consent of the AIFM, is expressly prohibited. Each prospective investor, by accepting delivery of this Placement Memorandum, agrees to the foregoing and agrees to make no photocopies of this Placement Memorandum or any documents related hereto and, if the offeree does not purchase Units or the offering is terminated, to return this Placement Memorandum and all documents attached hereto.

The Fund qualifies as an alternative investment fund under article 1(39) of the AIFM Law. Units can be market by the AIFM with the passport to professional investors in the European Economic Area (**EEA**) under articles 29 and 30 of the AIFM Law.

## IMPORTANT NOTICES FOR PROSPECTIVE INVESTORS

**General**

An investment in the Fund is speculative and involves certain significant risks that should be carefully considered by prospective purchasers of the Units. Please refer to Section 13 of Part I on risk factors. An investment in the Fund is suitable for and is offered only to persons of substantial financial resources who have no need for liquidity in their investment and who otherwise meet the eligibility requirements set forth in this Placement Memorandum. No assurance can be given that the Fund's investment objectives will be achieved or that the Units will generate a positive return for the investors. Prospective investors should review this Placement Memorandum carefully in its entirety and must be willing and able to conduct an independent investigation of the risks of investing in and owning the Units. Prospective investors should seek the advice of their independent financial, taxation, actuarial, legal and other advisors regarding the suitability and consequences of making an investment in the Fund, including without limitation: (i) the legal requirements within their own countries for the purchase, holding, redemption or disposal of Units; (ii) any foreign exchange restrictions to which they are subject in their own countries in relation to the purchase, holding or redemption of Units; and (iii) the legal, tax, financial or other consequences of subscribing for, purchasing, holding or redeeming Units.

In making an investment decision, investors must rely on their own examination of the Fund, the assets in which the Fund will invest, and the terms of the offering, including the merits and risks involved.

The AIFM reserves the right to reject any subscription for reasons of eligibility or any other reason, in its sole discretion. Investors in Units who are subsequently determined not to be Eligible Investors, or who are otherwise unauthorised to hold Units in the Fund, are subject to mandatory redemption. Please refer to Section 14 of Part I on restrictions on the ownership of Units.

There is no public market for the Units and no such market is expected to develop in the future. Units are subject to limitations on redemption and to restrictions on transferability and resale and may not be transferred or resold except with the prior written consent of the AIFM and as permitted under this Placement Memorandum, the SIF Law, the Securities Act, the Investment Company Act and applicable state securities laws, pursuant to registration or exemption therefrom. Investors should be aware that they may be required to bear the financial risks of this investment for an indefinite period of time.

No representations or warranties of any kind are intended or should be inferred with respect to the economic return or the tax consequences from an investment in the Units. No assurance can be given that existing laws will not be changed or interpreted adversely. Investors are not to construe this Placement Memorandum as legal, business, actuarial, investment, tax or other advice.

The Units are offered solely on the basis of the information contained herein and in the reports referred to in the Placement Memorandum. This Placement Memorandum supersedes all prior written and oral information, data or materials relating to the Fund and the investment opportunity in the Units described in this Placement Memorandum. No person has been authorised to make representations, or give any information with respect to the Units, except the information contained herein, and any information or representation not contained herein or otherwise supplied by the AIFM in writing must not be relied upon as having been authorised by the Fund.

The AIFM shall make available to each investor or its representative, prior to any subscription for the Units, the opportunity to ask questions of and receive answers from representatives of the AIFM concerning any aspect of the Fund and its proposed business and to obtain any additional related information to the extent the AIFM possesses such information or can acquire it without unreasonable effort or expense.

2

This Placement Memorandum contains statements that are not purely historical in nature but are "forward-looking statements". These include, among other things, future performance targets and specific investment strategies. These forward-looking statements are based upon certain assumptions and involve significant elements of subjective judgment and analysis. No representation is made that any returns indicated will be achieved or that all assumptions have been considered or stated. Actual events may differ materially from those assumed. All forward-looking statements included herein are based on information available on the date hereof and neither the Fund nor its affiliates assume any duty to update any forward-looking statement.

Neither the delivery hereof nor any sale made hereunder shall under any circumstances imply that no change in the affairs of any participant in the transactions described in this Placement Memorandum has occurred or that the information herein is correct as of any date subsequent to the date hereof. The AIFM reserves the right to reject any offer to purchase the Units in whole or in part, for any reason, or to sell less than the stated initial principal amount of the Units offered hereby.

Time referred to in the Placement Memorandum is Central European Time (CET).

Health epidemic/pandemic and natural disasters: Any occurrence of force majeure events, natural disasters, or outbreak of epidemics or pandemics, such as the 2019 novel coronavirus (COVID-19), SARS, H5N1 and H7N9 avian flu, H1N1 swine flu, Ebola, depending on their scale, may cause material disruptions to business operations of the Fund and its service providers, which may in turn cause delays in distributions to the Unitholders. These events could also have a material effect on general economic conditions and market liquidity, which may in turn adversely affect the financial performance of the Fund and its assets and, therefore, its Unitholders.

**Important notice for EEA investors**

The AIFM only contemplates to market Units to Professional Investors. Where Units would be offered or issued to Eligible Investors in the EEA other than Professional Investors, a key information document will be provided to these investors in accordance with Regulation (EU) No 1286/2014 of the European Parliament and of the Council of 26 November 2014 on key information documents for packaged retail and insurance-based investment products (**PRIIPS**).

**Important notice for Swiss investors**

*General*

The Units of the Fund can be distributed in Switzerland exclusively to qualified investors as defined by Article 10 § 3 of the Collective Investment Scheme Act 2006, as amended, (**CISA**). The Fund has not been and will not be registered with the Swiss Financial Market Supervisory Authority (**FINMA**).

*Representative*

The Representative of the Fund in Switzerland is REYL & Cie Ltd, with its registered office at 62 rue du Rhône, CH-1204 Geneva. (Tel.: +41 22 816 80 00, email: frs@reyl.com).

*Paying agent*

The Paying Agent in Switzerland is REYL & Cie Ltd, with its registered office at 62 rue du Rhône, CH-1204 Geneva, Switzerland. Units may be subscribed and/or redeemed with the Paying Agent. A handling commission of CHF 800.00 per transaction will be charged by the Paying Agent and deducted from the subscription or redemption amount paid or received. If a subscription or redemption is made through the

3

Paying Agent, instructions and money must be received by the Paying Agent at least 24 hours before the appropriate dealing cut-off time.

*Location where the relevant documents may be obtained*

The offering documents and annual or semi-annual reports can be obtained free of charge from the Representative.

*Payment of retrocessions to third parties*

The Management Company for the account of the Fund and its agents may pay retrocessions as remuneration for distribution activity in respect of fund Units in or from Switzerland. This remuneration may be deemed payment for the following services in particular:

- Any Offering or Distribution of interests by financial service providers within the meaning of Art. 3 para. d. of FinSA and Art. 3 par. 5 FinSO

Retrocessions are not deemed to be rebates even if they are ultimately passed on, in full or in part, to the investors.

The recipients of the retrocessions must ensure transparent disclosure and inform investors, unsolicited and free of charge, about the amount of remuneration they may receive for distribution.

On request, the recipients of retrocessions must disclose the amounts they actually receive for distributing the collective investment schemes of the investors concerned.

*Granting of rebates*

In respect of distribution in or from Switzerland, the Fund Management Company the Fund and its agents do not grant any rebates to reduce the fees or costs incurred by the investor and charged to the fund.

**Important notice for US investors**

The Units have not been and will not be registered under the United States Securities Act of 1933, as amended (the **Securities Act)**, or the securities laws of any state or other jurisdiction. In addition, the Fund is not, and will not be, registered under the US Investment Company Act of 1940, as amended (the **Investment Company Act)**. The Units will be offered and sold for investment pursuant to the exemptions from registration requirements of the Securities Act for offers and sales of securities that do not involve any public offering and analogous exemptions under state and other securities laws. The Units are only being offered and sold: (1) to US persons (as defined in Regulation S under the Securities Act) and other investors in the United States who are both "Qualified Purchasers" (as defined in Section 2(A)(51) of the Investment Company Act and the rules thereunder) and "Accredited Investors" as defined in Regulation D under the Securities Act, and (2) outside the United States to non US persons in offshore transactions (as defined in Regulation S under the Securities Act) in reliance on Regulation S.

Prospective investors must be "non-U.S. Persons" or "Permitted U.S. Persons." The term "Permitted U.S. Person" means a Tax-Exempt U.S. Person (as defined herein) or a pass-through entity for U.S. federal tax purposes substantially all of the ownership interests in which are held by Tax-Exempt U.S. Persons. In addition, each Permitted U.S. Person that invest in the Fund must be a "Qualified Purchaser", as defined in the Investment Company Act and must also meet other suitability requirements. The subscription documents for the Fund contain questionnaires relating to these qualifications. The AIFM, in its discretion, may decline to accept the subscription of any prospective investor.

4

No federal or state securities commission or any other regulatory authority including the United States Securities and Exchange Commission (**SEC**) has expressed an opinion or recommendation on the Units. Furthermore, the foregoing authorities have not confirmed the accuracy or determined the adequacy of this document. Any representation to the contrary is a criminal offence.

The AIFM has filed with the SEC as an exempt reporting adviser under the Investment Advisers Act of 1940, as amended (the **Advisers Act**). Investors in the Fund will not be afforded all of the protections of provisions of the Advisers Act applicable to advisers registered thereunder.

28558437.2.EU_BUSINESS

## TABLE OF CONTENTS

**Page**

PART I:       PROVISIONS APPLICABLE TO THE FUND IN GENERAL ....................................18
1.            THE FUND ....................................................................................................................18
2.            INVESTMENT OBJECTIVE, POLICY AND STRATEGY ..........................................18
3.            AIFM ..............................................................................................................................19
4.            PORTFOLIO MANAGER ............................................................................................19
5.            INVESTMENT ADVISER ............................................................................................20
6.            DEPOSITARY ................................................................................................................20
7.            CENTRAL ADMINISTRATION AGENT ....................................................................22
8.            DISTRIBUTORS ...........................................................................................................22
9.            OTHER PARTIES INVOLVED IN THE STRUCTURE ..............................................23
10.           RISK MANAGEMENT ..................................................................................................25
11.           LEVERAGE ...................................................................................................................26
12.           LIQUIDITY MANAGEMENT ......................................................................................26
13.           RISK FACTORS ............................................................................................................26
14.           RESTRICTIONS ON THE OWNERSHIP OF UNITS..................................................32
15.           TRANSMISSION OF UNITS .......................................................................................33
16.           UNITS.............................................................................................................................33
17.           NET ASSET VALUE .....................................................................................................37
18.           FEES AND EXPENSES.................................................................................................40
19.           DISTRIBUTION POLICY ............................................................................................41
20.           DURATION AND LIQUIDATION OF THE FUND .....................................................41
21.           TERMINATION AND AMALGAMATION OF SUB-FUNDS / CLASSES OF
              UNITS.............................................................................................................................42
22.           APPLICABLE LAW AND JURISDICTION ................................................................43
23.           PREVENTION OF MONEY LAUNDERING AND TERRORISM FINANCING .......43
24.           TAX ................................................................................................................................46
25.           FINANCIAL YEAR - AUDIT .......................................................................................55
26.           DATA PROTECTION ....................................................................................................55
27.           UNITHOLDERS' INFORMATION ..............................................................................58
28.           CONFIDENTIALITY ....................................................................................................61
29.           AMENDMENTS TO THE PLACEMENT MEMORANDUM ......................................61
PART II:      PROVISIONS APPLICABLE TO THE SUB-FUNDS....................................................62

6

**TABLE OF CONTENTS**
(continued)

Page

LUXEMBOURG LIFE FUND – LONG TERM GROWTH FUND ........................................................ 63

1.    INVESTMENT OBJECTIVE, POLICY, STRATEGY AND RESTRICTIONS ........... 63

2.    UNITS ................................................................................................ 65

3.    REFERENCE CURRENCY ..................................................................... 75

4.    NET ASSET VALUE CALCULATION AND VALUATION DAY ............................ 75

5.    PORTFOLIO MANAGEMENT / INVESTMENT ADVISOR ..................................... 76

6.    FEES IN RELATION TO THE LONG TERM GROWTH FUND ............................. 76

7.    SPECIFIC RISKS APPLICABLE TO THE LONG TERM GROWTH FUND ............. 79

8.    NO LISTING OF UNITS ......................................................................... 79

9.    DURATION ........................................................................................ 79

LUXEMBOURG LIFE FUND – LONG TERM GROWTH FUND (2021) ............................................ 80

1.    INVESTMENT OBJECTIVE, POLICY, STRATEGY AND RESTRICTIONS ........... 80

2.    UNITS ................................................................................................ 82

3.    REFERENCE CURRENCY ..................................................................... 88

4.    VALUATION DAY – NET ASSET VALUE CALCULATION – VALUATION ........ 88

5.    FEES CHARGED TO LTGF (2021) ......................................................... 89

6.    SPECIFIC RISKS APPLICABLE TO LONG TERM GROWTH FUND ................... 91

7.    NO LISTING OF UNITS ......................................................................... 91

8.    DURATION ........................................................................................ 91

LUXEMBOURG LIFE FUND – ABSOLUTE RETURN FUND I ....................................................... 92

1.    INVESTMENT OBJECTIVE, POLICY, STRATEGY AND RESTRICTIONS ........... 92

2.    CLASSES OF UNITS – SUBSCRIPTION OF UNITS – LOCK-UP PERIOD – REDEMPTION OF UNITS ..................................................................... 94

3.    REFERENCE CURRENCY ..................................................................... 99

4.    NET ASSET VALUE CALCULATION AND VALUATION DAY – SPECIFIC VALUATION POLICY ......................................................................... 99

5.    PORTFOLIO MANAGEMENT ................................................................ 100

6.    FEES CHARGED TO THE ABSOLUTE RETURN FUND I ................................ 100

7.    SPECIFIC RISKS APPLICABLE TO THE ABSOLUTE RETURN FUND I ............. 101

8.    NO LISTING OF UNITS ....................................................................... 102

9.    DURATION ....................................................................................... 102

## MANAGEMENT AND ADMINISTRATION

### AIFM

Carlisle Management Company S.C.A.
9, rue Sainte Zithe
L - 2763 Luxembourg

### UNLIMITED MANAGING SHAREHOLDER OF THE AIFM

Carlisle Investment Group S.à.r.l.
9, rue Sainte Zithe
L -2763 Luxembourg

### BOARD OF MANAGERS OF THE UNLIMITED MANAGING SHAREHOLDER

Chairman:
Timmo Henk Mol
9, rue Sainte Zithe
L-2763 Luxembourg

Other members:
Jose-Esteban Casares Garcia
9, rue Sainte Zithe
L-2763 Luxembourg

Emmanuel René Bégat
16, rue Jean-Pierre Brasseur,
L-1258 Luxembourg

### DEPOSITARY

CACEIS Bank, Luxembourg Branch
5, allée Scheffer
L-2520 Luxembourg

### CENTRAL ADMINISTRATION AGENT

CACEIS Bank, Luxembourg Branch
5, allée Scheffer
L-2520 Luxembourg

28558437.2.EU_BUSINESS

**US CUSTODIAN, POLICY PAYING AGENT, SECURITIES INTERMEDIARY
AND POLICY ESCROW AGENT**

Wells Fargo Bank, N.A.
Sixth Street and Marquette Avenue,
Minneapolis, MN 55479
USA

**SERVICING AGENTS**

Life Equity LLC
5611 Hudson Drive
Suite 100
Hudson, OH 44236
USA

Life Capital Group, Inc.
7924 Ivanhoe Avenue, Suite 10
La Jolla, CA 92037
USA

**CONTINGENT SERVICING AGENT**

Life Capital Group, Inc.
7924 Ivanhoe Avenue, Suite 10
La Jolla, CA 92037
USA

**AUDITORS**

As to the financial audit of the Fund

KPMG Luxembourg
39, avenue J.F. Kennedy
L – 1855 Luxembourg

As to the independent actuarial review of the Fund's valuation (External Valuer):

Lewis & Ellis
700 Central Expressway South
Suite 550
Allen, TX 75013-8098

9

**COUNSEL AS TO LUXEMBOURG LAW**

Arendt & Medernach S.A
41A, avenue J.F. Kennedy
L-2082 Luxembourg

**COUNSEL AS TO LUXEMBOURG TAX**

TSP Law
10, rue Dicks
L-4017 Luxembourg

10

## DEFINED TERMS

| | |
|---|---|
| AIFM Directive | The European Directive 2011/61/EU on Alternative Investment Fund Managers and amending Directives 2003/41/EC and 2009/65/EC and Regulations (EC) No 1060/2009 and (EU) No 1095/2010. |
| AIFMD-CDR | The Commission Delegated Regulation 231/2013 of 19 December 2012 supplementing the AIFM Directive with regard to exemptions, general operating conditions, depositaries, leverage, transparency and supervision. |
| AIFM Law | The Luxembourg law of 12 July 2013 on alternative investment fund managers, as amended. |
| AIFM Rules | The AIFM Directive, the AIFMD-CDR, the AIFM Law and any circulars, regulations or other measures implementing the AIFM Directive or the AIFM Law. |
| AIFM | Carlisle Management Company S.C.A., a *société en commandite par actions* organised under the laws of Luxembourg and authorised as a management company and alternative investment fund manager under article 125-2 of the law dated 17 December 2010 on undertaking for collective investments, as amended (the "**UCI Law**") and as authorised alternative investment fund manager under article 5 of the AIFM Law. |
| Annual Report | The report on the Fund's activities, investments and on the management of these investments. |
| Auditors | Means the approved statutory auditor, which is, as of the date of this placement memorandum, KPMG Luxembourg. |
| Business Day | A day on which banks are open for business in Luxembourg (with the exception of December 24). |
| Board of Managers | The board of managers of the General Partner of the AIFM that comprises the following members:<br><br>- Timmo Henk Mol<br><br>- Jose-Esteban Casares Garcia<br><br>- Emmanuel René Bégat |
| Central Administration Agent | CACEIS Bank, Luxembourg Branch in its capacity as Central Administration Agent will perform the functions of Administrative Agent and Registrar and Transfer Agent for the Fund. |

11

| | |
|---|---|
| CSSF | The *Commission de Surveillance du Secteur Financier,* the Luxembourg supervisory authority of the financial sector. |
| Depositary | CACEIS Bank, Luxembourg Branch. |
| Eligible Investors | "Eligible Investors" shall only include: |

(1) EU investors that are Institutional Investors or Professional Investors (as defined in Article 2 (12) of EU Regulation 2017/2402) (including opt-up Professional Investors);

(2) (i) US persons (as defined in Regulation S) or persons otherwise purchasing in the United States: that are both "Qualified Purchasers" (as defined in the Investment Company Act and the rules thereunder) and "Accredited Investors" as defined in Regulation D under the Securities Act, and (ii) non US persons, that are purchasing in offshore transactions (as defined in Regulation S) and meet any additional requirements imposed under other applicable laws.

The AIFM reserves the right to restrict the access of an Investor to the Fund or to admit other types of Investors, in accordance with applicable laws and regulations.

| | |
|---|---|
| External Valuer | Lewis & Ellis or any other reputable firm as determined by the AIFM and subject to the agreement of the Investment Committee (if any) of the relevant Sub-Fund as set out under Part II of this Placement Memorandum. |
| Financial Reporting | The Central Administration Agent shall distribute audited financial statements on an annual basis. In addition, the Central Administration Agent or the AIFM shall distribute any required tax notices or similar documents whenever required by law. |

The Net Asset Value statement will be distributed to Unitholders by the Central Administration Agent as set out in Part II of this Placement Memorandum.

| | |
|---|---|
| Fund | Luxembourg Life Fund, an umbrella specialised investment fund organised as common fund under the laws of Luxembourg. |
| General Partner | Carlisle Investment Group S.à.r.l., a *société à responsabilité limitée,* organised under the laws of Luxembourg. The purpose of the General Partner is to act as unlimited managing shareholder *(actionnaire gérant commandité)* of the AIFM. |
| Initial Offering Date / Period | The Initial Offering Date / Period will be the first date or period on / during which investors will be offered to |

12

|  | subscribe for Units of each Sub-Fund, as set out under Part II of this Placement Memorandum. |
|---|---|
| Investment Committee | The investment committee of the relevant Sub-Fund. See Part II of this Placement Memorandum. |
| Investor Disclosure | The disclosures required pursuant to the AIFMD-CDR, including any disclosure or communication to Unitholders and/or prospective Unitholders given or made available through one or more of the following means (with the appropriate method of disclosure or communication for any relevant information being determined by the AIFM in its sole discretion), this list not being limitative: annual reports, updates or supplements to this Placement Memorandum, newsletters (or other Unitholders' notices, announcements or other means of communication), additional reports, due diligence documentation or information on the AIFM's website. |
| Life Settlements | US Dollar-denominated life insurances policies and/or beneficial interest in US trust and other entities that own life insurance policies, issued by insurance carriers that satisfy the investment eligibility criteria described in this Placement Memorandum. See "Investment Objective, Policy and Strategy". |
| Liquidity Management Policy | The liquidity management policy established by the AIFM in accordance with the AIFM Rules with a view to monitor the liquidity risk of the Fund and its Sub-Funds and to ensure that the liquidity profiles of the Sub-Funds' investments are in line with their underlying obligations, as may be amended from time to time by the AIFM. |
| Lock-up Period | Period starting from the end of the Initial Offering Date / Period or from the issue date of the Unit to be redeemed, as set out for each Sub-Fund under Part II of this Placement Memorandum. |
| Offering Type | The issuance of the Units will be completed in accordance with Luxembourg law. Units will only be offered outside Luxembourg in transactions that comply with locally applicable law, and investors will be required to certify as to their eligibility under applicable securities or other laws. |
| Redemptions | After the expiration of the Lock-up Period, if applicable, Unitholders shall have the right to redeem a portion of their Units on the basis of the Net Asset Value as of the applicable Redemption Day as adjusted to take account of any redemption fees. Please refer to Section 16.4 of Part I and to the relevant Sub-Fund described in Part II. |

13

| Redemption Day | The day as of which the Net Asset Value is calculated for the purpose of the redemption of Units. Please refer to Part II. |
|---|---|
| Risk Management Policy | The risk management policy established by the AIFM in accordance with the AIFM Rules setting out the risk management systems that are implemented by the AIFM in order to identify, measure, manage and monitor appropriately all risks relevant to the Fund and the relevant Sub-Fund. |
| Reference Currency of the Fund | The currency in which the Fund is denominated is the US Dollar (hereafter "**US$**" or "**USD**"). Each Sub-Fund and Class may be denominated in another currency, as further specified herein. |
| Servicing Agent | Life Equity LLC for Luxembourg Life Fund – Long Term Growth Fund.<br><br>Capital Equity LLC for Luxembourg Life Fund – Absolute Return Fund I. |
| Securities Offered | Units of the Fund. |
| SIF Law | Luxembourg law of 13 February 2007 on specialised investment funds, as amended. |
| Subscription Document | The subscription agreement entered into, or the application form executed by, each investor and the AIFM, acting on behalf the Fund for the account of such Sub-Fund, as the case may be, setting out the terms under which the investor intends to invest, or actually invests in the relevant Sub-Fund. |
| SFDR | Regulation (EU) 2019/2088 of the European Parliament and of the Council of 27 November 2019 on sustainability-related disclosures in the financial services sector, as amended. |
| Targeted Investments | Diversified portfolio of Life Settlements (directly or via limited liability special purpose vehicles holding Life Settlements meeting the criteria and investment restrictions set out in this Placement Memorandum or investment vehicles investing in such Life Settlements).<br><br>The Fund may only make investment via such special purpose vehicles or trusts after it has obtained confirmation from an appropriately qualified independent tax advisor that such investment shall not expose the Fund or the Sub-Fund or any investor therein to any additional taxation risks, meaning any taxation risks to which the Fund or Sub-Fund is not exposed when making direct investments. |

| | |
|---|---|
| Taxonomy Regulation | Regulation (EU) 2020/852 on the establishment of a framework to facilitate sustainability investment and amending SFDR. |
| Term of the Fund | Perpetual and open-ended. |
| Term of the Sub-Funds | Sub-Funds may be open-ended or closed-ended as indicated in Part II of this Placement Memorandum. |
| UCI | Any undertaking for collective investment. |
| UCITS | Any undertaking for collective investment in transferable securities established pursuant to the Directive 2009/65/EC relating to undertakings for collective investment in transferable securities (UCITS), as amended. |
| Unitholder | Any registered holder of Units. |
| US Custodian, Policy Paying Agent, Securities Intermediary and Policy Escrow Agent | Wells Fargo Bank, N.A. |
| U.S. Person | A person who is in either of the following two categories: (a) a person included in the definition of "U.S. person" under Rule 902 of Regulation S under the 1933 Act or (b) a person excluded from the definition of a "Non-United States person" as used in CFTC Rule 4.7 – for the avoidance of doubt, a person is excluded from this definition of U.S. Person only if it does not satisfy any of the definitions of "U.S. person" in Rule 902 and qualifies as a "Non-United States person" under CFTC Rule 4.7. |

"U.S. person" under Rule 902 includes the following:

(a) any natural person resident in the United States;

(b) any partnership or corporation organised or incorporated under the laws of the United States;

(c) any estate of which any executor or administrator is a U.S. Person;

(d) any trust of which any trustee is a U.S. Person;

(e) any agency or branch of a non-U.S. entity located in the United States;

(f) any non-discretionary account or similar account (other than an estate or trust) held by a dealer or other fiduciary for the benefit or account of a U.S. Person;

(g) any discretionary account or similar account (other than an estate or trust) held by a dealer or other fiduciary

15

organised, incorporated or (if an individual) resident in the United States; and

(h) any partnership or corporation if (i) organised or incorporated under the laws of any non-U.S. jurisdiction; and (ii) formed by a U.S. Person principally for the purpose of investing in securities not registered under the 1933 Act, unless it is organised or incorporated, and owned, by accredited investors (as defined in Rule 501(a) of Regulation D under the 1933 Act) who are not natural persons, estates or trusts.

Notwithstanding the preceding paragraph, a "U.S. person" under Rule 902 does not include:

(a) any discretionary account or similar account (other than an estate or trust) held for the benefit or account of a non-U.S. person by a dealer or other professional fiduciary organised, incorporated, or (if an individual) resident in the United States;

(b) any estate of which any professional fiduciary acting as executor or administrator is a U.S. Person, if (i) an executor or administrator of the estate who is not a U.S. Person has sole or shared investment discretion with respect to the assets of the estate, and (ii) the estate is governed by non-U.S. law;

(c) any trust of which any professional fiduciary acting as trustee is a U.S. Person, if a trustee who is not a U.S. Person has sole or shared investment discretion with respect to the trust assets, and no beneficiary of the trust (and no settlor if the trust is revocable) is a U.S. Person;

(d) any employee benefit plan established and administered in accordance with the law of a country other than the United States and customary practices and documentation of such country;

(e) any agency or branch of a U.S. Person located outside the United States if (i) the agency or branch operates for valid business reasons, and (ii) the agency or branch is engaged in the business of insurance or banking and is subject to substantive insurance or banking regulation, respectively, in the jurisdiction where located; and

(f) certain international organisations as specified in Rule 902(k)(2)(vi) of Regulation S under the 1933 Act, including their agencies, affiliates and pension plans.

CFTC Rule 4.7 currently provides in relevant part that the following persons are considered "Non-United States persons":

(a) a natural person who is not a resident of the United States or an enclave of the U.S. government, its agencies or instrumentalities;

16

(b) a partnership, corporation or other entity, other than an entity organised principally for passive investment, organised under the laws of a non-U.S. jurisdiction and which has its principal place of business in a non-U.S. jurisdiction;

(c) an estate or trust, the income of which is not subject to United States income tax regardless of source;

(d) an entity organised principally for passive investment such as a pool, investment company or other similar entity, provided, that units of participation in the entity held by persons who do not qualify as Non-United States persons or otherwise as qualified eligible persons (as defined in CFTC Rule 4.7(a)(2) or (3)) represent in the aggregate less than ten per cent. of the beneficial interest in the entity, and that such entity was not formed principally for the purpose of facilitating investment by persons who do not qualify as Non-United States persons in a pool with respect to which the operator is exempt from certain requirements of Part 4 of the CFTC's regulations by virtue of its participants being Non-United States persons; and

(e) a pension plan for the employees, officers or principals of an entity organised and with its principal place of business outside the United States.

| | |
|---|---|
| Valuation Day | The day as of which the Net Asset Value is calculated. Please refer to the relevant Sub-Fund described in Part II. |
| Valuation Policy | The valuation policy established by the AIFM in accordance with the AIFM Rules with a view to ensure a sound, transparent, comprehensive and appropriately documented valuation process of the Fund's (and each Sub-Fund's) portfolio, as may be amended from time to time by the AIFM. |

## PART I: PROVISIONS APPLICABLE TO THE FUND IN GENERAL

1.  **THE FUND**

The Fund is organised under the laws of the Grand-Duchy of Luxembourg as a common fund ("*fonds commun de placement*"). The Fund has been set-up for an undetermined period on 25 June 2009 and is registered on the official list of the CSSF as specialised investment fund pursuant to the SIF Law. However such registration does not require any Luxembourg authority to approve or disapprove either the adequacy or accuracy of the contents of the Placement Memorandum or the assets held in the Fund. Any representations to the contrary are unauthorised and unlawful.

The Fund qualifies as an alternative investment fund (**AIF**) under the AIFM Law.

The Fund is managed by a management company (the **AIFM**) in accordance with the Fund's management regulations (the **Management Regulations**). These Management Regulations and any amendments shall be filed with the Luxembourg Trade and Companies Registry and will be published in the *Recueil Electronique des Sociétés et Associations* (RESA) where copies thereof shall be available.

The AIFM is offering Units of one or several separate sub-funds (individually a **Sub-Fund** and collectively the **Sub-Funds**) based on the information contained in this Placement Memorandum and in the documents referred to herein. A separate portfolio of assets is maintained for each Sub-Fund and is invested in accordance with the investment objective and policy applicable to the relevant Sub-Fund. As a result, the Fund is an "umbrella fund" enabling investors to choose between one or more investment objectives by investing in one or more Sub-Funds. Investors may choose which one or more Sub-Fund(s) may be most appropriate for their specific risk and return expectations as well as their diversification needs. In the event of the creation of new Sub-Funds, the Placement Memorandum will be supplemented. As investment in the various Sub-Funds is subject to normal market risks, realisation of the main objective cannot be guaranteed.

The Fund shall be considered as one single entity. However, with regard to third parties, in particular towards the Fund's creditors, each Sub-Fund shall be exclusively responsible for all liabilities attributable to it. The assets of one Sub-Fund belong to it alone and creditors of a Sub-Fund have no ability or right of recovery against assets of another Sub-Fund.

Furthermore, the General Partner may decide to issue one or more classes of Units in each Sub-Fund (individually a "Class" and collectively the "Classes"), each Class having (i) a specific sales and redemption charge structure and/or (ii) a specific management or advisory fee structure including performance fee and/or (iii) different distribution, or other fees and/or (iv) different types of targeted investors and/or (v) such other features as may be determined by the General Partner from time to time.

Units of different Classes may be issued and redeemed as defined in the Management Regulations.

The assets of the Fund are segregated from those of the AIFM and from those of other funds managed, from time to time, by the AIFM.

2.  **INVESTMENT OBJECTIVE, POLICY AND STRATEGY**

The investment objective of each Sub-Fund is to achieve, by investing in asset classes which have low correlation to traditional asset classes, capital markets, and fundamental economic indicators, medium to long-term capital growth.

18

Each Sub-Fund is managed in accordance with the investment objective, policy, strategy and restrictions as set out under Part II of this Placement Memorandum and may use the investment techniques and instruments permitted by the SIF Law.

3.    **AIFM**

Carlisle Management Company S.C.A. is a management company as defined under article 125-2 of the UCI Law and, as such, acts as the Fund's AIFM within the meaning of the AIFM Law. It is thus responsible, among others, for portfolio management and risk management functions of any AIFs it manages. The AIFM is organised as a corporate partnership limited by shares (*société en commandite par actions*) under the laws of the Grand Duchy of Luxembourg and has its registered office in Luxembourg City. The minimum share capital of the AIFM must at any time amount to EUR 125,000.

The AIFM covers, through additional own funds and adequate insurance, its professional liability risk associated with its function as AIFM of the Fund.

The AIFM was established on 30 December 2008 for an undetermined period of time and registered with the Luxembourg Trade and Companies Registry under number B 144.257. The articles of incorporation of the AIFM are published in RESA. The AIFM manages the assets of the Fund and its Sub-Funds in compliance with the Management Regulations in its own name, but for the sole benefit of the Unitholders.

The AIFM determines the investment policy of the Fund within the objectives and restrictions set forth herein and in the Management Regulations.

The AIFM is responsible for the execution of the duties concerning the Fund's investment management, central administration and distribution.

The AIFM has delegated the execution of the central administration duties to CACEIS Bank, Luxembourg Branch in accordance with article 18 of the AIFM Law.

Without prejudice to the aforementioned delegations, the AIFM remains responsible for the supervision of the respective delegated duties.

The AIFM has the broadest powers to administer and manage the Fund and its Sub-Funds within the restrictions referred to above, including but not limited to the purchase, sale, subscription, exchange and receipt of life insurance policies, securities and other assets permitted by law and the exercise of all rights attached directly or indirectly to the assets of the Fund and its Sub-Funds.

The AIFM receives fees as described in the Section "Fees and Expenses".

4.    **PORTFOLIO MANAGER**

The AIFM may enter into a written agreement with one or more persons to act as investment manager (the **Portfolio Manager(s)**) for one or more Sub-Fund(s) and to render such other services as may be agreed upon by the AIFM and such Portfolio Manager(s).

The Portfolio Manager(s) shall provide the AIFM with advice, reports and recommendations in connection with the management of the relevant Sub-Fund(s), and shall advise the AIFM as to the selection of the securities and other assets constituting the portfolio of each relevant Sub-Fund. Furthermore, the Portfolio Manager(s) shall, on a day-to-day basis and subject to the overall control and ultimate responsibility of the General Partner, purchase and sell securities (including senior Life

19

Settlements) and otherwise manage the portfolio of the relevant Sub-Fund(s) and may, subject to the approval of the AIFM, sub-delegate all or part of their functions hereunder. Such agreement(s) may provide for such fees and contain such terms and conditions as the parties thereto shall deem appropriate. Notwithstanding such agreement(s), the AIFM shall remain ultimately responsible for the management of the Fund's and its Sub-Funds' assets.

The AIFM shall pay the Portfolio Manager, if any, out of its own assets, such fees as determined for each Sub-Fund in Part II of this Placement Memorandum.

If a Portfolio Manager is appointed for Sub-Fund, it will be disclosed in Part II of this Placement Memorandum.

5. **INVESTMENT ADVISER**

The AIFM may from time to time appoint one or several investment advisers (the **Investment Adviser(s)**) to advise the AIFM and/or the Portfolio Manager(s) in relation to the assets of one or more Sub-Funds. The appointment of one or more investment advisers will not lead to an increase of expenses for the Fund/the Sub-Funds. In case of the appointment of any such investment advisers by the AIFM, the AIFM shall exercise reasonable care in the selection and supervision of the relevant investment advisers.

The AIFM shall pay the Investment Adviser (if any), out of its own assets, an advisory fee as determined from time to time in the Investment Advisory Agreement.

If an Investment Adviser is appointed for a Sub-Fund, it will be disclosed in Part II of this Placement Memorandum.

6. **DEPOSITARY**

CACEIS Bank, Luxembourg Branch, is the depositary of the Fund' assets in accordance with the AIFM Law.

Until 30 December 2016, the Depositary of the Fund was CACEIS Bank Luxembourg a public limited company (*société anonyme*) incorporated under the laws of Luxembourg with its registered office at 5, allée Scheffer, L-2520 Luxembourg.

CACEIS Bank Luxembourg, through a cross-border merger by absorption by CACEIS Bank France, a public limited liability company (*société anonyme*) incorporated under the laws of France with a share capital of 440,000,000 Euros, having its registered office located at 1-3, place Valhubert, 75013 Paris, France, identified under number 692 024 722 RCS Paris, turned into the Luxembourg branch of the CACEIS Bank France with effect as of 31 December 2016. Since 1st January 2017, the name of the Luxembourg Branch is CACEIS Bank, Luxembourg Branch. The transaction was approved by the responsible French and Luxembourg authorities. As a consequence the Depositary continues to provide services to the Fund under the Depositary Agreement defined below.

CACEIS Bank, Luxembourg Branch, is licensed in Luxembourg to carry out banking activities.

In accordance with a depositary agreement dated 12 January 2017 as amended from time to time (the **Depositary Agreement**) and the relevant provisions of the SIF Law and AIFM Law, the Depositary has been entrusted with the custody and/or, as the case may be, recordkeeping of the Sub-Funds' assets, and it shall fulfil the obligations and duties provided for by the SIF Law and the AIFM Law.

(a)    In accordance with the AIFM Law, the Depositary is responsible for monitoring the Fund's cash flows, the safe-keeping of the assets of the Fund and for other oversight duties such as to:

(b)    ensure that the sale, issue, redemption, conversion and cancellation of Units effected on behalf of the Fund or by the AIFM are carried out in accordance with applicable law and the Management Regulations;

(c)    ensure that the value of Units is calculated in accordance with applicable law and the Management Regulations;

(d)    carry out the instructions of the AIFM, unless they conflict with applicable law or the Management Regulations;

(e)    ensure that in transactions involving the assets of the Fund any consideration is remitted to it within the customary settlement dates; and

(f)    ensure that the income attributable to the Fund is applied in accordance with applicable law and the Management Regulations.

The Depositary may delegate to third parties the safe-keeping of the assets of the Fund subject to the requirements laid down in the AIFM Law, and in particular that such third parties are subject to effective prudential regulation (including minimum capital requirements, supervision in the jurisdiction concerned and external periodic audit) for the custody of financial instruments.

The Depositary's liability shall not be affected by any such delegation mentioned in the above paragraphs. However, the Depositary may discharge its liability in case of loss of assets held in custody with delegates provided that:

(a)    all requirements for the delegation of its safe-keeping services set forth above are met;

(b)    the written contract between the Depositary and the relevant delegate expressly transfers the liability of the Depositary to that delegate and makes it possible for the AIFM acting on behalf of the Fund to make a claim against that delegate in respect of the loss of assets or for the Depositary to make such a claim on behalf of the Fund; and

(c)    there are objective reasons for such discharge of liability which are: (i) limited to precise and concrete circumstances characterising a given activity; and (ii) consistent with the Depositary's policies and decisions.

Such objective reasons shall be established each time the Depositary intends to discharge itself of liability. There is no discharge of liability of the Depositary in place for the time being. In case this situation changes, the AIFM, acting on behalf of the Fund shall inform the Unitholders accordingly before the changes are effective.

The Depositary's liability to Unitholders may be invoked indirectly through the AIFM, in its quality as AIFM of the Fund.

The Depositary will hold no responsibility for selecting or valuing the investments of the Fund and its Sub-Funds. The Depositary will have no decision-making discretion in relation to the Fund's assets.

21

In consideration for its services, the Depositary shall be paid a fee as determined from time to time pursuant to the depositary services agreement. This agreement may be terminated by either the AIFM or the Depositary upon 90 calendar days' prior written notice. In any case the Depositary will have to be replaced within two (2) months from its voluntary withdrawal or from its removal by the AIFM. The Depositary shall continue its activities until the Fund's or Sub-Funds' assets have been transferred to a new depositary.

The fees and charges of the Depositary will be borne by the relevant Sub-Fund in accordance with common practice in Luxembourg.

The Depositary is a service provider to the Fund and is not responsible for the preparation of this Placement Memorandum and therefore accepts no responsibility for the accuracy of any information contained in this Placement Memorandum or the validity of the structure and investments of the Fund.

## 7.    CENTRAL ADMINISTRATION AGENT

CACEIS Bank, Luxembourg Branch has been appointed as the Central Administration Agent, in accordance with the Central Administration Agreement, made for an unlimited duration, which may be terminated by either party by giving a minimum of ninety (90) calendar day's prior written notice.

CACEIS Bank, Luxembourg, through a cross-border merger by way of absorption by CACEIS Bank France, a public limited liability company (*société anonyme*) incorporated under the laws of France with a share capital of 440,000,000 Euros, having its registered office located at 1-3, place Valhubert, 75013 Paris, France, identified under number 692 024 722 RCS Paris, turned into the Luxembourg branch of the CACEIS Bank France with effect as of 31 December 2016. The name of the Luxembourg Branch is CACEIS Bank, Luxembourg Branch. The transaction was approved by the responsible French and Luxembourg authorities. As a consequence the Central Administration Agent continues to provide services to the Fund under the Central Administration Agreement.

As Administrative Agent, CACEIS Bank, Luxembourg Branch is responsible for the processing of the calculation of the Net Asset Value for each Class of each Sub-Fund, the maintenance of records and other general administrative functions concerning the Sub-Funds, as well as for providing the annual report of the Fund. The Net Asset Value shall be determined by the Central Administration Agent in accordance with the method of valuation specified in the constitutive documents of the Fund, and more particularly in accordance with the Life Settlement valuation provided by the AIFM and verified by Lewis & Ellis as part of their monthly or quarterly actuarial review.

As Registrar and Transfer Agent, CACEIS Bank, Luxembourg Branch is responsible for the processing of the subscription, issue, registration and redemption of the Units and the settlement arrangements thereof. The Registrar and Transfer Agent, with the assistance of the AIFM, monitors the controls that are designed to ensure that Unitholders are Eligible Investors.

The fees and charges of the Central Administration Agent are borne by the relevant Sub-Fund in accordance with common practice in Luxembourg.

## 8.    DISTRIBUTORS

The AIFM may appoint one or several distributors in respect of one or several Sub-Funds.

The rights and duties of any distributor, if any, will each time be set forth in a distribution agreement to be entered into in accordance with Luxembourg law as further described in the Appendix for the relevant Sub-Funds. The distributor's remuneration shall be determined on a Sub-Fund basis.

22

Each Sub-Fund shall be responsible for all costs and expenses incurred in relation to such distribution services. The distributor; if any, will be entitled to a distribution fee paid out of the AIFM's fees.

## 9. OTHER PARTIES INVOLVED IN THE STRUCTURE

9.1    Policy Paying Agent, Securities Intermediary and Policy Escrow Agent

Wells Fargo Bank, N.A. (**Wells Fargo**) serves as the Policy Paying Agent, Securities Intermediary, and Policy Escrow Agent. Wells Fargo is a United States national banking association, with offices at 600 S 4th St 1 Minneapolis, MN 55479 MAC N9300-061, USA. It has an issued share capital of 3,296,807,000 shares and a market capitalisation, as at the date of this Placement Memorandum, of approximately US$ 90,662,000,000.

As Policy Escrow Agent (the **Policy Escrow Agent**), Wells Fargo facilitates the acquisition of Life Settlements from the seller. At the time of acquisition of a Life Settlement, the Life Settlement transfer documents will be deposited with the Policy Escrow Agent and then submitted to the insurance carrier for a change of ownership and beneficiary rights. The purchase price for the Life Settlement will, on instruction of the AIFM (or any authorised agent thereof), also be deposited in escrow with the Policy Escrow Agent. When the changed Life Settlement has been received from the insurance carrier and other conditions to the acquisition have been satisfied (and verified by the AIFM), the Policy Escrow Agent will hold the Life Settlement and will deliver the purchase price to the appropriate payees including the seller of the Life Settlement.

In its capacity as Securities Intermediary, Wells Fargo receives payments of benefits under the Life Settlements and distribute such amounts to the relevant Sub-Fund. As Policy Paying Agent, it will also make payments of premiums under the Life Settlements from funds made available to it by the relevant Sub-Fund.

9.2    US Custodian

The AIFM has appointed Wells Fargo Bank, N.A. to provide custodial services to the Fund (the **US Custodian**) in respect of the Life Settlements.

The US Custodian performs its duties, subject to the terms of the US Custodian Services Agreement.

The US Custodian is entitled to such fees as further described in a separate agreement between the US Custodian and the Fund.

The US Custodian and the AIFM may terminate the US Custodian Services Agreement at any time upon sixty (60) days written notice.

9.3    Servicing Agent and Contingent Servicing Agent

9.3.1    Servicing Agent

Life Equity LLC (**Life Equity**) serves as the Servicing Agent for the Long Term Growth Fund. Life Equity is a Hudson based company, with offices at 5611 Hudson Drive, Suite 100, Ohio 44236, USA.

Life Capital Group, Inc (**Life Capital**) serves as the Servicing Agent for the Absolute Return Fund I. Life Capital Group, Inc is a Maryland based company, with offices at 7924 Ivanhoe Avenue, Suite 10, La Jolla, CA 92037.

23

The Servicing Agents' functions are as follows:

(a)  Monthly Premium Administration

  (i)  Servicing Agent will call the insurance carrier monthly for account value, cash surrender value and date/amount of last premium paid

  (ii)  Prepare disbursement instructions for premium payments for owner/trustee

  (iii)  Provide a premium report monthly

(b)  Order Medical Records

  (i)  With appropriate medical release form, list of doctor(s), and their contact information, Servicing Agent will keep all medical records current (no more than 120 days old)

  (ii)  Contact doctor(s) regarding medical record request procedures

  (iii)  Submit request to doctor(s) with advance payment

  (iv)  Follow-up to assure timely delivery of medical records

  (v)  Verify that the past two years of medical records have been obtained and labels electronic files with dates

(c)  Order Life Expectancy Reports

  (i)  Servicing Agent will keep life expectancy report(s) current (no more than 120 days)

  (ii)  The AIFM provides authorization for Servicing Agent to order life expectancy report(s) on behalf of the AIFM

  (iii)  Out-of-pocket expenses for life expectancy report(s) are paid by Servicing Agent and billed by Servicing Agent to the AIFM

(d)  Obtain Updated Release Forms

  (i)  Servicing Agent prepares letter and package of forms for insured's signature

  (ii)  Mail forms to insured

  (iii)  Follow up to obtain forms with signatures

(e)  Tracking of Insured

  (i)  Quarterly tracking utilizing subscribed database services, mailings, and telephone calls

  (ii)  Social security death index searches performed every 2 weeks

24

      (iii)       Provide report on tracking quarterly

      (iv)       Notify the AIFM of death of insured as soon as known

  (f)      Insurance Claims

      (i)       Once death of an insured is known, Servicing Agent requests and completes insurance claim forms for signature by owner/trustee

      (ii)       Obtain certified death certificate of insured

      (iii)       Forward insurance claim package to owner/trustee for signature

      (iv)       Follow-up with insurance company until claim is paid.

9.3.2    Contingent Servicing Agent

Life Capital serves as Contingent Servicing Agent for the Long Term Growth Fund.

The Contingent Servicing Agent will maintain the life settlement's portfolio providing the following services:

  (a)      Support during the sales (trading) of policies during liquidity events.

  (b)      Acting as back up to the Servicing Agent in order to ensure a continuous service level and administration of the Life Settlement portfolio of the Fund.

9.4    Independent Actuarial Valuation Agent

Lewis & Ellis, with registered office at 700 North Central Expressway South, Suite 550, Allen, TX 75013-8098, serves as independent actuarial valuation agent of the Fund under the actuarial consulting agreement of 1 October 2009. By amendment to this agreement dated 26 September 2016, Lewis & Ellis has been appointed as external valuer of the Fund's assets under the AIFM Directive.

Lewis & Ellis carries out proper and independent valuation of the Fund's assets and its activity is separate and distinct from the calculation of the Net Asset Value which is performed by the Central Administration Agent. Lewis & Ellis is an entity independent from the Fund, the AIFM or other persons with close links to the Fund or the AIFM.

Lewis & Ellis provides external valuation services in relation to the assets of the Fund in accordance with the Management Regulations, this Placement Memorandum and the Valuation Policy (as further detailed in Part II of this Placement Memorandum).

## 10.    RISK MANAGEMENT

The AIFM is required to maintain an adequate and documented risk management process detailed in the Risk Management Policy to monitor and measure at all times the risks associated with its investments on behalf of a Sub-Fund and their contribution to the overall risk profile of the relevant Sub-Fund.

This risk management process will measure the global exposure of each Sub-Fund with the commitment approach (measuring the net leverage incurred through the use of derivatives, taking into

account hedging or netting arrangements) and the gross approach (taking into account the sum of the absolute values of all positions, so as to give an indication of overall exposure).

11.    **LEVERAGE**

The use of financial derivative instruments and borrowing may result in a Sub-Fund being leveraged. Leverage is monitored on an ongoing basis. The leverage for each Sub-Fund is not expected to exceed the levels set out for each Sub-Fund in Part II of this Placement Memorandum.

The Sub-Funds may receive any collateral in connection with over-the counter (**OTC**) financial derivative instruments and efficient portfolio management techniques and have the right to reuse such collateral. The nature of the rights granted for the reuse of collateral will be disclosed in the financial reports.

The leverage is measured as the sum of notional amounts of the financial derivative instruments used and borrowed money. In this context, the leverage is measured as a percentage in excess of each Sub-Fund's Net Asset Value. Under certain circumstances (e.g., very low market volatility) the leverage may exceed the levels referred to in Part II of this Placement Memorandum.

12.    **LIQUIDITY MANAGEMENT**

With respect to liquidity management, the AIFM shall:

(a)    employ for each Sub-Fund an appropriate liquidity management system and adopt procedures which enable to monitor the liquidity risk of the Sub-Funds as detailed in the Liquidity Management Policy and to ensure that the liquidity profile of the investments of the Sub-Funds complies with their underlying obligations;

(b)    regularly conduct stress tests, under normal and exceptional liquidity conditions, which enable to assess the liquidity risk of the Sub-Funds and monitor the liquidity risk of the Sub-Funds accordingly; and

(c)    ensure that, for each Sub-Fund, the investment strategy, liquidity profile and redemption policy are all consistent.

13.    **RISK FACTORS**

13.1    General Risk Factors

**General:** An investment in a Sub-Fund involves certain risks relating to the particular Sub-Fund's structure and investment objectives which investors should evaluate before making a decision to invest in such Sub-Fund.

The investments within each Sub-Fund are subject to market fluctuations and to the risks inherent in all investments; accordingly, no assurance can be given that the investment objective will be achieved.

Investors should make their own independent evaluation of the financial, market, legal, regulatory, credit, tax and accounting risks and consequences involved in investment in a Sub-Fund and its suitability for their own purposes. In evaluating the merits and suitability of an investment in a Sub-Fund, careful consideration should be given to all of the risks attached to investing in a Sub-Fund.

26

The following is a brief description of certain factors which should be considered along with other matters discussed elsewhere in this Placement Memorandum. The following however, does not purport to be a comprehensive summary of all the risks associated with investments in any Sub-Fund.

An investment in Units in a Sub-Fund carries substantial risk and is suitable only for investors who accept the risks, can assume the risk of losing their entire investment and who understand that there is no recourse other than to the assets of the relevant Sub- Fund.

**Early termination:** In the event of the early termination of the Fund, the AIFM would have to distribute to the Unitholders their pro-rata interest in the assets of the Fund. The Fund's investments would have to be sold by the AIFM or distributed to the Unitholders. It is possible that at the time of such sale or redemption certain investments held by the Fund may be worth less than the initial cost of the investment, resulting in a loss to the Fund and to its Unitholders. Moreover, in the event the Fund terminates prior to the complete amortisation of organisational expenses, any unamortised portion of such expenses will be accelerated and will be debited from (and thereby reduce) amounts otherwise available for distribution to Unitholders.

**Currency fluctuation risk:** The underlying investments of a Sub-Fund may be denominated in currencies other than the reference currency of this Sub-Fund. Any fluctuation in the value of these other currencies against the reference currency will affect the profitability of the Sub-Fund when the investments are converted into its reference currency. The AIFM may use hedging instruments including forward exchange contracts, futures, and options to minimise such currency risk.

**Potential Conflicts of Interest:** The AIFM, the Portfolio Manager and the Investment Adviser if any, the Depositary, the US Custodian, the Central Administration Agent, any Unitholder and any of their respective subsidiaries, affiliates, associates, agents or delegates (for the purposes hereof, each a **Connected Person**) may:

(a)     contract or enter into any financial, banking or other transactions or arrangements with one another or with the AIFM including, without limitation, investment by the Fund in securities or investment by any Connected Person in any company or body any of whose investments form part of the assets of the Fund or be interested in any such contracts or transactions;

(b)     invest in and deal with Units, securities, assets or any property of the kind included in the property of the Fund for their respective individual accounts or for the account of a third party; and

(c)     deal as agent or principal in the sale or purchase of securities and other investments to or from the Fund through or with a Connected Person.

Should any Manager of the General Partner become aware of a direct or indirect financial interest that conflicts to the interest of the Fund in a contemplated transaction, such Manager shall inform the Board of Managers (and as the case may be convene a meeting) and such declaration must be inserted in the minutes of the meeting and the Board of Managers shall use its best endeavours to settle such conflict on an arm's length basis prior to completion of such transaction.

Additionally, where the AIFM acting on behalf of the Fund invests in products the performance of which is linked with an underlying asset, the AIFM or any relevant party mentioned in this Placement Memorandum may possess or acquire material information about the underlying assets and such activities and information may cause adverse consequences to Unitholders. Such actions or conflicts may include, without limitation, the exercise of voting power, the purchase and sale of securities, financial advisory relationships and creditor rights. The AIFM or any involved party shall have no

27

obligation to disclose such information about the underlying asset or the companies to which they relate.

Any existing conflict of interest shall be recorded in a register to be kept at the registered office of the AIFM, detailing the relevant information in respect thereof. The AIFM shall adapt and update the register further to any change affecting a recorded conflict of interest. A major conflict of interest will either be reported to the Unitholders via the Fund's annual report. In addition, Unitholders may, upon prior written notice given to the AIFM, consult the register of conflicts of interests at the AIFM's registered office.

Where conflicts of interest cannot be avoided and there is a risk of harm to Unitholders' interests, the AIFM will inform Unitholders of the general nature or source of such conflicts of interest and will endeavour to remedy them, while ensuring equal treatment between Unitholders and ensuring that the Fund is treated fairly.

Unitholders are advised that the management of a conflict of interest may result in the loss of an investment opportunity or the fact that the AIFM behaves on the markets in a manner different from the way of which it would have acted if these conflicts had not been present, which could have a negative impact on the performance of the Fund.

Attention should be drawn to the fact that the Net Asset Value per Unit can go down as well as up. An investor may not get back the amount he has invested, particularly if Units are redeemed soon after they are issued and the Units have been subject to charges. Changes in exchange rates may also cause the Net Asset Value per Unit in the investor's base currency to go up or down. No guarantee as to future performance of, or future return from, the Fund can be given.

**Leverage risk:** Where a Sub-Fund uses leverage to increase potential investment returns a significant risk exists should the cost of borrowing exceed the rate of return of the investment assets. The Sub-Funds' exposure to capital risks is increased by the degree of leverage employed.

**Custody risk:** If a Sub-Fund borrows for the purpose of leverage, it may be required to provide security to the lender. Where security is required, assets will be deposited with or pledged to the lender and will cease to be within the Depositary's exclusive control. Accordingly, a Sub-Fund may be exposed to acts, omissions, or insolvency risk of the lender. If the pledging of security is required, the AIFM will source a reliable financial institution with good credit ratings to minimise such risk.

**Redemption Charges risk:** Units redeemed in the early years from acquisition will be subject to redemption charges. Such charges will decrease the redemption value of Units.

**Voting rights:** Units carry no voting rights, including no right to vote on a proposed winding-up of the Fund.

**Cyber Security Breaches and Identity Theft:** The AIFM's information and technology systems may be vulnerable to damage or interruption from computer viruses, network failures, computer and telecommunication failures, infiltration by unauthorized persons and security breaches, usage errors by its professionals, power outages and catastrophic events such as fires, tornadoes, floods, hurricanes and earthquakes. Although the AIFM has implemented various measures to manage risks relating to these types of events, if these systems are compromised, become inoperable for extended periods of time or cease to function properly, the AIFM and/or the Fund may have to make a significant investment to fix or replace them. The failure of these systems and/or of disaster recovery plans for any reason could cause significant interruptions in the AIFM and/or the Fund's operations and result in a failure to maintain the security, confidentiality or privacy of sensitive data, including personal

28

information relating to investors (and the beneficial owners of investors). Such a failure could harm the AIFM's and/or the Fund's reputation, subject any such entity and their respective affiliates to legal claims and otherwise affect their business and financial performance.

13.2    Risks Related to investments in Life Settlements

**General investment risk:** The return on the investment assets, and in turn the investment portfolio held by the Fund, will primarily be dependent upon the ability and expertise of the AIFM and/or Investment Adviser to source and price the underlying Life Settlements.

**Availability risk:** The continuity of operation of the Fund is dependent on the Sub-Funds' ongoing ability to purchase investment assets and the availability of the leverage, where required, to meet the investment objectives of the relevant Sub-Fund. A change in the availability of investment assets or the leverage (if appropriate) could adversely affect the AIFM's ability to execute its investment strategy leading to the potential failure of the Fund to meet its investment objectives.

**Valuation overstatement or understatement risk:** The valuation of Life Settlements is based on projected cash flows, which depend upon an unknown length of time for which the insured will live. If a life expectancy estimate underestimates how long an insured may live, a Sub-Fund may experience a lower investment return.

Inaccurate forecasting of an insured's life expectancy could result from, among other things: advances in medical treatment resulting in deaths occurring later than forecast, inaccurate diagnosis or prognosis, changes of lifestyle habits, or the individual's ability to fight disease resulting in improved health, fraud, or misrepresentation by the insured.

Although qualified physicians' estimates may be used, such a valuation will ultimately be a matter of informed judgment, there is no guarantee the Net Asset Value will not be overstated or understated, and the AIFM and/or Investment Adviser cannot accept responsibility for consequent incorrect valuations.

**Validity of (adjusted) life expectancy tables:** Each Life Settlement will be valued using the U.S. Society of Actuaries 2015 Valuation Basic Table as adjusted by the External Valuer under the supervision of the AIFM, or later table as becomes generally available and adopted (the **Valuation Basis**). Although the pertinence of the Valuation Basis is checked on a regular basis, there is no guarantee that the valuation of a Life Settlement will be not overstated or understated in the event the Valuation Basis is based on outdated statistics and the AIFM and/or Investment Adviser cannot accept responsibility for consequent incorrect valuation of a Life Settlement.

**Insured fraud risk:** Although the AIFM and/or Investment Adviser will conduct a reasonable level of due diligence in advance of investing in a Life Settlement, there is a risk that a Sub-Fund may be defrauded. Among other types of fraud that may exist, an insured may misrepresent the status of his/her illness, may fail to disclose all beneficiaries, or may sell a Life Settlement to more than one purchaser. If the Sub-Fund is exposed to such fraud, the return on investment may be adversely affected.

**Availability risk:** The continuity of operation of a Sub-Fund is dependent on its ongoing ability to purchase Life Settlement policies. Changes in circumstances may result in a reduced supply of Life Settlements. Such changes could result from, among other things: (i) improvement in the economy overall, generating higher investment returns to insureds from their investment portfolios; (ii) improvements in health insurance coverage, limiting the need of insureds to obtain funds to pay the cost of their medical treatment; (iii) a change in law requiring the Sub-Fund to apply more stringent credit standards in purchasing Life Settlements; (iv) the entry into the market of less reputable third-

29

party brokers who submit inaccurate or false Life Settlement information to the AIFM and/or Investment Adviser on behalf of insureds; (v) the establishment of new licensing requirements for the market participants and a delay in complying, or an inability to comply, with such new requirements; or (vi) refusal of the insurance company that issued the policy to consent to its transfer.

A change in the availability of Life Settlements could adversely affect the AIFM's ability to execute its investment strategy and meet its investment objective. A Sub-Fund will therefore be dependent on its ability to find an adequate supply of Life Settlements.

**Life Settlement pricing risks:** Beginning in 2004, the Life Settlements market has witnessed an inflow of funding. Most of these investment groups have elected to use either the life expectancy at the lower confidence level, or they have used some variations of the mortality curves provided by life expectancy firms. This practice of purchasing Life Settlements with shorter life expectancies derived from a lower confidence level has created an extremely competitive pricing arena. An increase in the competitiveness in pricing may make it more difficult for a Sub-Fund to purchase Life Settlements in an expedient manner and result in lower margins on the investments.

**Liquidity risk:** each Sub-Fund may use a substantial portion of the funds to acquire a pool of Life Settlements. There is minimal or no cash flow on such purchases until maturity. Proceeds derived from maturing Life Settlements will be reinvested and will not be readily available to satisfy redemption requests. Such an investment is essentially illiquid. Therefore, the Sub-Funds may not have access to liquid assets to make any payment to Unitholders until the Life Settlements mature, or unless it realises the assets through the secondary market. In addition, the Sub-Funds may not have access to liquid assets to make premium payments, unless they realise the assets through the secondary market. The secondary market for these settlements is not highly regulated or developed and there is no certainty the market will be active. Accordingly, delays may occur in redemption payments. In order to increase a Sub-Fund's liquidity, the AIFM shall seek to match redemptions with subscriptions and source available credit facilities with the pledging of the Life Settlements held by a Sub-Fund.

**Missing insured:** There is a risk that an insured with whom it has been entered into a contract for a Sub-Fund may go missing, or that there may be a delay in ascertaining that an insured has died, or in obtaining the required documentation needed to claim the insured's death benefit. The Sub-Funds could incur substantial delays in collecting death benefits which would affect investment performance. In some States, the regulator may limit the frequency of contact that the AIFM, through its tracking firms, can make to the insured in order to obtain his/her medical records, hence further causing delays.

**Counterparty risk:** There is a counterparty risk in respect of the solvency of the insurance company during the period a Life Settlement is held to maturity. There is no guarantee that the insurance companies will meet their obligations to make payment on maturity. The AIFM manages counterparty risk by limiting the exposure to any single insurance company obligor, and by only buying policies written by insurers that meet its rating requirements.

The Sub-Funds rely on the AIFM and/or Investment Adviser to locate and evaluate Life Settlements to be purchased, to administer the Life Settlements, and to process claims. If, as a result of insolvency or liquidation, or otherwise, the AIFM were to cease servicing the Life Settlements, it may be difficult to find a suitable successor adviser. Any successor adviser may have less experience and be less capable in evaluating Life Settlements, processing claims, and managing collection systems.

**Performance fee risk:** The Performance fee payable to the AIFM is based on gains in the Net Asset Value per Unit. In determining the Net Asset Value, a Sub-Fund's Life Settlement holdings may not be marked to market but valued on the assumption of holding the Life Settlements to maturity. It is envisaged that the difference between the market realisable value and the valuation adopted by a Sub-

Fund can be material. As determined in Part II of this Placement Memorandum, a Performance fee may be paid out of unrealised profits. Should the payment of a Performance fee be applicable to a Sub-Fund, there is a risk that these unrealised profits may not be crystallised in the event of early realisation, or delayed maturity of Life Settlements. As a result, the total performance of such a Sub-Fund may be adversely affected.

**Risk of Life Settlements being deemed securities:** Should the United States Internal Revenue Service deem Life Settlements to be classified as "securities" at some point in time this could potentially have implications with regard to the application of withholding tax. The application of withholding tax at current tax rates to a Sub-Fund would consequently negatively impact returns.

In addition to the above risks, the investment in each Sub-Fund entails specific risks related to the investment policy and strategy of each Sub-Fund. The specific risks related to the investment in the Sub-Funds are described in Part II of this Placement Memorandum.

13.3    Legal and tax risks

**Changes in applicable law:** The AIFM must comply with various regulatory and legal requirements, including securities laws and tax laws as imposed by the jurisdictions under which it operates. Should any of those laws change over the life of the Fund, the regulatory and legal requirements to which the Fund and its Unitholders may be subject could differ materially from current requirements.

**General tax Risks:** An investment in each Sub-Fund involves a number of complex tax considerations. Changes in tax legislation in any of the countries in which the relevant Sub-Fund will have investments (or of Luxembourg), or changes in tax treaties negotiated by those countries, could adversely affect the returns from a Sub-Fund to its Unitholders. No assurance can be given regarding the actual level of taxation imposed upon each Sub-Fund. Each Unitholder is strongly urged to consult its own tax advisers regarding the tax implications for it of investing, holding and disposing of Units in a Sub-Fund and, if relevant, receiving distributions in respect of Units in such Sub-Fund.

**U.S. Federal income tax risks:** The Fund will not seek any rulings from the IRS as to any U.S. tax matters, and therefore cannot guarantee that the IRS would agree with all of the tax positions taken by the Fund. In many instances these determinations may be based on highly factual considerations or relate to matters for which the tax treatment is uncertain.

The AIFM intends to cause the Fund (including any Sub-Funds) to be treated as one or more partnerships for U.S. federal tax purposes. Treatment of the Fund or any Sub-Fund as a corporation could result in material adverse consequences to the Fund and its Unitholders. U.S. Unitholders will be required to furnish the Fund with a properly executed IRS Form W-9; all other Unitholders will be required to furnish an appropriate, properly executed IRS Form W-8.

Unitholders will be taxed on their distributive shares of Fund income and gain regardless of whether they receive any cash distributions from the Fund. Unitholders should expect that a substantial portion of the income and gain derived from an investment in Units will be characterized as ordinary income and gain. Unitholders will not be allowed a deduction for interest paid or accrued by the Fund on indebtedness with respect to the Life Settlement policies held by the Fund. Any interest amounts so disallowed must be capitalized.

Unitholders that are tax-exempt organizations should expect that a material portion of any income derived from an investment in Units will be "unrelated business taxable income."

31

Non-U.S. Unitholders who are not eligible for treaty benefits under an applicable income tax treaty with the United States should expect that a substantial portion of the income derived from an investment in Units will be subject to a 30 percent U.S. tax that generally will be withheld at source.

The Fund intends to restrict its activities within the United States. If, however, the Fund were deemed to derive income that is either effectively connected with a trade or business carried on by the Fund within the United States, or attributable to a permanent establishment situated within the United States, the value of an investment in Units could be severely diminished for a non-U.S. Unitholder.

Pursuant to the FATCA, the Fund (or each Sub-Fund) will be required to comply with extensive reporting and withholding requirements designed to inform the U.S. Department of the Treasury of U.S.-owned foreign investment accounts. Failure to comply (or be deemed compliant) with these requirements will subject the Fund (or each Sub-Fund) to U.S. withholding taxes on certain U.S.-sourced income and (effective as from 1 January 2019) gross proceeds. Pursuant to the intergovernmental agreement between the United States and Luxembourg, the Fund (or each Sub-Fund) may be deemed compliant, and therefore not subject to the withholding tax, if it identifies and reports U.S. taxpayer information to the Luxembourg tax authorities. Investors may be requested to provide additional information to the Fund to enable the Fund, (or each Sub-Fund) to satisfy these obligations. Failure to provide requested information or (if applicable) satisfy its own FATCA obligations may subject a Unitholder to liability for any resulting U.S. withholding taxes, U.S. tax information reporting and/or mandatory redemption, transfer or other termination of the Unitholder's interest in its Units.

## 14.    RESTRICTIONS ON THE OWNERSHIP OF UNITS

Subscription for and ownership of Units is restricted to Eligible Investors. Units have not been registered or qualified for sale in certain jurisdictions and offers and sales of Units can only be made to investors to the extent permitted under applicable local laws and regulations.

The AIFM may refuse to issue Units at its sole discretion and may proceed to the compulsory redemption of Units in accordance with this Memorandum and the Management Regulations including in the cases where a Unitholder turns out not to be an Eligible Investor in the meaning of the SIF Law, the Management Regulations and the Memorandum.

The AIFM may refuse to issue Units to any person if the AIFM believes that the direct or indirect owning of the Units by this person would violate Luxembourg Law or the laws and regulations of another jurisdiction or may subject the Fund (or any of the Sub-Funds or Classes) to adverse taxation in the relevant jurisdiction or may otherwise be detrimental to the Fund or the AIFM.

Such restriction would also apply if the status of the Unitholder is changing or if the Unitholder is unwilling to enable the AIFM to collect the information required to comply, amongst others, with rules on preventing money laundering and disclosure obligations under FATCA or CRS.

In particular, the AIFM may restrict or prevent the ownership of Units in the Fund by any person:

(a)      Who is not an Eligible Investor;

(b)      Who is a US Person;

(c)      If in the opinion of the AIFM such holding may be detrimental to the Fund;

(d)     If the holding of Units may result in a breach of law or regulation whether in Luxembourg or in another jurisdiction; or

(e)     If as a result thereof the Fund may become exposed to tax disadvantages or other financial disadvantages that it would not have otherwise incurred.

To that end, the AIFM may:

(a)     Decline to issue Units or to register the transfer of Units; and/or

(b)     Proceed with the compulsory redemption of Units.

For the avoidance of doubt, the compulsory redemption of Units decided by the AIFM may be subject to all applicable fees and charges (including a redemption fee) as set out in this Placement Memorandum.

15.     **TRANSMISSION OF UNITS**

If a Unitholder dies, the survivor or survivors (where the Unitholder was a joint holder) or his or her legal personal representatives (where the Unitholder was a sole holder) shall be the only persons recognised by the AIFM as having any title to the Unitholder's interest in the Fund. The death of any Unitholder shall not operate to relieve, waive or reduce any liabilities or commitment attaching to the Unitholder's Units at the time of death and such liabilities shall continue to bind any survivor or survivors, or any personal representative, as the case may be.

Any person becoming entitled to a Unit in consequence of the death or bankruptcy, or the liquidation or dissolution, of a Unitholder and who is an Eligible Investor may, upon delivery to the AIFM of such evidence as may from time to time be required by it of:

(a)     such person's entitlement to such Units; and/or

(b)     such person's status as an Eligible Investor,

elect to become the holder of such Units.

If such person elects to become the holder of such Units, such person shall give notice in writing to the AIFM to that effect, but the AIFM shall, have the right to decline registration of such person as a holder of such Units.

Any person becoming entitled to Units in consequence of the death or bankruptcy, or the liquidation or dissolution, of a Unitholder and who is not an Eligible Investor shall not be registered as the holder of such Units and the relevant Units will be compulsorily redeemed by the AIFM.

16.     **UNITS**

16.1    General Information

By acquiring Units, Unitholders approve and fully accept that the Management Regulations shall govern the relationship between the Unitholders, the AIFM and the Depositary.

Subject to the approval of the Depositary, the Management Regulations may be amended by the AIFM at any time, in whole or in part.

33

Amendments will become effective as per the date of their signature by the AIFM and the Depositary.

The Fund may offer different Classes of Units for subscription, as described below.

The Fund will issue Units of any Class in registered form only. The inscription of the Unitholder's name on the register of Unitholders evidences his right of ownership of registered Units. Confirmation of ownership for the Units will be sent to investors upon settlement of their subscription.

Fractional Units may be issued up to three decimal places and shall carry rights in proportion to the fraction of a Unit they represent.

All Units must be fully paid up and are of no par value and carry no preferential or pre-emptive rights.

No general meetings of Unitholders will be held and no voting rights are attached to the Units (except in the context of the Investment Committee of a specific Sub-Fund (if any) as specified under Part II of this Placement Memorandum).

16.2    Classes of Units

For each Sub-Fund, the AIFM may decide to issue different classes of Units (the **Classes**) corresponding to (i) a specific sales and redemption charge structure and/or (ii) a specific management or advisory fee structure including performance fee and/or (iii) different distribution, or other fees and/or (iv) different types of targeted investors and/or (v) such other features as may be determined by the General Partner from time to time. Classes available for a relevant Sub-Fund are described in Part II of this Placement Memorandum.

16.3    Subscription of Units

The possibility to subscribe for Units on a continuous basis will be described, if applicable, for each Sub-Fund in Part II of this Placement Memorandum.

Except as otherwise provided in Part II of this Placement Memorandum, the AIFM shall be authorised, without limitation and at any time, to issue Units of no par value at the applicable Net Asset Value per Unit of the relevant Class in each Sub-Fund, to which a subscription fee may be added as set out for each Sub-Fund in Part II of this Placement Memorandum.

Except as otherwise provided in Part II of this Placement Memorandum, after the Initial Offering Date / Period, Units are issued on each "Valuation Day" (as defined for each Sub-Fund under Part II of this Placement Memorandum). If a subscription order is to be carried out on a Valuation Day, written instructions must have reached the Central Administration Agent before the deadline indicated for each Sub-Fund under Part II of this Placement Memorandum, otherwise they will be held over to the following Valuation Day. The Net Asset Value will be calculated after this deadline on the basis of the last available prices, in order to avoid that subscription may be done at a known Net Asset Value or known prices.

Payment for subscriptions of Units in a Sub-Fund must be made in the reference currency of the relevant Class or Sub-Fund within a period of time set out for each Sub-Fund in Part II of this Placement Memorandum. The AIFM may however also denominate Units and/or accept payments in major currencies other than the reference currency of the relevant Sub-Fund or Class. The value of these payments in the reference currency of a Sub-Fund will then be determined on basis of the market exchange rates. The related costs are borne by the investor.

34

Unitholders must note that the AIFM reserves the right to postpone subscriptions where there is no certainty that payment and/or satisfactory Unitholder's identification documentation will reach the Depositary by due date. Units will therefore be allotted only after receipt of the subscription request together with cleared money or a document evidencing irrevocable and timely payment and confirmations of transactions will be dispatched. In case of payment by cheque, Units will be allotted only after confirmation of the cheque's clearance.

The AIFM has the right to reject any subscriptions. In addition, the AIFM may determine to restrict the purchase of Units or to close the Sub-Funds to new investors when it is in the interest of the relevant Sub-Fund and/or its Unitholders to do so, including when the Fund or any Sub-Fund reaches a size that could impact the ability to find suitable investments for the Fund or Sub-Fund.

The AIFM may agree to issue Units as consideration for a contribution in kind to the Sub-Funds of securities or assets, provided that such securities or assets comply with the investment objectives, policies and restrictions laid down in this Placement Memorandum and in compliance with the conditions set forth by Luxembourg law, in particular the obligation to deliver a valuation report from the auditor of the Fund ("*réviseur d'entreprises agréé*") which shall be available for inspection. Any costs incurred in connection with a contribution in kind shall be borne by the relevant Unitholders.

16.4    Transfer of Units

The possibility to transfer Units will be described, if applicable, in the relevant section of the relevant Sub-Fund under Part II of this Placement Memorandum.

16.5    Redemption of Units

The possibility to redeem Units will be described, if applicable, in each Sub-Fund under Part II of this Placement Memorandum.

If applicable, Units may be redeemed by notifying the Central Administration Agent in writing. Unitholders concerned must send an irrevocable request in writing for redemption to the Central Administration Agent, for execution on behalf of the AIFM.

Redemption requests must be submitted within the deadline indicated for each Sub-Fund under Part II of this Placement Memorandum (the **Redemption Day**). All orders reaching the Central Administration Agent after that deadline will be held over until the next following Redemption Day for execution at the redemption price then ruling. The redemption price of a Sub-Fund's Units is equal to the applicable Net Asset Value of a Unit of the relevant Class, decreased by a redemption fee described for each Sub-Fund in Part II of this Placement Memorandum. The AIFM reserves the right to reduce proportionally all requests for redemption in the Sub-Fund to be executed on one Redemption Day whenever the total proceeds to be paid for the Units so tendered for redemption exceeds a percentage of the Sub-Fund's total net assets as described for each Sub-Fund in Part II of this Placement Memorandum. The portion of the redemptions not executed on that Redemption Day will then be executed by priority on the next Redemption Day. Confirmation of the execution of a redemption will be made by the dispatch to the Unitholder of an advice. The payment will be made by bank transfer in the reference currency of the Sub-Fund concerned with a value date within 30 calendar days following the corresponding Redemption Day. Redemption of Units may however, at the sole discretion of the AIFM and upon request of the Unitholders concerned, be made *in specie* by allocating to the Unitholders investments from the portfolio equal in value to the value of the Units to be redeemed. The nature and type of the assets to be transferred in such case shall be determined on a fair and reasonable basis and without prejudicing the interests of the other Unitholders and the calculation used shall be confirmed by a special report of the Fund's auditor. The costs of any such transfers shall

35

be borne by the transferee. Given the nature of the investments of the Fund, any Unitholder is urged, before requesting a redemption in kind, to consult his financial advisor. The Unitholder requesting redemption in kind is bearing the risk of receiving securities or any other assets that may not be recoverable at maturity. All redeemed Units are cancelled. The Depositary is only obliged to make payments for redemptions where legal provisions, particularly exchange control regulations or other cases of *force majeure* do not prohibit it from transferring or paying the redemption proceeds in the country where the redemption is requested.

16.6     Conversion of Units

Subject to any restrictions set out in Part II of this Placement Memorandum, a Unitholder may convert all or part of the Units he holds in a Sub-Fund into Units in another Sub-Fund or Units of one Class into Units of another Class of the same or of another Sub-Fund.

The rate at which Units of any Class in any Sub-Fund shall be converted will be determined by reference to the respective Net Asset Values of the relevant Units calculated as of the same specific Valuation Day following receipt of the documents referred to below by a time defined in Part II of this Placement Memorandum for each Class individually in each Sub-Fund.

Conversions are executed free of commission, but the AIFM may levy a fee to cover costs and expenses related to the conversion. This fee will in no event exceed 3% of the Net Asset Value of the Units of the Sub-Fund or Class from which the Unitholder converts. The amount of the conversion fee is indicated for each Sub-Fund in Part II of this Placement Memorandum, if applicable.

To apply for conversion, the Unitholder must send an irrevocable request in writing to the Central Administration Agent.

Conversions may not be executed if the calculation of the Net Asset Value, or subscriptions or redemptions is suspended in one of the concerned Sub-Funds.

When the valuations of two Sub-Funds do not have the same frequency, conversion shall be made on the next Valuation Date common to both Sub-Funds following the conversion request.

The number of Units allotted in the new Sub-Fund or in the new Class is determined by means of the following formula:

$$\frac{(A \times B \times C) - \text{Fee}}{D} = N$$

where:

A.     is the number of Units presented for conversion,

B.     is the Net Asset Value of one Unit in that Sub-Fund and/or of that class of which the Units are presented for conversion, on the day the conversion is executed,

C.     is the conversion factor between the base currencies of the two Sub-Funds on the day of execution. If the Sub-Funds or the two classes of Units have the same base currency, this factor is one,

D.     is the Net Asset Value per Unit of the new Sub-Fund and /or Class on the day of execution,

N.     is the number of Units allotted in the new Sub-Fund and/or Class.

36

17.     **NET ASSET VALUE**

17.1    Determination of the Net Asset Value

The net asset value per Unit (the **Net Asset Value**) as determined for each Class within the relevant Sub-Fund and the issue, conversion and redemption prices will be calculated as of any Valuation Day (as defined for each Sub-Fund under Part II of this Placement Memorandum), by reference to the value of the assets attributable to the relevant Class within the relevant Sub-Fund as determined in accordance with the provisions of the Management Regulations. Such calculation will be done by the Central Administration Agent.

The Net Asset Value per Unit as determined for each Class within the relevant Sub-Fund shall be expressed in the reference currency of the relevant Class and shall be calculated by dividing the Net Asset Value of the Sub-Fund attributable to the relevant Class which is equal to (i) the value of the assets attributable to such Class and the income thereon, less (ii) the liabilities attributable to such Class and any provisions deemed prudent or necessary, through the total number of Units of such Class outstanding on the relevant Valuation Day. The Net Asset Value will be calculated within a term as determined by the AIFM and laid down in this Placement Memorandum.

The Net Asset Value per Unit may be rounded up or down to the nearest hundredth unit of the reference currency of each Class within each Sub-Fund.

If since the time of determination of the Net Asset Value of the Units of a particular Sub-Fund there has been a material change in the valuation of the underlying Life Settlement investment assets and/or quotations in the markets on which a substantial portion of the investments of such Sub-Fund are dealt in or quoted, the AIFM may, in order to safeguard the interests of the Unitholders and the Fund, cancel the first calculation of the Net Asset Value of the Units of such Sub-Fund and carry out a second calculation.

To the extent feasible, investment income, interest payable, fees and other liabilities (including the administration costs and management fees payable to the AIFM will be accrued each Valuation Day.

The value of the assets will be determined as set forth below. The charges incurred by the Fund are set forth in section "Fees and Expenses" hereof.

The Net Asset Value will be determined by the Central Administration Agent, under the oversight of the AIFM as of each Valuation Day.

The Net Asset Value shall be determined in good faith based on the underlying investments as follows:

(a)     The value of any cash on hand or on deposit, bills and demand notes and accounts receivable, prepaid expenses, cash dividends and interest declared or accrued as aforesaid and not yet received is deemed to be the full amount thereof, unless in any case the same is unlikely to be paid or received in full, in which case the value thereof is arrived at after making such discount as may be considered appropriate in such case to reflect the true value thereof.

(b)     Each Life Settlement within the portfolio will be valued using valuation principles as specified in Part II of this Placement Memorandum.

(c)     The value of assets, which are listed or dealt in on any stock exchange, money market or other market, is based on the last available price on the stock exchange, money market or market, which is normally the principal market for such assets.

37

(d)     In the event that any assets are not listed or dealt in on any stock exchange or other market, or if, with respect to assets listed or dealt in on any stock exchange or other market, the price as determined pursuant to sub-paragraph (c) is not representative of the fair market value of the relevant assets, the value of such assets will be based on the reasonably foreseeable value determined prudently and in good faith.

(e)     Interest rate swaps will be valued at their market value established by reference to the applicable interest rates' curve. Other swaps will be valued at fair market value as determined in good faith pursuant to the procedures established by the General Partner and recognised by the Auditors.

(f)     The value of the participations in undertakings for collective investments (**UCI**) shall be based on the last available valuation. Generally, participations in UCI will be valued in accordance with the methods provided by the instruments governing such UCI. These valuations shall normally be provided by the Central Administration Agent or valuation agent of an investment fund. To ensure consistency within the valuation of the Fund, if the time at which the valuation of UCI was calculated does not coincide with the relevant Valuation Day, and such valuation is determined to have changed materially since it was calculated, then the net asset value of the underlying UCI may be adjusted to reflect the change as determined in good faith by and under the direction of the AIFM.

(g)     The valuation of derivatives traded over-the-counter (OTC), such as futures, forward or option contracts not traded on exchanges or on other recognised markets, will be based on their net liquidating value determined, pursuant to the policies established by the AIFM on the basis of recognised financial models in the market and in a consistent manner for each category of contracts. The net liquidating value of a derivative position is to be understood as being equal to the net unrealized profit/loss with respect to the relevant position; and

(h)     The value of other assets will be determined prudently and in good faith by and under the direction of the AIFM in accordance with generally accepted valuation principles and procedures.

(i)     The value of all assets and liabilities not expressed in the reference currency of a Sub-Fund will be converted into the reference currency of such Sub-Fund at rates last quoted by any major bank. If such quotations are not available, the rate of exchange will be determined in good faith by or under procedures established by the AIFM.

(j)     The AIFM, in its discretion, may permit some other method of valuation to be used if it considers that such valuation better reflects the fair value of any asset of the Fund, it being understood that such other method of valuation shall be applied in a consistent manner. Any proposed amendment made to the valuation methodology used in respect of Life Settlements is subject to review by the Valuation Agent as part of their monthly or quarterly actuarial review and report to the Board of Managers.

(k)     The annual financial statements and report of the Fund will include a consolidation of all the Sub-Funds. These consolidated figures will be expressed in USD.

(l)     For this purpose, all figures expressed in another currency than the USD will be converted into USD on basis of the average rate of the last known bid and offer rates.

38

17.2    Temporary Suspension of the Net Asset Value

The AIFM may temporarily suspend the determination of the Net Asset Value per Unit of the Fund and the issue and redemption of its Units in one or several Sub-Funds from its Unitholders:

(a)    during any period when any of the principal stock exchanges or other markets on which any substantial portion of the investments of the Sub-Fund is quoted or dealt in is closed otherwise than for ordinary holidays, or during which dealings therein are restricted or suspended, provided that such restriction or suspension affects the valuation on the investments of the Sub-Fund quoted thereon;

(b)    during the existence of any state of affairs which constitutes an emergency in the opinion of the AIFM as a result of which disposals or valuation of assets owned by the Sub-Fund would be impracticable;

(c)    during any breakdown in the means of communication normally employed in determining the price or value of any of the investments of the Sub-Fund or the current price or values on any stock exchange or other market in respect of the assets of the Sub-Fund;

(d)    when for any other reason beyond the control of the AIFM the prices of any investments owned by the Sub-Fund cannot promptly or accurately be ascertained;

(e)    during any period when the Fund is unable to repatriate funds for the purpose of making payments on the redemption of the Units of such Sub-Fund or during which any transfer of funds involved in the realization or acquisition of investments or payments due on redemption of Units cannot in the opinion of the AIFM be affected at normal rates of exchange; or

(f)    when the political, economic, military or monetary environment, or an event of *force majeure*, prevent the AIFM from being able to manage normally the assets or the liabilities of the Fund and prevent the determination of their value in a reasonable manner.

In the event of exceptional circumstances which could adversely affect the interest of the Unitholders or insufficient market liquidity, the AIFM reserves its right to determine the Net Asset Value of the Units only after it shall have completed the necessary purchases and sales of securities, financial instruments or other assets on behalf of the Fund.

Such suspension as to any Sub-Fund shall have no effect on the calculation of the Net Asset Value per Unit, or on the issue and redemption of Units of any other Sub-Fund.

The suspension of the calculation of the Net Asset Value and/or, where applicable, of the subscription, redemption, conversion of Units, shall be notified to Unitholders through all means reasonably available to the AIFM.

Any request for subscription or redemption shall be irrevocable except in the event of a suspension of the calculation of the Net Asset Value, in which case Unitholders may give notice that they wish to withdraw their application. If no such notice is received by the Fund, such application will be dealt with as of the first Valuation Day following the end of the period of suspension, subject to the limitations set forth in part II of this Placement Memorandum.

Unitholders who have requested the issue or redemption of Units shall be informed of such suspension when such request is made.

**18.    FEES AND EXPENSES**

The Fund will bear all costs relating to its establishment and operations.

18.1    Formation and Launching Expenses

Expenses incurred in connection with the establishment of the Fund and the creation of the initial Sub-Funds, including professional fees and expenses incurred in the preparation and publication of the first Placement Memorandum and any other related or supporting documents, as well as the governmental taxes, duties and any other publication expenses, shall be borne by the Fund and will be allocated equally throughout the first financial year. In the event of early termination of the Fund, the unamortised portion of any costs and expenses will be accelerated, thereby decreasing amounts otherwise available for distribution.

For any additional Sub-Fund created within a period of twelve months from the launch of the Fund, expenses incurred in connection with the creation of such additional Sub-Fund shall be borne by the relevant Sub-Fund and allocated equally throughout the first financial year. The additional Sub-Fund shall be charged a pro rata portion of the initial establishment expenses unamortised since its launch date.

For any additional Sub-Fund created after the period of twelve months from the launch of the Fund, expenses incurred in connection with the creation of such additional Sub-Fund shall exclusively be borne by the relevant Sub-Fund and shall be allocated equally throughout the first financial year.

18.2    Operating Expenses Charged to the Fund

The operating costs and expenses of the Fund include the remuneration of the AIFM, US Custodian, Depositary, Central Administration Agent, Policy Paying Agent, Securities Intermediary and Policy Escrow Agent, Servicing Agent and other providers of services, brokerage fees, transaction fees and expenses, taxes and costs connected with the movements of securities or cash, as well as the fees of the Auditor (including for the performance of the quarterly actuarial review of the Life Settlement investment portfolio), legal advisor(s), the costs of preparation and distribution of the Placement Memorandum and periodic reports, Luxembourg subscription tax and any other taxes relating to the operations of the Fund, the costs related to the issue, redemption or conversion of Units, translations and legal publications, the costs of its securities servicing, the possible costs of listing on any stock exchange or of publication of the price of its Units, the costs of official deeds and any legal costs relating thereto.

18.3    Fees Paid to the AIFM

In payment of its services, the AIFM receives, out of the relevant Sub-Fund's assets, a fee computed and payable monthly on the basis of the Net Asset Value of each Class of the relevant Sub-Fund as at the end of each month or quarter. The amount of such fee is detailed for each Sub-Fund in Part II of this Placement Memorandum.

The AIFM may also receive, out of the relevant Sub-Fund's assets, a performance fee payable in respect of each Performance Period. The amount of such fee is detailed for each Sub-Fund in Part II of this Placement Memorandum.

Any fees payable to the Portfolio Manager (if any), the Investment Adviser (if any) and any placement agents, will be paid by the AIFM out of its own fees.

40

18.4    Fees Paid to the US Custodian, the Depositary, the Central Administration Agent and Other Parties

The US Custodian, will be paid, out of the assets of the relevant Sub-Fund, fees that are within the customary range for the services provided. Similarly, the Paying Agent, Securities Intermediary, Escrow Agent and Servicing Agent will be paid, out of the assets of the relevant Sub-Fund, fees that are within the customary range for the services provided.

The amount of the Central Administration Agent and Depositary fee is detailed for each Sub-Fund in Part II of this Placement Memorandum.

Notwithstanding such fees, the Depositary and other parties will receive customary banking fees for transactions.

Any reasonable disbursements and out-of-pocket expenses (including telephone, telex, cable, and postage expenses) necessarily incurred in the ordinary course of business by the Depositary, Central Administration Agent and any custody charges of banks and financial institutions to which custody of assets of a Sub-Fund is entrusted, will be borne by the relevant Sub-Fund.

18.5    Other Fees

Other fees may be payable by the Sub-Funds to other third parties, like verification fees, as well as external costs, and other costs which are transaction related costs are not included and will also be payable by the relevant Sub-Fund.

**19.    DISTRIBUTION POLICY**

Within each Sub-Fund, Units may be issued as capitalization Units and/or as distribution Units. The features of the Units available within each Sub-Fund are set out in Part II of this Placement Memorandum.

The AIFM will decide from time to time if and to what extent distributions could be made to holders of Units of a Sub-Fund out of the net results of the operations attributable to the relevant Class of that specific Sub-Fund, plus the equalization account on the net issues of such Units. Such distributions will be paid to holders of the relevant Class as soon as practicable after the decision.

Results of operations of each Sub-Fund include all costs and other income such as dividends / distributions and interest contributing proceeds of the assets of the Sub-Fund, net realized and unrealized capital gains and any other proceeds not to be defined as income.

Distributions not claimed within five years from their due date will elapse and revert to the relevant Sub-Fund.

The equalization account is operated in relation with subscriptions and redemptions in all Sub-Funds where distributions Units are in existence.

**20.    DURATION AND LIQUIDATION OF THE FUND**

The Fund has been established for an unlimited duration. The Fund will however be automatically put into liquidation upon the termination of such Sub-Fund is the only active Sub-Fund at that time.

Sub-Funds may be created for a limited or unlimited duration (in which case they will be automatically liquidated upon their termination, unless prolonged), as provided for in Part II of this Placement Memorandum.

41

The Fund may be liquidated at any time by the AIFM, where the AIFM is acting as liquidator. The Fund must be liquidated if the AIFM is wound up for any reason. Should an event occur causing liquidation of the Fund, the Fund shall stop issuing Units. The AIFM may decide to stop redemption of Units or accept redemption requests insofar as it is possible to ensure the equal treatment of the Unitholders.

The Depositary shall share any liquidation revenue for each Class within the Fund minus liquidation expenses and fees among the Unitholders of the relevant Class in the Fund in proportion to their holding of such Units in such Class, as instructed by the AIFM or by any liquidators that may have been appointed by the AIFM or the Depositary in agreement with the supervisory authorities. Liquidation revenue not distributed to unitholders after conclusion of the liquidation proceedings shall be converted into Euro if required by law and shall be deposited by the Depositary on behalf of entitled Unitholders after conclusion of the liquidation proceedings with the Luxembourg *Caisse de Consignation*. Unless claimed within the statutory time limit, such amounts shall accrue to the *Caisse de Consignation*.

Unitholders, their heirs and/or heirs in title, may not petition for the liquidation and/or division of the Fund.

21.   **TERMINATION AND AMALGAMATION OF SUB-FUNDS / CLASSES OF UNITS**

In the event that for any reason the value of the total net assets in any Sub-Fund or Class has decreased to, or has not reached, an amount determined by the AIFM to be the minimum level for such Sub-Fund or Class to be operated in an economically efficient manner (which amount is currently fixed at US$ 500,000) or in case of a substantial modification in the political, economic or monetary situation or as a matter of economic rationalization, the Board of Managers may decide to redeem all the Units of the relevant Sub-Fund or Class at the Net Asset Value per Unit (taking into account actual realization prices of investments and realization expenses) calculated on the Valuation Day at which such decision shall take effect. The Fund shall serve a notice to the holders of the relevant Units prior to the effective date for the compulsory redemption, which will indicate the reasons of and the procedure for the redemption operations: registered holders shall be notified in writing. Unless it is otherwise decided in the interests of, or to keep equal treatment between, the Unitholders, the Unitholders of the Sub-Fund or Class concerned may continue to request redemption of their Units free of charge (but considering actual realization prices of investments and realization expenses) prior to the date effective for the compulsory redemption.

Assets which may not be distributed to their beneficiaries upon the implementation of the redemption will be deposited with the Depositary for a period of six months thereafter; after such period, the assets will be deposited with the *Caisse de Consignations* on behalf of the persons entitled thereto.

All redeemed Units shall be cancelled.

Under the same circumstances as provided by the first paragraph here above, the AIFM may decide to allocate the assets of any Sub-Fund to those of another existing Sub-Fund within the Fund or to another undertaking for collective investment (**UCI**) submitted to the UCI Law or to the SIF Law or to another sub-fund within such other UCI (the **new Sub-Fund**) and to re-designate the Units of the Sub-Fund concerned as Units of another Sub-Fund (following a split or consolidation, if necessary, and the payment of the amount corresponding to any fractional entitlement to unitholders). Such decision will be published in the same manner as described in the first paragraph here above one month before its effectiveness (and, in addition, the publication will contain information in relation to the new Sub-Fund), in order to enable unitholders to request redemption of their Units, free of charge, during such period.

42

22.     **APPLICABLE LAW AND JURISDICTION**

The Management Regulations are governed by the laws of the Grand Duchy of Luxembourg.

By applying for Units when submitting the subscription form or otherwise, prospective investors agree to be bound by the Management Regulations, this Placement Memorandum and the terms and conditions of the Subscription Document. This contractual relationship is governed by Luxembourg Law. The Fund, the AIFM and the Unitholders will be subject to the exclusive jurisdiction of the courts of Luxembourg-City to settle any dispute or claim arising out of or in connection with a Unitholder's investment in the Fund or any related matter.

Notwithstanding the foregoing, the AIFM and the Depositary may subject themselves and the Fund, (i) to the jurisdiction of the courts of the countries in which the Units of the Fund are offered and sold with respect to claims by investors resident in such countries, and (ii) with respect to matters relating to subscription, repurchase and conversion by Unitholders resident in such countries, to the laws of such countries.

The claims of the Unitholders against the AIFM or the Depositary will lapse five years after the date of the event which gave rise to such claims.

As Member State of the European Union, Luxembourg applies Regulation (EU) 1215/2012 of the European Parliament and of the Council of 12 December 2012 on jurisdiction and the recognition and enforcement of judgments in civil and commercial matters.

According to the Council Regulation (EU) 1215/2012 on jurisdiction and the recognition and enforcement of judgments in civil and commercial matters, a judgement given and enforceable in an European Member State shall in principle be recognised in the other European Member States without any special procedure being required and shall generally be enforceable in the other European Member States on the application of any interested party, save certain circumstances.

Luxembourg also adheres to other treaties and conventions on jurisdiction and the recognition and enforcement of judgments in civil and commercial matters and, in the absence of an EU regulation, a treaty or a convention, Luxembourg courts can, under certain conditions grant exequatur (enforcement) to a foreign judgment in Luxembourg.

23.     **PREVENTION OF MONEY LAUNDERING AND TERRORISM FINANCING**

**General**

The AIFM, the Fund and the Central Administration Agent are falling within the scope of the Luxembourg law of 12 November 2004 on the fight against money laundering and terrorist financing ("**AML/CFT**"), as amended (the **AML Law**) and shall at all times comply with the obligations imposed by laws and regulations to prevent money laundering and terrorist financing including the Grand Ducal Regulation of 1 February 2010 providing details on certain provisions of the AML Law, the Luxembourg law of 19 December 2020 on the implementation of restrictive measures in financial matters, CSSF Regulation n°12-02 on the fight against money laundering and terrorist financing, ("**CSSF Regulation 12-02**") as amended by CSSF Regulation 20-05 and further implementing regulations and CSSF circulars in the field of AML/CFT, as they may be amended or revised from time to time (collectively referred to as the "**AML/CFT Regulations**").

43

**Identification and verification of investors**

In particular, the AML/CFT Regulations require an identification and a detailed verification of an applicant's identity, of any of their representatives / authorised signatories and, where applicable, of the beneficial owners on the basis of documents, data or information obtained from a reliable and independent source and, amongst others, to gather information on the source of funds used to invest in the Fund and to monitor the business relationship on an ongoing basis.

The AIFM and its delegates, notably the Central Administration Agent, will request such information and supporting documentation deemed necessary to verify the identity of an applicant (as well as of any of the above-mentioned persons) and the source of the funds used for the subscription of Units. In any case, the AIFM and/or its delegate have the right to request additional information until being reasonably satisfied that it understands the identity and economic purpose of the applicant and in order to being able to comply with the AML/CFT Regulations. Furthermore, any existing Unitholder is required to notify the AIFM and/or its delegate of any change of its information as set out in the subscription form and, as the case may be, prior to the occurrence of any change in the identity of any beneficial owner of Units. In addition, the AML Law requires the AIFM to conduct an ongoing monitoring of the business relationship with existing Unitholders which includes, inter alia, the obligation to verify and, where appropriate, to update, within an appropriate timeframe, the documents, data or information gathered while fulfilling the customer due diligence obligations. In this context, the AIFM and/or its delegate may require from existing investors, at any time, additional information together with all supporting documentation deemed necessary for the AIFM to comply with the AML/CFT Regulations.

In the event of delay or failure by the applicant or an existing Unitholder to produce any information required for verification purposes, the AIFM and/or its delegates have the right (a) to reject the application for Units or for a conversion of Units including the subscription amount and/or (b) to postpone the application until all information and documents have been received for this purpose.

In addition, the AIFM shall not proceed with the redemption or conversion of Units or the payment of any redemption proceeds or make any distributions to a Unitholder if the identification documents of the latter are no longer accurate or up-to-date. Furthermore, in such case, the AIFM and/or its delegates may take the measures that it considers to be appropriate, including but not limited to, the blocking of such Unitholder's account until the receipt of the information and documents required. Any costs (including account maintenance costs) which are related to non cooperation of such Unitholder will be borne by the respective Unitholder.

No liability for any interest, costs or compensation will be accepted in that regard.

The identification of Investors is under the responsibility of the AIFM and has been delegated (under its supervision) to the Central Administration Agent.

Where the Unitholder is investing in the Fund through an intermediary/nominee subscribing for / investing in Units in their own name but on behalf of their own underlying investors (and thus the intermediary/nominee-investor being directly registered in the Fund's shareholder register), the due diligence with regard to such intermediary/nominee-investor generally takes place at two levels, including inter alia:

i.  A risk-based customer due diligence on the intermediary/nominee-investor (by using reliable, independent source documents, data or information) as well as on its representatives and, as the case may be, beneficial owners, such that notably the AIFM is satisfied that it knows who the beneficial owner(s) of the intermediary/nominee-investor are;

44

ii.   In addition, enhanced due diligence shall be applied by the Central Administration Agent on the intermediary/nominee-investor pursuant to article 3 of the CSSF Regulation 12-02 as well as article 3-2 of the AML Law, which includes *inter alia* to evaluate the intermediary's AML/CFT controls as well as the requirement to obtain periodic representation that such intermediary has collected all information and documents and is maintaining adequate recordings of their own underlying investors.

A risk-based approach depending also on the money-laundering/terrorist financing risk identified is applied for the identification – and verification measures upon the investors.

**Asset due diligence measures**

In addition to the due diligence measures on Investors, pursuant to articles 3 (7) and 4 (1) of the AML Law, the AIFM is also required to apply precautionary measures regarding the assets of the Fund. The AIFM should assess, using its risk based approach, the extent to which the offering of its products and services presents potential vulnerabilities to placement, layering or integration of criminal proceeds into the financial system.

Pursuant to the Law of 19 December 2020 on the implementation of restrictive measures in financial matters, the application of international financial sanctions must be enforced by any Luxembourg natural or legal person, as well as any other natural or legal person operating in or from the Luxembourg territory. As a result, prior investing in assets, the AIFM must, as a minimum, screen the name of such assets or of the issuer against the target financial sanctions lists.

As part of such asset due diligence measures, the AIFM identifies the counterparties, its representatives, and as the case may be, any of its beneficial owners and conducts ongoing monitoring of transactions made for the account of the Fund to comply with the AML Law and other applicable laws and regulations.

In this context, a risk-based approach depending also on the money-laundering/terrorist financing risk identified is applied for the identification of counterparties and transactions made for the account of the Fund.

**Disclosure obligations of the AIFM**

Many jurisdictions are in the process of changing or creating anti-money laundering, embargo and trade sanctions, or similar laws, regulations, requirements (whether or not with force of law) or regulatory policies and many financial intermediaries are in the process of changing or creating responsive disclosure and compliance policies (collectively, the **AML Requirements**) and the AIFM is requested or required to obtain certain assurances from investors subscribing for Units to disclose information pertaining to them to governmental, regulatory or other authorities or to financial intermediaries or engage in due diligence or take other related actions in the future. It is the policy of the AIFM to comply with the AML Requirements to which it is or may become subject and to interpret them broadly in favour of disclosure, it being understood that the AIFM will at all times comply with applicable data protection laws and regulations.

To achieve this objective, each Unitholder will be deemed to have agreed by reason of owning any Units, that it will provide additional information as may be necessary or advisable for the AIFM to comply with any AML Requirements, related legal process or appropriate requests (whether formal or informal) or otherwise. Each Unitholder by executing the Subscription Agreement and by owning Units is deemed to have consented to disclosure by the AIFM and their delegates to relevant third

parties of information pertaining to it in respect of the requirements or information requests related thereto.

**Register of beneficial owners (RBE)**

Pursuant to the Luxembourg Law of 13 January 2019 establishing a register of beneficial owners ("**RBE**") (the "**RBE Law**"), the Fund is required to collect, hold accurate and up-to-date and make available certain information on its "beneficial owner(s)" (as defined in the AML Law). Such information includes, as further specified in the RBE Law, among others, first and last name, nationality, country of residence, personal or professional address, national identification number and information on the nature and the scope of the beneficial ownership interest held by each beneficial owner in the Fund. In this context, the Fund must report certain information on its beneficial owners and file supporting evidence to the RBE. The RBE may be accessed not only by certain national authorities (including the public prosecutor, Financial Intelligence Unit (*Cellule des Renseignements Financier*), Indirect Tax Authority and the CSSF) but also by the public. While the relevant Luxembourg national authorities will have full access to all the information filed regarding beneficial owners, certain information such as the address and national identification number of the beneficial owners will not be available to the public. The Fund is further required, among others, to make the information available upon request to such authorities and upon motivated request also of other professionals of the financial sector subject to the AML/CFT Regulations. Under the RBE Law, criminal sanctions may be imposed on the Fund in case of its failure to comply with the obligations to collect and make available the required information, but also on any beneficial owner(s) that fail to make all relevant necessary information available to the Fund. Any Unitholder that fails to comply with the AIFM's information or documentation requests may be held liable for penalties imposed on the Fund as a result of such Unitholder's failure to provide the information or subject to disclosure of the information by the Fund to the Luxembourg national authorities and the AIFM may, in its sole discretion, redeem the Units of such Unitholders.

24.    **TAX**

24.1    General

The following is based on the AIFM's understanding of, and advice received on, certain aspects of the taxation law and practice currently in force. There can be no guarantee that the tax position at the date of this Placement Memorandum or at the time of an investment will endure indefinitely. The following should not be taken as constituting legal or tax advice and investors are advised to obtain information and, if necessary, advice regarding the laws and regulations applicable to them by reason of the subscription, purchase, holding and realization of Units in their countries of origin, residence or domicile.

Investors should consult their professional advisors on the possible tax and other consequences of their subscribing for, purchasing, holding or redeeming Units under the laws of their country of incorporation, establishment, citizenship, residence or domicile.

24.2    Taxation of the Fund

The Fund is currently not liable for any Luxembourg tax on profits or income, nor are distributions paid by the Fund liable to Luxembourg withholding tax.

The Fund is, however, liable in Luxembourg to a tax ("*taxe d'abonnement*") of 0.01% per annum of its Net Asset Value, such tax being payable quarterly on the basis of the value of the aggregate net assets of the Fund at the end of the relevant calendar quarter.

46

No stamp duty or other tax is payable in Luxembourg on the issue of Units.

No Luxembourg tax is payable on the realised capital appreciation of the assets of the Fund.

24.3    Taxation of Unitholders

Except as provided below regarding certain withholding taxes, an investor without a physical presence or permanent establishment in Luxembourg will not be subject to Luxembourg taxation on income from its investment in the Fund.

24.4    EU Tax Considerations

Directive 2014/107/EU on administrative cooperation in the field of direct taxation (the **ACD**) provides for automatic exchange of financial account information between EU Member States.

The ACD brings interest, dividends, gross proceeds from the sale of financial assets and other income, and account balances within the scope of the automatic exchange of information between EU Member States. It also provides for the implementation of a common reporting standard (**CRS**) on the automatic exchange of information developed by the OECD.

On 18 December 2015, the Luxembourg Parliament adopted the law implementing the ACD and introducing the CRS, which came into effect on 1 January 2016 (the **ACD Law**). Under the ACD Law, Luxembourg reporting financial institutions must identify accounts held by investors or clients residing in any of the countries participating to the CRS initiative (**Reportable Accounts**) and report personal and financial information related to these Reportable Accounts to the Luxembourg tax authorities. The Luxembourg tax authorities will subsequently report this information to the competent foreign authorities.

Accordingly, the AIFM will require Unitholders to provide information in relation to the identity and fiscal residence of financial account holders (including certain entities and their controlling persons), account details, reporting entity, account balance/value and income/sale or redemption proceeds to the local tax authorities of the country of fiscal residency of the foreign investors to the extent that they are fiscally resident in a jurisdiction participating in the automatic exchange of information.

In addition, Luxembourg signed the OECD's multilateral competent authority agreement (**Multilateral Agreement**) to automatically exchange information under the CRS. The Multilateral Agreement aims to implement the CRS among non-Member States; it requires agreements on a country-by-country basis. Unitholder may therefore be reported to the Luxembourg and other relevant tax authorities in accordance with applicable rules and regulations.

Such request for information will be processed by the AIFM and the service providers of the Fund in compliance with laws and regulations applicable to the protection of personal data.

Although the legal scope of the ACD does not extend outside the European Union, certain non-EU jurisdictions have (or in the future may) put in place legislation that supports the aims of the ACD, along with bilateral agreements with all EU Member States.

Unitholders should therefore consult their own financial or tax advisers on the implications of the ACD and of any relevant legislation put in place in their own tax residence in relation thereto.

24.5    US Foreign Account Tax Compliance Act (**FATCA**)

The Fund may currently be subject to 30% withholding tax on investment income from sources within the United States. FATCA was signed into law in the US on 18 March 2010, as a component of the Hiring Incentives to Restore Employment Act (the **HIRE Act**) and seeks to reduce tax evasion by US citizens and residents by requiring all financial institutions outside the US (**Foreign Financial Institutions** or **FFIs**) to identify and report their US investors or account holders to the US Internal Revenue Service (**IRS**) on an annual basis.

The Fund intends to take the steps necessary to be treated as FATCA-compliant and avoid the FATCA withholding tax. As the Luxembourg and US governments have entered into a Model 1 intergovernmental agreement (**IGA**) to implement the provisions of FATCA. Consequently, the Fund will need to comply with the provisions of the IGA as implemented in the Luxembourg law and may not be required to enter into an agreement with the IRS (an **FFI Agreement**) to avoid the FATCA withholding tax. However, the Fund may still be required to obtain identifying information on its investors, report annually to the Luxembourg tax authority or to the IRS, and comply with certain registration requirements. If the Fund is unable to satisfy its requirements for compliance under FATCA, the Fund may be subject to 30% withholding tax which may reduce the Fund's value.

The Fund will continually assess the extent of the requirements that FATCA and notably the Luxembourg IGA places upon it.

As part of its obligations under FATCA and the Luxembourg IGA, the Fund may (without this list being limitative):

(a)    request information or documentation, including W-8 tax forms, a Global Intermediary Identification Number, if applicable, or any other valid evidence of a Unitholder's FATCA registration with the IRS or a corresponding exemption, in order to ascertain such Unitholder's FATCA status;

(b)    report information concerning a Unitholder, its direct or indirect beneficial owners and their account holding in the Fund to the Luxembourg tax authorities if such account is deemed to be reported under the Luxembourg IGA; and

(c)    deduct applicable US withholding taxes from certain payments made to a Unitholder by or on behalf of the Fund in accordance with FATCA and the Luxembourg IGA.

The Fund's ability to satisfy its obligations under the IGA will depend on each investor in the Fund providing the Fund including information concerning the direct or indirect owners of such investor, that the Fund determines is necessary to satisfy such obligations. Each investor will agree in its Subscription Document to provide such information upon request from the Fund, which request will be made once the IRS has provided final guidance regarding FATCA requirements. If any Unitholder fails to provide the Fund with the information required for its FATCA compliance, payments to the Unitholder may also be subject to withholding. The Fund may create a separate Class or exercise its right to completely redeem an investor (at any time upon any or no notice) that fails to provide the Fund with the information the Fund requests to satisfy the Fund's obligations under the FATCA. Subscribers are encouraged to consult with their own tax advisors regarding the possible implications of FATCA on their investment in the Fund.

48

24.6    General U.S. tax considerations

Sub-Funds may have two Classes of Units, taxable and non-taxable to accommodate different types of Investors. The relevant Sub-Fund will elect to be treated as a partnership for U.S. federal income tax purposes but Units from a different Class will have different treatment. A Sub-Fund may issue "Non-Taxable Units" whereby no U.S. withholding tax will be levied, as well as "Taxable Units" whereby U.S. withholding taxes will be levied on the allocable share of the difference between the purchase price of the Life Settlement Policy plus any attributable costs such as but not limited to premiums and the Life Insurance proceeds paid upon the death of the U.S. insured.

The Fund (and any Sub-Funds) will not be entitled to treaty benefits under the US-Luxembourg income tax treaty. Unless a Unitholder is entitled to treaty benefits under a treaty between his, her or its country of residence and the United States, life insurance proceeds paid upon the death of a U.S. insured allocable to such Unitholder may be subject to U.S. withholding tax as explained above.

To the extent U.S. withholding taxes are imposed on a Unitholder's allocable share of proceeds or other income from Life Settlements, such Unitholder's account will be credited with its share of proceeds or other income from Life Settlements reduced by such withholding tax.

The AIFM may be required by the Depositary to provide a tax opinion as to the fiscal treatment of the Life Settlements proceeds for each country of fiscal residence of the Unitholder or its beneficial owner(s). The tax opinion, if any, shall be issued to the sole benefit of the Depositary and/or the AIFM, at the Fund's expenses.

Requirements for U.S. treaty entitlement are discussed in general terms herein. However, a Unitholder should satisfy him-, her-, or itself as to the overall U.S. and non-U.S. tax consequences in their own particular circumstances of their acquisition, ownership and disposal of the Units, by consulting their own tax advisers.

Discussion contained herein is intended only as a general guide and is not intended to be, nor should it be considered, legal or tax advice to any relevant Unitholder. It is not intended to address all tax aspects that may be relevant to a Unitholder. In view of the complexity of the applicable tax rules, potential investors should satisfy themselves by consulting their own tax advisers.

24.7    U.S. federal income tax consequences

*Introduction*

As with any investment, the tax consequences of an investment in Units may be material to an analysis of an investment in the Fund. Unitholders should be aware of the tax consequences of such an investment before purchasing Units. The discussion below is general and does not address tax consequences that may be relevant to certain types of investors. The tax consequences of an investment will depend not only on the nature of the Fund's operations and the then applicable federal tax principles, but also on certain factual determinations, including a particular Unitholder's individual circumstances.

The following discussion is based upon the U.S. Internal Revenue Code of 1986, as amended (the **Code**), and upon judicial decisions, U.S. Treasury regulations, IRS rulings and other administrative materials interpreting the Code, all of which are subject to change that may or may not be retroactive. As is the case with any investment, there can be no guarantee that the tax position or proposed tax position prevailing at the time an investment is made will endure indefinitely.

49

Each Investor is urged to consult its tax advisor regarding the specific consequences of an investment in the Fund under applicable United States federal, state, local and foreign income tax laws as well as with respect to any specific gift, estate and inheritance tax issues.

A U.S. Person, as defined for U.S. federal income tax purposes (referred to herein as a **U.S. Holder**), includes a U.S. citizen or resident alien of the United States (as defined for U.S. federal income tax purposes); any entity treated as a partnership or corporation for U.S. tax purposes that is created or organized in, or under the laws of, the United States or any State thereof; any other partnership that is treated as a U.S. Person under U.S. Treasury Department regulations; any estate, the income of which is subject to U.S. income taxation regardless of source; and any trust over whose administration a court within the United States has primary supervision and all substantial decisions of which are under the control of one or more U.S. fiduciaries. Persons who have lost their U.S. citizenship and who live outside the United States may nonetheless in some circumstances be treated as U.S. Persons.

The following discussion assumes that the Fund, including each Sub-Fund thereof, will be treated as a single entity for U.S. federal income tax purposes. The law in this area is uncertain. Thus, it is possible that the Fund may adopt an alternative approach, treating each Sub-Fund of the Fund as a separate entity for U.S. federal income tax purposes. There can be no assurance that the IRS will agree with the position taken by the Fund.

*Tax treatment of the Fund – Partnership status*

In general, the federal income tax consequences of an investment in the Fund will depend on whether the Fund is treated for U.S. federal income tax purposes as a partnership rather than as an association taxable as a corporation.

If the Fund is classified as a "partnership" for U.S. federal income tax purposes and is not a "publicly traded partnership," it generally will not be subject to any regular U.S. federal tax. Instead, Unitholders subject to U.S. federal income taxation will be subject to tax on their distributive shares of Fund income and gain and, subject to certain limitations described below, will be entitled to claim their distributive shares of Fund's losses. On the other hand, if the Fund were to be classified as an association taxable as a corporation or as a "publicly traded partnership," Unitholders would be treated as shareholders of a corporation. Consequently, items of income, gain, loss and deduction would not flow through to Unitholders to be accounted for on their individual U.S. federal income tax returns; instead, the Fund itself could possibly be subject to U.S. income and branch profits taxes and would not be eligible for relief pursuant to the income tax treaty currently in force between the United States and Luxembourg. Also, the Fund could possibly be classified as a "passive foreign investment company" or a "controlled foreign corporation" for U.S. federal income tax purposes, either of which classifications would subject the Fund's U.S. Holders to adverse consequences under special rules designed to prevent deferral of U.S. taxation and conversion of ordinary income into capital gains through investment in non-U.S. investment companies. Furthermore, non-U.S. Holders otherwise eligible for treaty benefits would possibly lose the ability to claim such benefits. Thus, the treatment of the Fund as a corporation for U.S. tax purposes could materially and adversely affect the Fund and its Unitholders.

Section 301.7701-1 through 301.7701-3 of the Treasury regulations provides a largely elective regime for determining when a corporate organization may be classified as a partnership rather than as a corporation. Under this regime, certain business entities are treated as *per se* corporations for federal tax purposes. All other business entities generally may choose their classification. The AIFM intends to cause the Fund (or any Sub-Fund) to elect to be classified as a partnership for U.S. federal taxation purposes.

50

An organization that is classified as a partnership under the rules of Treas. Reg. § 301.7701-1 through 301.7701-3 nevertheless may be treated as a corporation for U.S. federal income tax purposes. Under Section 7704 of the Code, certain "publicly traded partnerships" are taxable as corporations. A publicly traded partnership for these purposes is a partnership whose interests are traded on an established securities market or are readily tradable on a secondary market or its economic equivalent. Although interests in the Fund will not be tradable on an established securities market, because interests may be redeemed under certain circumstances, they could be considered to be readily tradable on a secondary market or its economic equivalent.

Treasury regulations issued under Code Section 7704 provide that if all of the interests in a partnership are offered in a private placement, and the partnership has not more than 100 partners, the interests in the partnership will not be considered readily tradable on a secondary market (or its substantial equivalent). For purposes of determining the number of partners, the beneficial owner of an interest in a partnership, grantor trust or US corporation (a "look-through entity") that invests in the Fund will be treated as a partner in the Fund, but only if substantially all of the value of the beneficial owner's interest in the look-through entity is attributable to that entity's interest in the Fund, and a principal purpose for the tiered arrangement was to satisfy the 100-partner condition. In addition, under an exception in Section 7704(c) of the Code, a publicly traded partnership is not treated as a corporation for tax purposes if ninety percent or more of its gross income consists of "qualifying income." For this purpose, qualifying income includes, among other items, interest, dividends and gains from the sale or disposition of a capital asset held to produce such income. It is not expected that the Fund would satisfy the qualifying income test in any given taxable year. Should the Fund fail to qualify for the private placement safe harbour described above, the AIFM intends to take the position that, based on a "facts and circumstances" analysis, considering the Treasury regulations and the anticipated operations of the Fund (including the absence of regular opportunities for Unitholders to redeem their Units), the Fund should not be treated as a corporation under the publicly traded partnership rules. There can be no assurance that the IRS would agree with this position.

The remainder of this discussion assumes that the Fund will be treated as a partnership for U.S. federal income tax purposes.

Each Unitholder, to the extent subject to U.S. federal income taxation, will be required to take into account in computing its federal income tax liability its distributive share of the Fund's income, gains, losses, deductions, credits and tax preference items for any taxable year of the Fund ending with or within the taxable year of such Unitholder without regard to whether the Unitholder has received or will receive a cash distribution from the Fund. The amount of tax due, if any, with respect to gains and income of the Fund is determined separately for each Unitholder. If for any taxable year the Fund derives any income from U.S. sources and has any Unitholders that are U.S. Holders (or pass-through type entities that are owned, directly or indirectly through one or more other pass-through entities, by a U.S. Holder), it will be required to file annually an information return on IRS Form 1065 and, with respect to each U.S. Holder (or pass-through type entity that is owned, directly or indirectly through one or more other pass-through entities, by a U.S. Holder), a Schedule K-1 indicating such Unitholder's allocable share of the Fund's income, gain, losses, deductions, credits and items of tax preference. If for any taxable year the Fund derives income that is effectively connected with a U.S. trade or business, it will be required to submit a Schedule K-1 with respect to each Unitholder (whether a U.S. or non-U.S. Holder). Each Unitholder, however, is responsible for keeping its own records for determining such Unitholder's tax basis in its Units and calculating and reporting any gain or loss resulting from a Fund distribution or disposition of Units.

The Fund will use the accrual method of accounting to determine its net profits or net losses for U.S. federal income tax purposes. The Fund's taxable year will end on 31 December for U.S. accounting

51

and income tax purposes. In the event, however, that one or more Unitholders having an aggregate interest in Fund profits and capital of more than fifty percent, or all Unitholders having a five percent or greater interest in Fund profits or capital, have a differing taxable year end (disregarding for this purpose certain Unitholders that are not subject to U.S. income tax), the Fund may be required to adopt or change to a different taxable year.

It is possible that the Fund will provide Schedules K-1 to Unitholders after 15 April, if required to do so, and Unitholders should, therefore, be prepared to file extensions with relevant state, federal and local taxing authorities.

*Tax reporting requirements applicable to life settlement transactions*

New reporting requirements applicable to the direct or indirect purchase of existing life insurance contracts, as well as the payment of death benefits under such contracts, will impact the Fund and its Unitholders. It is expected that the Fund and its Unitholders will be required to report information relating to life settlement policies acquired by the Fund to the IRS, to the insurance companies that issued such policies, and to the sellers of such policies. Upon receipt of such report, or of notice of the transfer of a life insurance contract to a non-U.S. Holder, the issuing insurance company must report certain information, including the seller's basis in the transferred contract, to the IRS and to the seller. Also, upon the payment of a death benefit under a life insurance contract, the paying insurance company must report certain information, including the gross amount of the payment, an estimate of the buyer's basis in the contract, and the name, address and U.S. taxpayer identification number of the paying insurance company and of each recipient of the payment. Although the new rules are applicable to life settlement transactions and payments occurring after 2017, reporting is currently suspended pending the issuance of final regulations.

*Taxation of Non-U.S. Holders*

(a)    Taxation at Source of Certain U.S. Source Income

Assuming that none of the income of the Fund will be treated as "effectively connected" with a U.S. trade or business carried on by the Fund or a non-U.S. Holder, death benefit income derived by the Fund upon the death of an insured under a Life Settlement policy, and possibly certain other categories of income (including dividends and certain types of interest income), if any, derived by the Fund from U.S. sources, will be subject to a U.S. tax of 30 percent to the extent allocable to the non-U.S. Holder, unless the tax is reduced or eliminated pursuant to a treaty under which the non-U.S. Holder is eligible to claim treaty benefits. This tax generally will be withheld from such income, and the amount of such income and withheld tax will be reported on an IRS Form 1042-S with respect to each non-U.S. Holder. Certain other categories of income, generally including capital gains and interest on certain portfolio debt obligations (which may include U.S. government securities), original issue deposit obligations having an original maturity of 183 calendar days or less, and certificates of deposit, will not be subject to this 30 percent tax. With respect to interest on portfolio debt obligations, however, the exemption from this 30 percent tax will not apply unless the non-U.S. Holder furnishes a properly executed IRS Form W-8BEN or W-8BEN-E.

IRS guidance addresses the taxation of investments by secondary purchasers, such as the Fund, in life insurance contracts. This guidance clarifies that the amount of income recognized by the Fund upon the receipt of death benefits under a Life Settlement policy will equal the excess of the total death benefit received, less the actual value of the consideration paid by the Fund to acquire the policy and any premiums and other consideration paid by the Fund after acquiring the policy. Furthermore, in the absence of treaty relief, such income will be subject

52

to the 30 percent tax referred to above if, as is generally contemplated, the policy is issued by a U.S. insurance company and the insured is a U.S. citizen residing in the United States. It is possible, however, that a paying agent may seek to withhold on the full amount of the death benefit. In such event, a non-U.S. Holder would be required to file a U.S. federal income tax return to claim a refund of any excess amounts of withheld tax.

IRS guidance also clarifies the amount of any gain recognized by the Fund upon the sale or other disposition of a life settlement policy, although it does not specifically address the source of such gain and whether the 30 percent tax referred to above would apply to such gain. In general, however, gains recognized by the Fund upon the sale or other disposition of property would not be expected to be subject to this 30 percent tax. There can be no assurance, however, that future IRS guidance would not take a contrary position with respect to all or some portion of any gain recognized by the Fund upon the sale or other disposition of a life settlement policy.

(b)    Taxation of income that is effectively connected with a U.S. trade or business

If the Fund derives income which is effectively connected with a U.S. trade or business carried on by the Fund, the 30 percent tax described above will not apply to such effectively connected income. Instead, unless a non-U.S. Holder were eligible for relief under an applicable income tax treaty, the Fund generally would be required to withhold quarterly amounts of tax from the amount of effectively connected taxable income allocable to such non-U.S. Holder at the highest rate of tax applicable to a corporate or individual U.S. Holder, as applicable. Thus, a non-U.S. Holder would be taxable on capital gains, as well as other income which is treated as effectively connected with the Fund's U.S. trade or business, and generally would be required to file U.S. tax returns. A corporate non-U.S. Holder also would be subject to additional branch profits taxes on effectively connected earnings deemed removed from the United States. Gain from an actual or deemed disposition of Units by a non-U.S. Holder also would be treated as effectively connected with a U.S. trade or business to the extent that the non-U.S. Holder would have had effectively connected gain if the Fund sold all of its assets at fair market value. In such event, a transferee of the Units generally would be required to withhold tax at a 10 percent rate from the amount realized by the non-U.S. Holder from the disposition. Under future guidance, the Fund would be required to withhold any amount (plus interest) that the transferee failed to withhold as required. Any taxes withheld by the Fund, or by the transferee of Units, in respect of a non-U.S. Holder would be creditable against the non-U.S. Holder's U.S. federal income tax liability.

The Fund intends to limit its activities within the United States. Nevertheless, as this determination is highly factual, there can be no assurance that the Fund would not be deemed to be engaged in a trade or business within the United States.

(c)    Treaty considerations

Non-U.S. Holders entitled to claim the benefits of an applicable income tax treaty generally will not be subject to U.S. federal income taxation with respect to Fund income that is effectively connected with a trade or business, provided that such income is not attributable to a permanent establishment in the United States through which such trade or business is conducted. Certain treaties may also provide relief from the 30% tax referred to above for eligible non-U.S. Holders, provided that the income otherwise subject to the tax is not attributable to a permanent establishment in the United States. The Fund intends to conduct its activities such that a non-U.S. Holder generally will not be deemed to have a permanent within the United States solely by reason of investing in the Fund. Because, however, this

53

determination is highly factual, there can be no assurance that the IRS would not successfully challenge this position.

A non-U.S. Holder wishing to claim treaty relief should satisfy itself that it fulfils any eligibility criteria, including satisfying any residency requirement, not having a permanent establishment in the United States, and taking into account any limitation on benefits provisions. A non-U.S. Holder seeking treaty relief also will be required to furnish the Fund with a properly executed IRS Form W-8BEN or W-8BEN-E (updated as necessary) that supports the claim for treaty relief and contains a valid U.S. taxpayer identification number of the non-U.S. Holder. If the treaty relief relates to Fund income that is effectively connected with a U.S. trade or business, the non-U.S. Holder generally would also be required to attach to its U.S. federal income tax return an IRS Form 8833, although certain exemptions from filing IRS Form 8833 may apply. Non-U.S. Holders should consult their own tax advisers regarding such potential filing obligations.

(d)     Audit of tax returns

If the Fund is required to file any U.S. information returns and such returns are audited, a "partnership representative" will have sole authority to act on behalf of the Fund in any audit proceeding, and generally will bind the Fund and its Unitholders. Absent certain elections by the Fund, this audit regime could cause any adjustments to Fund tax items, and any resulting tax liability, to be determined and collected at the Fund level and thus borne by its Unitholders in the year in which the audit is completed, rather than the year to which the audit relates. Unitholders (including former Unitholders) may be required to indemnify the Fund for any taxes (and related interest, penalties or other charges or expenses) payable by the Fund and attributable to such Unitholders' Units. It is expected that the AIFM or its designee will act as the Fund's "partnership representative" and, as such, will have authority to make elections and otherwise act on behalf of the Fund in the event of an audit. Future guidance is expected to clarify many aspects of this partnership audit regime.

While the AIFM believes the tax treatment to be afforded to the Fund will be correct and proper, there can be no assurance that the Fund will not be audited and that adjustments will not be made.

*Information reporting and backup withholding considerations*

A Unitholder's distributive share of death benefits paid to the Fund, and certain other income items of the Fund, generally will be reported to the Unitholder and the IRS on an IRS Form 1099, unless the Unitholder establishes an exemption from such reporting and withholding (as described below).

Failure to provide an appropriate and properly executed IRS Form W-8 (in the case of Unitholders who are not U.S. Holders) or IRS Form W 9 (for Unitholders who are U.S. Holders), may subject a Unitholder to backup withholding tax. Backup withholding is not an additional tax. Any amounts withheld may be credited against a Unitholder's U.S. federal income tax liability. Unitholders not subject to U.S. federal income tax would be required to file a U.S. federal income tax return to reclaim any withheld amounts.

Tax-exempt entities, corporations, non-U.S. Unitholders and certain other categories of Unitholders will not be subject to reporting on IRS Form 1099 or backup withholding, if such Unitholders furnish the Fund with an appropriate and properly executed IRS Form W-8 or IRS Form W-9, as applicable, certifying as to their exempt status.

28558437.2.EU_BUSINESS

25.    **FINANCIAL YEAR - AUDIT**

The accounts of the Fund are closed each year on 31 December.

The accounts of the Fund shall be kept in US Dollars in compliance with International Financial Reporting Standards (**IFRS**).

The accounts of the AIFM and of the Fund will be audited annually by the Auditor, as appointed from time to time by the AIFM.

26.    **DATA PROTECTION**

The personal data or information given in a Subscription Document or otherwise collected, provided to or obtained by the AIFM, acting as data controller (the **Data Controller**), in connection with an application to subscribe for, or for the holding of, one or more Units, or at any other time, as well as details of the investor's holding of Units (the **Personal Data**), will be stored in digital form or otherwise collected, used, stored, retained, transferred and/or otherwise processed for the purposes described below (the **Processing**), in compliance with the Regulation (EU) 2016/679 of 27 April 2016 on the protection of natural persons with regard to the processing of personal data and on the free movement of such data, and repealing Directive 95/46/EC (**GDPR**) and the Luxembourg law of 1 August 2018 (together with GDPR the **Data Protection Law**).

The Data Controller will collect, use, store, retain, transfer and/or otherwise process the Personal Data: (i) on the basis of the investor's consent, (ii) to perform any services resulting from the Subscription Document, including the holding of one or more Units in general, (iii) to comply with a legal or regulatory obligation of the Data Controller, (iv) where necessary for the purposes of the legitimate interests pursued by the Data Controller, or by the service providers (including without limitation its auditors and information technology providers), any lender to the Data Controller or related entities (including without limitation their respective general partner or management company, investment manager and service providers) in or through which the Data Controller intend to invest, and any of the foregoing respective agents, delegates, affiliates, subcontractors and/or their successors and assigns generally (the **Data Processors**), which mainly consist in the provision of the services in connection with the Subscription Document to the investor in accordance with foreign laws and regulations or any order of a foreign court, government, regulatory or tax authority, including when providing such services in connection with the Subscription Document to the investors and beneficial owners who has not directly entered into the Subscription Document (the **Relevant Persons**), except where such legitimate interests are overridden by the interest or fundamental rights and freedoms of the investor or any Relevant Person. Should the investor refuse to communicate its Personal Data or the collection, use, storage, retention, transfer and/or any other processing of its Personal Data as described in this Section, the AIFM may refuse the subscription of Units.

The Processing includes, without limitation, the collection, use, storage, retention, transfer and/or any other processing of Personal Data for any of the following purposes: (i) to process, manage and administer the Units and any related accounts on an on-going basis, (ii) for any specific purposes to which the investor has consented in addition to its consent in the Subscription Document in compliance with the Data Protection Law, (iii) to comply with legal or regulatory requirements applicable to the Data Controller, a Data Processor and/or the Investor, (iv) where necessary for the purposes of tax reporting to one or more relevant authorities and (v) to fulfil the terms and conditions of, and any services required by, the investor in relation to the Subscription Document and the holding of the Units and to execute all tasks that are carried out under the Subscription Document and in relation to the Units.

55

The Personal Data that will be collected, used, retained, stored, transferred and/or otherwise processed includes without limitation: (i) the name, address, email address, telephone numbers, business contact information, current employment, career history, current investments, historic investments, investment preferences, and credit history of the investor and of related individuals of the investor (including without limitation the investor's directors, officers, individual representatives, legal representatives, trustees, settlors, signatories, shareholders, unitholders, investors, nominees, employees and/or any Relevant Person(s)); (ii) any other data required by the Data Controller to perform services in connection with or resulting from the Subscription Agreement, the Units, and/or any contract with any Data Processor; and (iii) any data required by the Data Controller to comply with any legal and/or regulatory obligations. The Personal Data will be directly collected from the investor or, as the case may be, through public sources, social media, subscription services, other third party data sources or, through the investor's authorized intermediaries, directors, officers, individual representatives (including, without limitation, legal representatives), trustees, settlors, signatories, shareholders, unitholders, investors, nominees or employees.

Each investor is required to have duly and completely informed all natural persons (including, without limitation, the investor's directors, officers, individual representatives, legal representatives, trustees, settlors, signatories, shareholders, unitholders, investors, nominees, employees, any Relevant Persons and representatives of legal persons) and other data subjects whose Personal Data will be processed in the context of the investor's holding of Units about the collection, use, storage, transfer or any other processing of their Personal Data and their rights in accordance with the information requirements under the Data Protection Law and, where necessary and appropriate, have obtained consent that may be required for the Processing of this Personal Data.

The Data Controller shall be entitled to assume that those persons have, where necessary, given any such consent and have been informed of all information relating to the collection, use, storage and/or transfer and/or processing of their Personal Data and of their rights as described in this section.

Each Investor acknowledges, understands and, to the extent necessary, consents:

(a)     that for purposes of and in connection with the Processing: (i) the Data Processors may collect, use, retain, store transfer and/or otherwise process Personal Data on behalf of the Data Controller in accordance with Data Protection Law and (ii) Personal Data may also be shared, transferred and disclosed, out of the context of any delegation, to any Data Processors and to third parties, acting as data controllers, including the investor's professional and financial advisers, any Data Processor's auditors, technology providers, board of managers or directors, delegates, duly appointed agents and related, associated or affiliated companies, in each case which may be located in a jurisdiction that does not have equivalent data protection laws to those of the EU, including the Data Protection Law and the law of 5 April 1993 on the financial sector, as amended which provides for a professional secrecy obligation, or that are not subject to an adequacy decision of the European Commission, for their own purposes, including, without limitation, developing and processing the business relationship with any Shareholder(s) and/or any Relevant Person(s);

(b)     to the collection, use, processing, storage and retention of Personal Data by any service providers acting as a data processor, for the provision of the services to be provided under the relevant agreements relating to the Fund and for other related purposes for which it acts as a data controller and also acknowledges and consents (i) to the transfer of such Personal Data to other entities within the relevant service provider's group, including entities outside Luxembourg and the EU and (ii) to the transfer of such Personal Data to third party companies or entities including their entities outside the EU where the transfer is necessary for the

56

maintenance of records, administrations or provision of services under the relevant agreements in relation to any investment product or services of any group of companies. The maintenance of records, administrations and provision of the services contemplated under the relevant agreements will leverage operational and technological capabilities located outside Luxembourg and the EU. Personal Data including the identity of investors and the values of its Units may therefore be accessible to other entities within the group of the relevant service providers; and

(c)     to the fact that Personal Data the Investor is supplying or that is collected will enable the AIFM as well as, where relevant, any of the Data Processors, to process, manage and administer the investor's Units and any related accounts on an on-going basis, and to provide appropriate services to the investor as an Unitholder. Any of the Data Processors may collect, use, store, retain or otherwise process the Personal Data for the purposes described in the Subscription Document, this Placement Memorandum, the relevant agreements with the service providers as well as for the purposes of the investor's (and any Relevant Person's) anti-money laundering identification and tax identification in this context, and in order to comply with their applicable legal obligations including without limitation tax reporting obligations, FATCA and CRS.

Without prejudice to the paragraph below, and notwithstanding the Investor's consent to the processing of its Personal Data in the manner set forth in the Subscription Document, the Investor has the right to object at any time to processing of its Personal Data (including, without limitation, for direct marketing purposes, which includes profiling to the extent that it is relating to such marketing).

Furthermore, each Investor acknowledges, understands, and to the extent necessary, consents, that the Data Controller as well as, where relevant, the Data Processors, may be required by applicable laws and regulations to transfer, disclose and/or provide Personal Data, in full compliance with applicable laws and regulations, and in particular article 48 of the GDPR to supervisory, tax, or other authorities in various jurisdictions, in particular those jurisdictions where (i) the Fund is contemplated to be registered for offering of Units, (ii) investors are resident, domiciled or citizens or (iii) the AIFM is, or is seeking to, be registered, licensed or otherwise authorized.

Each Investor has the right to request a copy of Personal Data held in relation to it, and to request that they be amended, updated, completed or deleted as appropriate, if incorrect, and to request a limitation to a processing of its Personal Data and the portability of any Personal Data processed by the Data Controller in the manner and subject to the limitations prescribed in the Data Protection Law.

The Unitholder can exercise any of its rights in relation to its Personal Data and require any further information on the data protection policy by letter addressed to the AIFM's compliance officer:

dmorin@cmclux.com
Carlisle Management Company S.C.A.
9, rue Sainte Zithe
L-2673 Luxembourg
Grand Duchy of Luxembourg

Investors are entitled to address any claim relating to the processing of its Personal Data to a data protection supervisory authority – in Luxembourg, the *Commission Nationale pour la Protection des Données*.

The Unitholders have a right of opposition regarding the use of their Personal Data for marketing purposes. This opposition can be made by letter addressed to the AIFM's compliance officer.

The Data Controller and the Data Processors processing the Personal Data on its behalf will accept no liability with respect to an unauthorized third party receiving knowledge of, or having access to, its Personal Data, except in the case of proven negligence or serious misconduct by the Data Controller and/or any Data Processor that processes the Personal Data on its behalf or by any of their respective employees, officers, affiliates, agents and sub-contractors. In any event, the liability of the Data Controller with respect to the processing of Personal Data remains strictly limited to what is imposed by the Data Protection Law.

The Personal Data will be held until the investor ceases to be a Unitholder and a period of 10 years thereafter where necessary to comply with applicable laws and regulation or to establish, exercise or defend actual or potential legal claims, subject to the applicable statutes of limitation, unless a longer period is required by applicable laws and regulations.

The AIFM's personal data protection policy is available upon request and subject to update or modification.

## 27.     UNITHOLDERS' INFORMATION

27.1    Out of Court Complaints

The AIFM has implemented procedures for managing customer complaints which complies with the requirements of CSSF Regulation 16-07 relating to the out-of-court resolution of complaints.

A complaint is an expression of dissatisfaction received whether orally or in writing, justified or not, from or on behalf of an eligible complainant, about the AIFM's provision of or failure to provide a financial service. A request for information, clarification or service is not a complaint.

In this context, any complaint must be sent to the AIFM's complaints handling officer, whose full contact details can be requested free of charge to:

info@cmclux.com
or by letter addressed to:
Carlisle Management Company Luxembourg
Attn: Compliance Department
9, rue Sainte Zithe
L-2673 Luxembourg
Grand Duchy of Luxembourg

Complaints should include (i) the full name of complainant, (ii) role of complainant (e.g. Unitholder, Unitholder representative or lawyer, etc.), (iii) contact details, (iv) detailed description of the facts underlying the complaint, and (v) any document or other detail of relevance in connection with the complaint.

An acknowledgement letter will be sent to the complainant within ten Business Days as of the receipt of the complaint if the complaint cannot be closed before this timeline.

An update letter will be sent to the customer one month and every four weeks thereafter to inform them of the progress of their complaint.

A final letter will be sent to the customer to inform them on the outcome of the AIFM's investigation and the actions taken to resolve the complaint.

The AIFM informs its customers of the existence of the out-of-court dispute settlement procedure with the CSSF.

Where a customer did not receive a response or satisfactory response within one month of a complaint being submitted to the Fund, the customer can refer their complaint to the CSSF within one year of the date of filing their complaint with the Fund. In the event of submitting a complaint to the CSSF it should be submitted in the English, Luxembourgish, German, or French languages by the following means:

    (a)    by mail addressed to the Commission de Surveillance du Secteur Financier, 283, route d'Arlon, L-2991 Luxembourg;

    (b)    by fax at (+352) 26 25 1 – 601;

    (c)    by email at reclamation@cssf.lu; or

    (d)    at http://www.cssf.lu/fileadmin/files/Formulaires/Reclamation_240615_EN.pdf.

The complaints management policy of the AIFM is also available from the AIFM's complaints handling officer.

27.2    Periodic Reporting and Disclosures to Unitholders

The AIFM will publish an Annual Report within six months as from the end of each financial year, which will include, inter alia, audited financial statements, a description of the assets of the Fund, a report from the Auditor, a calculation of the value of the assets of the Fund as per the financial year end and, where applicable, any other information as set out below.

As required by the AIFM Rules, if applicable, the following information will be periodically provided to Unitholders by means of disclosure in the Annual Report of the Fund or, if the materiality so justifies, notified to Unitholders separately (by way of an Investor Disclosure):

(a)    any material changes in the information listed in article 21 of the AIFM Law over a relevant financial year;

(b)    the total amount of remuneration for the relevant financial year, split into fixed and variable remuneration, paid by the AIFM to its staff, and number of beneficiaries;

(c)    the aggregate amount of remuneration broken down by senior management and members of the staff of the AIFM whose actions have a material impact on the risk profile of the Fund;

(d)    the percentage of the Sub-Funds' assets which are subject to special arrangements arising from their illiquid nature;

(e)    any new arrangements for managing liquidity of the Sub-Funds, whether or not these are special arrangements, including any changes to the liquidity management systems and procedures referred to in article 16(1) of the AIFM Directive and as specified in the "liquidity management" or "leverage" sections of this Placement Memorandum which are material in accordance with article 106(1) of the AIFM-CDR;

(f)    the current risk profile of the Sub-Funds and the risk management system employed by the AIFM to manage those risks;

59

(g)   any changes to the maximum level of leverage which the AIFM may employ on behalf of the Sub-Funds as well as any right of the reuse of collateral or any guarantee granted under any leveraging arrangement;

the total amount of leverage employed by the Sub-Funds.

In case the AIFM decides to activate any gates, side pockets or similar special arrangements or suspend redemptions, the Fund shall immediately notify the affected Unitholders as set out in this Memorandum.

27.3    Documents Available for Inspection

The documents and information listed in article 21 of the AIFM Law as well as any material changes whereof can be inspected, free of charge, by the Unitholders and by prospective investors at the registered office of the AIFM:

(a)   this Placement Memorandum;

(b)   the Management Regulations;

(c)   the Annual Reports;

(d)   the Depositary Agreement;

(e)   the Central Administration Agreement;

(f)   the US Custody Services Agreement;

(g)   the Policy Escrow Agreement;

(h)   the Servicing Agent Agreement and the Contingent Servicing Agent Agreement;

(i)   the Actuarial Consulting Agreement;

(j)   the Portfolio Management Agreement(s) and Investment Advisory Agreement(s), if any;

(k)   the Liquidity Management Policy and Valuation Policy;

(l)   a description of any arrangement made by the Depositary to contractually discharge itself of liability in accordance with the AIFM Rules (or a confirmation that no such arrangement exists);

(m)   the Conflict of Interests Policy;

(n)   the Out of Court Complaint Policy; and

(o)   the latest Net Asset Value of the relevant Class within the relevant Sub-Fund.

27.4    Disclosure under SFDR and Taxonomy Regulation

The investment objective of each of the Sub-Funds is focused on generating return by acquiring life settlement policies and other mortality related financial products.

60

The AIFM does not take into account environmental, social or governance factors in its investment decision process. The AIFM takes the view that no such factors can be applied for life settlement policies and other mortality related financial products. It results that the usual sustainability risk factors do not have an impact on the performance of life settlement policies and other mortality related financial products and more generally on the portfolios of each of the Sub-Funds.

From the perspective of SFDR, the AIFM therefore classifies each of the Sub-Funds under the last paragraph of article 6.1 of the SFDR (so-called "explain" model).

Article 7 of Taxonomy Regulation applies to each Sub-Fund: The investment underlying this financial product do not take into account the EU criteria for environmentally sustainable economic activities.

## 28.    CONFIDENTIALITY

The AIFM has adopted internal procedures designed to protect confidential personal information of Unitholders from inappropriate disclosure to third parties.

Each Unitholder shall be prohibited from using for such Unitholder's own private or commercial purposes any confidential or proprietary information of the Fund or the AIFM, to which such Unitholder may have access by reason of an investment in the Fund, and from disclosing any such confidential or proprietary information to any third parties, except those employees, principals or agents of the Unitholder whose access to such information is reasonably necessary for such Unitholder's operations and who are bound by similar non-disclosure obligations.

## 29.    AMENDMENTS TO THE PLACEMENT MEMORANDUM

29.1    Subject to regulatory approval, the AIFM may amend the provisions of Part I of this Placement Memorandum as follows:

(a)    where the change is determined by the AIFM not to be material, upon the decision of the AIFM; and

(b)    where the change is determined by the AIFM to be material (including changes on the investment policy), only following with the written consent by all the Unitholders.

29.2    Subject to regulatory approval, the AIFM may amend the provisions of Part II of this Placement Memorandum as follows:

(a)    where the change is determined by the AIFM not to be material, upon the decision of the AIFM; and

(b)    where the change is determined by the AIFM to be material (including changes on the investment policy), only following the written consent by all the Unitholders in the relevant Sub-Fund.

29.3    Unitholders will be notified by the AIFM of all amendments that are adopted without their consent. No variation may be made to this section without unanimous consent of all Unitholders.

61

PART II:  PROVISIONS APPLICABLE TO THE SUB-FUNDS

**LUXEMBOURG LIFE FUND – LONG TERM GROWTH FUND**

**(hereafter "Long Term Growth Fund")**

1.    **INVESTMENT OBJECTIVE, POLICY, STRATEGY AND RESTRICTIONS**

1.1    Description of the Investment Objective, Policy and Strategy

   1.1.1    The investment policy of Long Term Growth Fund is to principally invest in a diversified portfolio of US-domiciled life insurance policies and on an ancillary basis in other mortality related products (such as but not limited to annuities, structured products with derivatives) insuring individuals of an advanced age (generally above the age of 65 years). Such policies are widely known as Life Settlements. Life Settlements offer a known, pay-out structure total return upon the death of the life insured. The Long Term Growth Fund will purchase Life Settlements, or portfolios of Life Settlements, in the secondary market at a discount to their known, final maturity values. A well-structured and properly diversified portfolio of Life Settlements can provide an attractive risk-return ratio to investors.

   1.1.2    The strategy of Long Term Growth Fund is to purchase carefully selected life insurance policies that are beyond the contestability period. Long Term Growth Fund seeks to build a large diversified portfolio. Diversification should be done across different sectors including but not limited to: carrier concentration, expected maturities, gender, age, medical impairment, geography and face value size. The primary risk in the strategy is longevity, which creates an investment with very little correlation to the financial market. This is a buy and hold strategy which however does not prevent the AIFM to sell life insurance policies if management deems it in the best interest of the Sub-Fund. Long Term Growth Fund can additionally seek to enhance yield by purchasing policies that have been premium financed. Premium finance policies will not exceed 25% the portfolio. The Long Term Growth Fund will seek to build a strong smooth long term performance with little volatility or correlation to market conditions.

1.2    Investment Restrictions

   1.2.1    The following investment restrictions will apply to Long Term Growth Fund. The Long Term Growth Fund:

      (a)    will **not** purchase a Life Settlement which is issued by an insurance company rated less than "A-" by AM Best, or equivalent by Standard & Poor's and/or Moody's;

      (b)    will **not** purchase a Life Settlement which has not yet passed the suicide and contestability period, unless covered by protection commensurate with the risk that the issuing life insurance company successfully contests the payment of a policy's maturity value should maturity occur during the policy's contestability period as defined within the policy contract (usually a period of 2 years from issuance);

      (c)    will **not** purchase Life Settlements issued by one single insurance company, the aggregate face value of which is more than 20% of the total face value of

the policies held by the Long Term Growth Fund. The total face value of Long Term Growth Fund applies from the 75th Life Settlement onwards;

(d)     will **not** purchase a Life Settlement where the insured's age is less than 65 years;

(e)     will **not** purchase a Life Settlement from a non-United States resident unless the policy was issued by a US insurer and meets all other conditions listed, and is approved by the AIFM;

(f)     will **not** purchase a Life Settlement where the face value exceeds 10% of the aggregate face value of the Long Term Growth Fund. The total face value of the Long Term Growth Fund applies from the 75th Life Settlement onwards;

(g)     will **not** purchase any Life Settlements where the insured has the primary diagnosis of having AIDS or being HIV positive;

(h)     will **not** purchase any Life Settlements whereby the insured has an average estimated life expectancy, as assessed by multiple independent medical experts, of less than 2 years (commonly referred to as "viaticals"); and

(i)     will **not** purchase a Life Settlement where there is less than one life expectancy assessment produced by the following independent life assessment companies as used to determine the Pricing Life Expectancy: 21st Services, American Viatical Services ("AVS"), Fasano and Associates, EMSI, ISC. The Long Term Growth Fund may use life expectancy assessments from companies not listed above if the company producing such assessment is deemed equivalent or superior to those listed above;

(j)     **may** invest in Life Settlements that have been premium financed. Once the portfolio investment level exceeds US$ 50 million, the value of ex-premium finance policies shall not exceed 25% of the value of the portfolio; and

(k)     **may** invest in foreign exchange forward contracts, futures contracts, and options, for the purpose of hedging of the investments only.

Notwithstanding the investment restriction (a) above, if the credit rating of an insurance company is lowered subsequent to the acquisition of the Life Settlements by the Long Term Growth Fund, the AIFM will not be obliged to sell such Life Settlements.

1.2.2     The limits set out in (c) and (f) above shall not apply during the first six months, or until a minimum of 75 Life Settlements have been purchased by the Long Term Growth Fund. If the excess in the limits set out in (c) or (f) above results from a subsequent change in the total face value of the underlying life insurance policies held, the excess shall not be treated as a breach of such restrictions, and the AIFM shall take necessary steps within a reasonable time to remedy the situation taking due account of the interests of the Unitholders.

1.2.3     The Long Term Growth Fund will ensure, via diversification of the underlying assets, an appropriate level of risk-spreading in accordance with CSSF Circular 07/309. Similarly, in relation to investments in derivatives such as but not limited to,

64

those provided for in (k) above, the counterparty risk in an OTC transaction will, where applicable, be limited having regard to the quality and qualification of the counterparty, which shall always be a first class professional specialised in this type of transactions.

1.3     Hedging Policy

The AIFM has the discretion to enter into hedging arrangements for hedging the fluctuation in the value of Life Settlements, as and when such products become available and are cost-effective.

1.4     Borrowing Policy/Leverage Policy

   1.4.1     The Long Term Growth Fund may borrow up to 50% of its net asset value to provide liquidity for redemption, payment of expenses, and bridging between the purchase of Life Settlements. It is not the policy of the Long Term Growth Fund to borrow directly for the purpose of leveraging its own investments.

   1.4.2     The maximum leverage of the Long Term Growth Fund will not exceed the ratio of 2:1 under both, the gross or commitment method, at any given time.

1.5     Securities Financing Transactions

The AIFM currently does not intend to engage in securities lending and/or repurchase (or reverse repurchase) transactions and to invest in total return swaps. If the AIFM decides to make use of such techniques and instruments, this Placement Memorandum will be updated accordingly to comply with the disclosure requirements of Regulation (EU) 2015/2365 of the European Parliament and of the Council of 25 November 2015 on transparency of securities financing transactions and of reuse and amending Regulation (EU) No 648/2012.

**2.     UNITS**

2.1     Classes of Units Available

   2.1.1     As of the date of this Memorandum, the following Classes have been created for Long Term Growth Fund:

      (a)     (USD) Class of Units: common capitalisation Units, denominated in USD.

              All subscriptions for A (USD) Class of Units should be made in USD. In the case of redemptions of A (USD) Class Units, all redemption proceeds will be paid in USD.

      (b)     (USD) Institutional Class of Units: common capitalisation Units, denominated in USD.

              All subscriptions for B (USD) Class of Units should be made in USD. In the case of redemptions of B (USD) Class Units, all redemption proceeds will be paid in USD.

      (c)     (EURO) Class of Units: common capitalisation Units, denominated in EURO.

65

All subscriptions for C (EURO) Class of Units should be made in EURO. In the case of redemptions of C (EURO) Class Units, all redemption proceeds will be paid in EURO.

(d)    (Euro) Institutional Class of Units: common capitalisation Units, denominated in EURO.

All subscriptions for D (EURO) Class of Units should be made in EURO. In the case of redemptions of D (EURO) Class Units, all redemption proceeds will be paid in EURO.

(e)    (GBP) Class of Units: common capitalisation Units, denominated in GBP.

All subscriptions for E (GBP) Class of Units should be made in GBP. In the case of redemptions of E (GBP) Class Units, all redemption proceeds will be paid in GBP.

(f)    (GBP) Institutional Class of Units: common capitalisation Units, denominated in GBP.

All subscriptions for F (GBP) Class of Units should be made in GBP. In the case of redemptions of F (GBP) Class Units, all redemption proceeds will be paid in GBP.

(g)    (USD) Taxable Class of Units: common capitalisation Units, denominated in USD.

All subscriptions for G (USD) Class of Units should be made in USD. In the case of redemptions of G (USD) Class Units, all redemption proceeds will be paid in USD.

(h)    (EURO) Taxable Class of Units: common capitalisation Units, denominated in EURO.

All subscriptions for H (EURO) Class of Units should be made in EURO. In the case of redemptions of H (EURO) Class Units, all redemption proceeds will be paid in EURO.

(i)    (GBP) Taxable Class of Units: common capitalisation Units, denominated in GBP.

All subscriptions for I (GBP) Class of Units should be made in GBP. In the case of redemptions of I (GBP) Class Units, all redemption proceeds will be paid in GBP.

(j)    (EURO) Class of Units: common capitalisation Units, denominated in EURO.

All subscriptions for J (EURO) Class of Units should be made in EURO. In the case of redemptions of J (EURO) Class Units, all redemption proceeds will be paid in EURO.

66

(k)    (USD) Taxable Institutional Class of Units: common capitalisation Units, denominated in USD.

All subscriptions for K (USD) Class of Units should be made in USD. In the case of redemptions of K (USD) Class Units, all redemption proceeds will be paid in USD.

(l)    (Euro) Taxable Institutional Class of Units: common capitalisation Units, denominated in EURO.

All subscriptions for L (EURO) Class of Units should be made in EURO. In the case of redemptions of L (EURO) Class Units, all redemption proceeds will be paid in EURO.

(m)    (GBP) Taxable Institutional Class of Units: common capitalisation Units, denominated in GBP.

All subscriptions for M (GBP) Class of Units should be made in GBP. In the case of redemptions of M (GBP) Class Units, all redemption proceeds will be paid in GBP.

(n)    (CHF) Class of Units: common capitalisation Units, denominated in CHF.

All subscriptions for N (CHF) Class of Units should be made in CHF. In the case of redemptions of N (CHF) Class Units, all redemption proceeds will be paid in CHF.

(o)    (CHF) Taxable Class of Units: common capitalisation Units, denominated in CHF.

All subscriptions for O (CHF) Class of Units should be made in CHF. In the case of redemptions of O (CHF) Class Units, all redemption proceeds will be paid in CHF.

(p)    (CHF) Institutional Class of Units: common capitalisation Units, denominated in CHF.

All subscriptions for P (CHF) Class of Units should be made in CHF. In the case of redemptions of P (CHF) Class Units, all redemption proceeds will be paid in CHF.

(q)    (CHF) Institutional Taxable Class of Units: common capitalisation Units, denominated in CHF.

All subscriptions for Q (CHF) Class of Units should be made in CHF. In the case of redemptions of Q (CHF) Class Units, all redemption proceeds will be paid in CHF.

(r)    (EURO) Class of Units: common capitalisation Units reserved to shareholders and employees of the AIFM, denominated in EURO.

67

All subscriptions for R (EURO) Class of Units should be made in EURO. In the case of redemptions of R (EURO) Class Units, all redemption proceeds will be paid in EURO.

(s)    (USD) Class of Units: common capitalisation Units reserved to shareholders and employees of the AIFM, denominated in USD.

All subscriptions for S (USD) Class of Units should be made in USD. In the case of redemptions of S (USD) Class Units, all redemption proceeds will be paid in USD.

(t)    (EURO) Taxable Class of Units: common capitalisation Units reserved to shareholders and employees of the AIFM, denominated in EURO.

All subscriptions for T (EURO) Class of Units should be made in EURO. In the case of redemptions of T (EURO) Class Units, all redemption proceeds will be paid in EURO.

(u)    (USD) Taxable Class of Units: common capitalisation Units reserved to shareholders and employees of the AIFM, denominated in USD.

All subscriptions for U (USD) Class of Units should be made in USD. In the case of redemptions of U (USD) Class Units, all redemption proceeds will be paid in USD.

(v)    (EUR) Taxable Class of Units: common capitalisation Units reserved to French AIFs as defined under article L214-24 of *Code monétaire et financier*, denominated in EUR.

All subscriptions for V (EUR) Class of Units should be made in EUR. In the case of redemptions of V (EUR) Class Units, all redemption proceeds will be paid in EUR.

The AIFM may create one or more additional Classes in which case the Placement Memorandum will be updated.

2.2    Transfer of Units

2.2.1    Units may not be transferred unless permitted by the AIFM, after having satisfactorily identified the transferee and verified its eligibility to become a Unitholder.

2.2.2    No sale, assignment, transfer, grant of a participation in, pledge, hypothecation, encumbrance or other disposal (each a **Transfer**) of all or any portion of any Units, whether voluntary or involuntary, shall be valid or effective if:

(a)    The Transfer would result in a violation of any Luxembourg Law or the laws and regulations of any other jurisdiction (including, without limitation, the Securities Act, any securities laws of the individual states of the United States, or ERISA) or submit the AIFM, a Sub-Fund or an intermediary vehicle to any other adverse tax, legal or regulatory consequences as determined by the AIFM;

68

(b)    The Transfer would result in a violation of any term or condition of the Management Regulations or of this Placement Memorandum; and

(c)    The Transfer would result in the AIFM being required to register as an investment company under the Investment Company Act, as amended.

2.2.3    It is a condition for any Transfer (whether permitted or required)

(a)    To be approved by the AIFM (prior to the Transfer, through the General Partner), such approval not to being unreasonably withheld;

(b)    That the transferee is an Eligible Investor;

(c)    Not to violate any laws or regulations (including, without limitation, any securities laws) applicable to it; and

(d)    That the transferee enters into a Subscription Agreement in respect of the relevant Units so transferred.

2.2.4    The AIFM, in its sole and absolute discretion, may condition such Transfer upon the receipt of an opinion of responsible counsel which opinion shall be reasonably satisfactory to the AIFM.

2.2.5    The transferor shall be responsible for and pay all costs and expenses (including any taxation) arising in connection with any such permitted Transfer, including reasonable legal fees arising in relation thereto incurred by the AIFM or its affiliates and stamp duty or stamp duty reserve tax (if any) payable. The transferor and the transferee must indemnify the indemnified persons, in a manner satisfactory to the AIFM against any claims and expenses to which the indemnified persons may become subject arising out of or based upon any false representation or warranty made by, or breach or failure to comply with any covenant or agreement of, such transferor or transferee in connection with such Transfer. In addition, each Unitholder agrees to indemnify the AIFM and each indemnified person from any claims and expenses resulting from any Transfer or attempted Transfer in violation of the Management Regulations, this Placement Memorandum (and the terms of their Subscription Agreement or any applicable side letter).

2.2.6    No Transfer of all or any part of any Units of this Sub-Fund, whether direct or indirect, voluntary or involuntary, shall be valid or effective if in breach of the additional restrictions (if any) on such a Transfer as set out in the applicable Special Section.

2.3    Minimum Subscription Amounts and Minimum Holding

2.3.1    A Unitholder's minimum initial subscription amount for Units in the Long Term Growth Fund per Class is:

| Classes | Minimum Subscription amounts |
|---------|------------------------------|
| A | Equivalent of EUR 125,000 in USD |

69

| B | USD 1,000,000 |
|---|---|
| C | EUR 125,000 |
| D | EUR 750,000 |
| E | Equivalent of EUR 125,000 in GBP |
| F | GBP 650,000 |
| G | Equivalent of EUR 125,000 in USD |
| H | EUR 125,000 |
| I | Equivalent of EUR 125,000 in GBP |
| J | EUR 125,000 |
| K | USD 1,000,000 |
| L | EUR 750,000 |
| M | GBP 650,000 |
| N | Equivalent of EUR 125,000 in CHF |
| O | Equivalent of EUR 125,000 in CHF |
| P | CHF 1,000,000 |
| Q | CHF 1,000,000 |
| R | EUR 125,000 |
| S | USD 125,000 |
| T | EUR 125,000 |
| U | USD 125,000 |
| V | EUR 125,000 |

2.3.2    The AIFM may, at its sole discretion, determine a minimum holding and subsequent subscription amount.

2.4    Subscriptions

2.4.1    A, B, C, D, E, F, J, N, P, R, S and V Units of the Sub-Fund are exclusively available to Eligible Investors that are resident in any "Eligible Country" appearing on the list of "Eligible Countries" established by the AIFM. Should the AIFM decide to add a new country, the list of "Eligible Countries" shall be amended accordingly. Any

70

amendment to the relevant list is subject to a prior tax opinion provided by the Fund's Counsel as to Tax Matters.

2.4.2     R and S Units of the Sub-Fund are exclusively available to Eligible Investors who are shareholders of the AIFM or have entered into an employment agreement with the AIFM and who are resident in any "Eligible Country" appearing on the list of "Eligible Countries" established by the AIFM. Should the AIFM decide to add a new country, the list of "Eligible Countries" shall be amended accordingly. Any amendment to the relevant list is subject to a prior tax opinion provided by the Fund's Counsel as to Tax Matters.

2.4.3     Prior to registration of Units in the name of an investor who is a resident of an Eligible Country such investor must provide, at its own expense, the Central Administration Agent with valid and properly completed US tax documentation (which will ordinarily consist of an original IRS Form W-8BEN or W-8IMY) certifying its ability to claim benefits under the double tax treaty between the USA and the Eligible Country of which such investor is a resident. Any subscription order belonging to an investor of the A, B, C, D, E, F, J, N, P, R, S and V Units that does not comply with the certification requirements required by the AIFM shall be rejected. Any subscription-related documentation (including U.S. tax documentation) received by the Central Administration Agent shall be forwarded by the Central Administration Agent to the AIFM or an agent thereof for monitoring and acceptance / refusal of the application. The Central Administration Agent shall not be responsible for verifying the validity, accuracy, genuineness or completeness of any subscription-related documents received from a potential investor.

2.4.4     G, H, I, K, L M, O, Q, T and U Units ("**Taxable Units**") of the Sub-Fund are available to Eligible Investors that are **not** resident in any "Eligible Countries". From the net realised gain allocable to investors of the Taxable Units, 30% Non-Resident Alien tax will be withheld by the Withholding Agent. Net realised gain is defined as the face value of the life settlement policy upon maturity minus the purchase price and the premiums paid by the Sub-Fund.

2.4.5     Following the Initial Offering Period, subscriptions for Units shall be dealt with respect to each Valuation Day (as defined below), with an offer price per Unit equivalent to the Net Asset Value per Unit of the relevant Class plus a marketing fee of maximum 5% of the Net Asset Value per Unit of the relevant Class, which shall be allocated to the AIFM.

2.4.6     Subscription forms must be received by the Central Administration Agent no later than 16:00 (Luxembourg time) five (5) Business Days before the applicable Valuation Day.

2.4.7     Subscription monies are payable in the currency of the Class and must reach the Depositary no later than on the applicable Valuation Day. No subscription fee is levied in this Sub-Fund.

2.4.8     Investors for which W8BEN or WBIMY forms are required will provide, at their own expense, the Central Administration Agent with originals of such forms.

71

2.5    Lock-up Period for Class A

Unless otherwise decided by the AIFM, Unitholders of Class A have not the right to redeem their Units during a period of one year after the Units have been issued to the relevant Unitholder (the "**Lock-up Period**"). Units held by these Unitholders after the Lock-up Period may be redeemed in accordance with Section 2.6.

2.6    Redemption of Units

2.6.1    Subject to the restrictions set forth below, Units may be redeemed with reference to the last day of each calendar quarter (being March, June, September and December) which is a bank business day in Luxembourg (the "**Redemption Day**"), following the Lock-up Period.

2.6.2    Redemption requests for all Classes except V Class must be received by the Central Administration Agent 90 (ninety) calendar days before the applicable Redemption Day – redemption requests for V Class must be received by the Central Administration Agent 30 (thirty) calendar days before the applicable Redemption Day. Requests received after the applicable deadline will not be effective until the next succeeding Redemption Day.

2.6.3    Redemption proceeds shall be paid in the currency of the Class within thirty (30) calendar days after the applicable Redemption Day, subject to the availability of funds, provided that the original formal redemption request has been received by the Central Administration Agent.

2.6.4    However, in case of significant redemption applications or in case of a lack of liquidity of a significant portion of the assets of the Long Term Growth Fund, the AIFM reserves the right to finalise the Net Asset Value of the Units only after carrying out the sale of Life Settlements as required, on behalf of the Long Term Growth Fund. In that case, the redeeming Unitholder may receive a partial payment of its redemption proceeds, to be considered as an advance on the final redemption amount that will be determined once the relevant sales of Life Settlements have been finalised.

2.6.5    However, the Long Term Growth Fund shall not proceed to the redemption of Units in the event that the net assets of the Long Term Growth Fund would fall below the minimum capital foreseen in article 21 of the SIF Law as a result of such distribution.

2.6.6    The AIFM will have absolute discretion in permitting any redemption of Units, but such permission will not, in normal circumstances and in the ordinary course of business, be unreasonably withheld.

2.6.7    The redemption fee charged by the AIFM per Class is the following:

| Classes | Redemption Fes |
|---------|----------------|
| A Class | 8% during twelve months following the subscription date ("**Year 1**") and twelve months following the first anniversary of the subscription date ("**Year 2**"), 6% during twelve months following the second anniversary of the subscription date ("**Year 3**"), 4% |

72

| | during twelve months following the third anniversary of the subscription date ("**Year 4**"). After the fourth anniversary of the subscription date, no redemption fee is payable. |
|---|---|
| B Class Institutional | No redemption fees |
| C Class | 5% during Year 1, 4% during Year 2, 3% during Year 3, 2% during Year 4 and 1% during twelve months following the fourth anniversary of the subscription date ("**Year 5**"). After the fifth anniversary of the subscription date, no redemption fee is payable. |
| D Class Institutional | No redemption fees |
| E Class | 5% during Year 1, 4% during Year 2, 3% during Year 3, 2% during Year 4, and 1% during Year 5. After the fifth anniversary of the subscription date, no redemption fee is payable. |
| F Class Institutional | No redemption fees |
| G Class | 5% during Year 1, 4% during Year 2, 3% during Year 3, 2% during Year 4, and 1% during Year 5. After the fifth anniversary of the subscription date, no redemption fee is payable. |
| H Class | 5% during Year 1, 4% during Year 2, 3% during Year 3, 2% during Year 4, and 1% during Year 5. After the fifth anniversary of the subscription date, no redemption fee is payable. |
| I Class | 5% during Year 1, 4% during Year 2, 3% during Year 3, 2% during Year 4, and 1% during Year 5. After the fifth anniversary of the subscription date, no redemption fee is payable. |
| J Class | 5% during Year 1, 4% during Year 2, 3% during Year 3, 2% during Year 4, and 1% during Year 5. After the fifth anniversary of the subscription date, no redemption fee is payable. |
| K Class Institutional | No redemption fees |
| L Class Institutional | No redemption fees |
| M Class Institutional | No redemption fees |
| N Class | 5% during Year 1, 4% during Year 2, 3% during Year 3, 2% during Year 4, and 1% during Year 5. |

73

| | | After the fifth anniversary of the subscription date, no redemption fee is payable. |
|---|---|---|
| | O Class | 5% during Year 1, 4% during Year 2, 3% during Year 3, 2% during Year 4, and 1% during Year 5. After the fifth anniversary of the subscription date, no redemption fee is payable. |
| | P Class | No redemption fees |
| | Q Class | No redemption fees |
| | R Class | No redemption fees |
| | S Class | No redemption fees |
| | T Class | No redemption fees |
| | U Class | No redemption fees |
| | V Class | No redemption fees |

2.6.8   The AIFM may at its sole discretion, reduce the redemption fees.

2.6.9   If total requests for redemption on any Redemption Day exceed 10% of the total assets attributable to the Units of any Sub-Fund, each redemption request may, at the sole discretion of the AIFM, be reduced pro-rata so that the maximum of 10% of the total value of issued Units of any Sub-Fund is redeemed in aggregate. Any redemption request, so reduced shall be deferred to the extent of such reduction and then effected, in respect of the number of Units by which it has been reduced, in priority to subsequent redemption requests on the following Redemption Day (subject to further deferral, if the deferred requests themselves exceed the 10% limit described).

2.7   Reserve for Contingent Liabilities

The AIFM has the right to establish a reserve for contingent liabilities and, upon any redemption of Units (or portion thereof), to withhold a certain portion of the redeeming Unitholders' redemption proceeds. Any amounts so withheld will be held in money market bank accounts until either used by the AIFM or returned to the Unitholders.

2.8   Redemptions by Long Term Growth Fund

A Unitholder who is subsequently determined by the AIFM not to be an Eligible Investor in the Units (or not otherwise authorised to own Units) is subject to mandatory redemption and the amount received by such Unitholder in respect of such redemption will be as set forth above under "Restrictions on the Ownership of Units".

2.9     Conversions

Conversions between Classes within the Long Term Growth Fund are permitted subject to compliance with any eligibility requirements and/or other specific conditions attached to the new Class upon Board Resolution.

2.10    Distribution Policy

The net income of the Long Term Growth Fund related to the Units is accumulated. No distribution will be made to the Unitholders.

**3.      REFERENCE CURRENCY**

The reference currency of Long Term Growth Fund is the USD.

**4.      NET ASSET VALUE CALCULATION AND VALUATION DAY**

For this Sub-Fund, the Net Asset Value per Unit of Long Term Growth Fund is calculated, under the overall responsibility of the AIFM, as of the last day of each month which is a bank business day in Luxembourg, such day being referred to as a "**Valuation Day**".

The Net Asset Value per Unit of each Class in the Long Term Growth Fund will be available at the registered office of the Central Administration Agent.

4.1     Specific Valuation Policy

    4.1.1     Each Life Settlement within this Sub-Fund will be valued using a formula designed to achieve a smooth emergence of growth between the point of purchase and the point of maturity/sale. Each Life Settlement will be valued using the U.S. Society of Actuaries 2015 Valuation Basic Table as adjusted by the External Valuer under the supervision of the AIFM, or later table as becomes generally available and adopted (the "**Valuation Basis**"). The Valuation Basis presumes that since the life insured/owner and/or the insured/owner's benefactors chose to sell the policy rather than waiting for a claim, then the life insured is presumed to be in relatively better health than if the life insured did not have the freedom of choice to the sale. The Valuation Basis therefore values the Life Settlement at various mortality probabilities of a rate implied by the independent medically-assessed life expectancies used to price the policy at the bidding stage. The Life Settlement will then be valued in accordance with these probabilities using a discount rate set such that the Life Settlement is valued at the total acquisition cost as at the purchase date. Such valuation will be carried out monthly for the determination of the Net Asset Value.

    4.1.2     The AIFM (or any authorised agent thereof) may make any necessary adjustment on a quarterly basis to the value of a Life Settlement after assessing the latest health condition of the life insured. Any such adjustment made to the valuation of an individual Life Settlement is subject to review by appointed actuarial consulting firm as part of their quarterly actuarial review and report to the Board of Managers.

75

5.      **PORTFOLIO MANAGEMENT / INVESTMENT ADVISOR**

The Sub-Fund is managed by the AIFM who has the sole discretion to decide which policies are purchased or sold. No Portfolio Manager and no Investment Advisor have been appointed for this Sub-Fund.

6.      **FEES IN RELATION TO THE LONG TERM GROWTH FUND**

6.1     Fees to the AIFM

6.1.1   In consideration for its services applicable to each Class of Units in the Long Term Growth Fund, the AIFM shall receive out of the Long Term Growth Fund's assets service fees composed of a Management Fee and a Performance Fee.

6.1.2   Any fees payable to the AIFM, the Investment Adviser, and any placement agents, will be paid by the AIFM out of its own fees.

6.2     Management Fee

In payment of its services, the AIFM receives, out of Long Term Growth Fund's assets, the following fees per annum, computed and payable monthly on the basis of the Net Asset Value of each Class of Long Term Growth Fund as at the end of each month.

| Classes | Fees |
|---------|------|
| A | 2% |
| B | 2% |
| C | 2% |
| D | 2% |
| E | 2% |
| F | 2% |
| G | 1.75% |
| H | 1.75% |
| I | 1.75% |
| J | 2% |
| K | 1.75% |
| L | 1.75% |

76

| Classes | Fees |
|---------|------|
| M | 1.75% |
| N | 2% |
| O | 1.75% |
| P | 2% |
| Q | 1.75% |
| R | None |
| S | None |
| T | None |
| U | None |
| V | 1.75% |

6.3    Performance Fee

In addition to the above mentioned Management Fee, the AIFM shall be entitled to receive a Performance Fee out of the Long Term Growth Fund's assets as follows:

| Classes | Performance Fees |
|---------|------------------|
| A, B, D, F, K, L, M, P, Q and V Classes | The AIFM will receive a Performance Fee, paid quarterly, based on the Net Asset Value, equivalent to 20 % of the performance of the Net Asset Value relative to the high watermark Net Asset Value (as defined hereafter) with a hurdle rate equal to 8% p.a. (based on the entire annualized return). |
| J Class | The AIFM will receive a Performance Fee, paid quarterly, based on the Net Asset Value of the J Class of Units, equivalent to 50% of the performance of the Net Asset Value relative to the high watermark Net Asset Value (as defined hereafter) with a hurdle rate equal to 5% p.a. (based on the entire annualized return). |
| C, E, G, H, I, N and O Classes | The AIFM will receive a Performance Fee, paid quarterly, based on the Net Asset Value, equivalent to 50 % of the performance of the Net Asset Value relative to the high watermark Net Asset Value (as defined hereafter) with a |

77

| Classes | Performance Fees |
|---------|------------------|
| | hurdle rate equal to 8% p.a. (based on the entire annualized return). |
| R, S, T and U Classes | No Performance Fee. |

6.3.1    The Performance Fee is calculated on the basis of the Net Asset Value after deduction of all expenses, liabilities, and Management Fee (but not the Performance Fee), and is adjusted to take account of all subscriptions and redemptions.

6.3.2    The high watermark Net Asset Value corresponds to the last Net Asset Value on which a Performance Fee has been paid, adjusted by the subscriptions and the redemptions since the last Performance Fee payment. Furthermore, the hurdle rate is taken into account since the last Performance Fee payment.

6.3.3    Provision will be made for this Performance Fee on each Valuation Day. In the event of a downturn in performance of the Net Asset Value during any calculation period, the provisions made in respect of the Performance Fee will be reduced accordingly. If these provisions fall to zero, no Performance Fee will be payable.

6.3.4    If Units are redeemed on a date other than that on which a Performance Fee is paid while provision has been made for Performance Fee, the Performance Fee for which provision has been made and which are attributable to the Units redeemed will be paid at the end of the period even if provision for Performance Fee is no longer made at that date.

6.3.5    The Performance Fee will be calculated and accrued as an expense of the relevant Class of Units on a monthly basis as of each Valuation Day and will be payable to the AIFM within 10 days of the quarter end calculation of the Net Asset Value.

6.4    Fees to the Depositary and Central Administration Agent and Other Parties

6.4.1    The US Custodian will be paid, out of the Long Term Growth Fund's assets, fees that are within the customary range for the services provided.

6.4.2    The Depositary is entitled to (i) a variable custody fee of 0.02% of the Long Term Growth Fund's average net assets and payable monthly in arrears and (ii) a variable annual supervisory fee of 0.004% of the Long Term Growth Fund's average net assets and payable monthly in arrears.

6.4.3    The Central Administration Agent is entitled to a variable fee of up to 0.09% of the Long Term Growth Fund's average net assets and payable monthly in arrears.

6.4.4    The Paying Agent, Securities Intermediary, Escrow Agent and Servicing Agent will be paid, out of the assets of the Sub-Fund, fees that are within the customary range for the services provided.

6.4.5    Notwithstanding such fees, the Depositary and other parties will receive customary banking fees for transactions.

78

6.4.6    Any reasonable disbursements and out-of-pocket expenses (including telephone, telex, cable, and postage expenses) necessarily incurred in the ordinary course of business by the Depositary, Central Administration Agent, and any custody charges of banks and financial institutions to which custody of assets of the Sub-Fund is entrusted, will be borne by the Long Term Growth Fund.

6.5    Fees to the Marketing Advisor for C, E, G, H, I, J, N and O Classes

A marketing service and advisory fee of 1% per annum for the first five years, payable in advance of the subscription amount per Unit of the relevant Class will be charged, which shall be allocated to the Marketing Advisor of the J Class. The marketing service and advisory fee is a pre-payment of services and covers a service period of 5 years, based on the marketing service and advisory contract with the Marketing Advisor.

## 7.    SPECIFIC RISKS APPLICABLE TO THE LONG TERM GROWTH FUND

There are a number of significant risks associated with an investment in an entity with the objectives of the Long Term Growth Fund. Prospective investors in the Long Term Growth Fund should understand that all investments involve risks and there can be no guarantee against losses resulting from an investment in the Long Term Growth Fund, neither can there be any assurance that the Long Term Growth Fund will be successful in achieving its objectives. In addition to the factors set forth elsewhere in this Placement Memorandum, prospective investors in the Long Term Growth Fund should carefully consider all of the factors below.

**Hedging risk:** If applicable, the use of hedging instruments involves certain special risks including dependence on the ability to predict movements in interest and currency rates, the price of investment assets and cash instruments being hedged, imperfect correlation between the hedging instruments and the investment assets, cash instruments, and interest and currency rates being hedged, and the fact that the skills needed to use hedging instruments are different from those needed to select the investments. Whilst such techniques can improve the return on invested capital, their use also increases the costs and the risk of losses to the Long Term Growth Fund.

## 8.    NO LISTING OF UNITS

The AIFM does not currently contemplate applying for a listing of the Long Term Growth Fund's Classes on the Luxembourg or any other stock exchange but reserves the possibility to do so at a future date.

## 9.    DURATION

Long Term Growth Fund has an unlimited duration.

28558437.2.EU_BUSINESS

**LUXEMBOURG LIFE FUND – LONG TERM GROWTH FUND (2021)**

**(hereafter "LTGF (2021)")**

1.    **INVESTMENT OBJECTIVE, POLICY, STRATEGY AND RESTRICTIONS**

1.1    Description of the Investment Objective, Policy and Strategy

1.1.1    The investment policy of LTGF (2021) is to principally invest in a diversified portfolio of US-domiciled life insurance policies and on an ancillary basis in other mortality related products (such as but not limited to annuities, structured products with derivatives) insuring individuals of an advanced age (generally above the age of 65 years). Such policies are widely known as Life Settlements. Life Settlements offer a known, pay-out structure total return upon the death of the life insured. LTGF (2021) will purchase Life Settlements, or portfolios of Life Settlements, in the secondary market at a discount to their known, final maturity values. A well-structured and properly diversified portfolio of Life Settlements can provide an attractive risk-return ratio to investors.

1.1.2    The strategy of LTGF (2021) is to purchase carefully selected life insurance policies that are beyond the contestability period. LTGF (2021) seeks to build a large diversified portfolio. Diversification should be done across different sectors including but not limited to: carrier concentration, expected maturities, gender, age, medical impairment, geography and face value size. The primary risk in the strategy is longevity, which creates an investment with very little correlation to the financial market. This is a buy and hold strategy which however does not prevent the AIFM to sell life insurance policies if management deems it in the best interest of the Sub-Fund. LTGF (2021) can additionally seek to enhance yield by purchasing policies that have been premium financed. Premium finance policies will not exceed 25% the portfolio. LTGF (2021) will seek to build a strong smooth long term performance with little volatility or correlation to market conditions.

1.2    Investment Restrictions

1.2.1    The following investment restrictions will apply to LTGF (2021) which:

(a)    will **not** purchase a Life Settlement which is issued by an insurance company rated less than "A-" by AM Best, or equivalent by Standard & Poor's and/or Moody's;

(b)    will **not** purchase a Life Settlement which has not yet passed the suicide and contestability period, unless covered by protection commensurate with the risk that the issuing life insurance company successfully contests the payment of a policy's maturity value should maturity occur during the policy's contestability period as defined within the policy contract (usually a period of 2 years from issuance);

(c)    will **not** purchase Life Settlements issued by one single insurance company, the aggregate face value of which is more than 20% of the total face value of the policies held by LTGF (2021). The total face value of LTGF (2021) applies from the 75th Life Settlement onwards;

80

(d)    will **not** purchase a Life Settlement where the insured's age is less than 65 years;

(e)    will **not** purchase a Life Settlement from a non-United States resident unless the policy was issued by a US insurer and meets all other conditions listed, and is approved by the AIFM;

(f)    will **not** purchase a Life Settlement where the face value exceeds 10% of the aggregate face value of LTGF (2021). The total face value of LTGF (2021) applies from the 75th Life Settlement onwards;

(g)    will **not** purchase any Life Settlements where the insured has the primary diagnosis of having AIDS or being HIV positive;

(h)    will **not** purchase any Life Settlements whereby the insured has an average estimated life expectancy, as assessed by multiple independent medical experts, of less than 2 years (commonly referred to as "viaticals"); and

(i)    will **not** purchase a Life Settlement where there is less than one life expectancy assessment produced by the following independent life assessment companies as used to determine the Pricing Life Expectancy: 21st Services, American Viatical Services ("AVS"), Fasano and Associates, EMSI, ISC. LTGF (2021) may use life expectancy assessments from companies not listed above if the company producing such assessment is deemed equivalent or superior to those listed above;

(j)    **may** invest in Life Settlements that have been premium financed. Once the portfolio investment level exceeds US$ 50 million, the value of ex-premium finance policies shall not exceed 25% of the value of the portfolio; and

(k)    **may** invest in foreign exchange forward contracts, futures contracts, and options, for the purpose of hedging of the investments only.

Notwithstanding the investment restriction (a) above, if the credit rating of an insurance company is lowered subsequent to the acquisition of the Life Settlements by LTGF (2021), the AIFM will not be obliged to sell such Life Settlements.

1.2.2    The limits set out in (c) and (f) above shall not apply during the first six months, or until a minimum of 75 Life Settlements have been purchased by LTGF (2021). If the excess in the limits set out in (c) or (f) above results from a subsequent change in the total face value of the underlying life insurance policies held, the excess shall not be treated as a breach of such restrictions, and the AIFM shall take necessary steps within a reasonable time to remedy the situation taking due account of the interests of the Unitholders.

1.2.3    LTGF (2021) will ensure, via diversification of the underlying assets, an appropriate level of risk-spreading in accordance with CSSF Circular 07/309. Similarly, in relation to investments in derivatives such as but not limited to, those provided for in (k) above, the counterparty risk in an OTC transaction will, where applicable, be limited having regard to the quality and qualification of the counterparty, which shall always be a first class professional specialised in this type of transactions.

81

1.3    Hedging Policy

The AIFM has the discretion to enter into hedging arrangements for hedging the fluctuation in the value of Life Settlements, as and when such products become available and are cost-effective.

1.4    Borrowing Policy/Leverage Policy

1.4.1    LTGF (2021) may borrow up to 100% of its net asset value to provide liquidity for redemption, payment of expenses, and bridging between the purchase of Life Settlements. It is not the policy of LTGF (2021) to borrow directly for the purpose of leveraging its own investments.

1.4.2    The maximum leverage of LTGF (2021) will not exceed the ratio of 2:1 under both, the gross or commitment method, at any given time.

1.5    Securities Financing Transactions

The AIFM currently does not intend to engage in securities lending and/or repurchase (or reverse repurchase) transactions and to invest in total return swaps. If the AIFM decides to make use of such techniques and instruments, this Placement Memorandum will be updated accordingly to comply with the disclosure requirements of Regulation (EU) 2015/2365 of the European Parliament and of the Council of 25 November 2015 on transparency of securities financing transactions and of reuse and amending Regulation (EU) No 648/2012.

**2.    UNITS**

2.1    Classes of Units Available

2.1.1    As of the date of this Memorandum, the Management Company has created the following Classes of Units:

| Class | Minimum Subscription amount | Reference Currency | Tax Status | Residency in an Eligible Country |
|-------|------------------------------|--------------------|------------|----------------------------------|
| A | Equivalent of EUR 125,000 in USD | USD | Non-taxable | Yes |
| B | USD 1,000,000 | USD | Non-taxable | Yes |
| D | EUR 750,000 | EUR | Non-taxable | Yes |
| G | Equivalent of EUR 125,000 in USD | USD | Taxable | No |
| H | EUR 125,000 | EUR | Taxable | No |
| I | Equivalent of EUR 125,000 in USD | GBP | Taxable | No |
| K | USD 1,000,000 | USD | Taxable | No |

28558437.2.EU_BUSINESS

| Class | Minimum Subscription amount | Reference Currency | Tax Status | Residency in an Eligible Country |
|-------|------------------------------|---------------------|------------|-----------------------------------|
| L | EUR 750,000 | EUR | Taxable | No |
| M | GBP 650,000 | GBP | Taxable | No |
| O | Equivalent of EUR 125,000 in CHF | CHF | Taxable | No |
| Q | CHF 1,000,000 | CHF | Taxable | No |
| R | EUR 125,000 | EUR | Non-taxable | Yes |
| T | EUR 125,000 | EUR | Taxable | No |
| U | Equivalent of EUR 125,000 in USD | USD | Taxable | No |

2.1.2    Subscription and redemption amounts shall be paid in the reference currency of the relevant Class as indicated in Section 2.1.1.

2.1.3    The AIFM may create one or more additional Classes in which case the Placement Memorandum will be updated.

2.2    Transfer of Units

2.2.1    Units may not be transferred unless permitted by the AIFM, after having satisfactorily identified the transferee and verified its eligibility to become a Unitholder.

2.2.2    No sale, assignment, transfer, grant of a participation in, pledge, hypothecation, encumbrance or other disposal (each a **Transfer**) of all or any portion of any Units, whether voluntary or involuntary, shall be valid or effective if:

(a)    The Transfer would result in a violation of any Luxembourg Law or the laws and regulations of any other jurisdiction (including, without limitation, the Securities Act, any securities laws of the individual states of the United States, or ERISA) or submit the AIFM, a Sub-Fund or an intermediary vehicle to any other adverse tax, legal or regulatory consequences as determined by the AIFM;

(b)    The Transfer would result in a violation of any term or condition of the Management Regulations or of this Placement Memorandum; and

(c)    The Transfer would result in the AIFM being required to register as an investment company under the Investment Company Act, as amended.

28558437.2.EU_BUSINESS

2.2.3    It is a condition for any Transfer (whether permitted or required)

    (a)    To be approved by the AIFM, such approval not to being unreasonably withheld;

    (b)    That the transferee is an Eligible Investor and fulfils the conditions required for the relevant Class;

    (c)    Not to violate any laws or regulations (including, without limitation, any securities laws); and

    (d)    That the transferor, the transferee and the AIFM enter into a written contractual arrangement to determine the Transfer.

2.2.4    The AIFM, in its sole and absolute discretion, may condition such Transfer upon the receipt of an opinion of responsible counsel which opinion shall be reasonably satisfactory to the AIFM.

2.2.5    The transferor shall be responsible for and pay all costs and expenses (including any taxation) arising in connection with any such permitted Transfer, including reasonable legal fees arising in relation thereto incurred by the AIFM or its affiliates and stamp duty or stamp duty reserve tax (if any) payable. The transferor and the transferee must indemnify the indemnified persons, in a manner satisfactory to the AIFM against any claims and expenses to which the indemnified persons may become subject arising out of or based upon any false representation or warranty made by, or breach or failure to comply with any covenant or agreement of, such transferor or transferee in connection with such Transfer. In addition, each Unitholder agrees to indemnify the AIFM and each indemnified person from any claims and expenses resulting from any Transfer or attempted Transfer in violation of the Management Regulations, this Placement Memorandum (and the terms of their contractual arrangements or any applicable side letter).

2.2.6    No Transfer of all or any part of Units, whether direct or indirect, voluntary or involuntary, shall be valid or effective in case of breach of any of the conditions under this Placement Memorandum.

2.3    Subscription of Units

2.3.1    Units of the Classes A, B, D and R (the **Non-Taxable Units**) are exclusively available to Eligible Investors that are resident in any "Eligible Country" (the **Eligible Country**) as indicated on the list of eligible countries (the **Eligible Country List**) which is established by the AIFM.

2.3.2    Units of Class R are exclusively available to Eligible Investors who are shareholders of the AIFM or have entered into an employment agreement with the AIFM and who are resident in any Eligible Country of the Eligible Countries List.

2.3.3    Should the AIFM decide to add a new country to the Eligible Country List, the latter shall be amended accordingly. Any amendment to the Eligible Country List is subject to a prior tax opinion provided by the Fund's tax adviser.

2.3.4    Prior to distribution of the Units to an investor who is a resident of an Eligible
Country such investor must provide, at its own expense, the Central Administration
Agent with valid and properly completed US tax documentation (which will
ordinarily consist of an original IRS Form W-8BEN or W-8IMY) certifying its
ability to claim benefits under the double tax treaty between the USA and the Eligible
Country of which such investor is a resident. Any subscription order belonging to an
investor of the Units of Classes A, B, D and R that does not comply with the
certification requirements required by the AIFM shall be rejected. Any subscription-
related documentation (including US tax documentation) received by the Central
Administration Agent shall be forwarded by the Central Administration Agent to the
AIFM or an agent thereof for monitoring and acceptance or refusal of the application.
The Central Administration Agent shall not be responsible for verifying the validity,
accuracy, genuineness or completeness of any subscription-related documents
received from a potential investor.

2.3.5    Units of Classes G, H, I, K, L, M, O, Q, T and U (the **Taxable Units**) are available
to Eligible Investors that are **not** resident in any Eligible Countries. From the net
realised gain allocable to the holders of the Taxable Units, 30% non-resident alien
tax will be withheld by the Withholding Agent. Net realised gain is defined as the
face value of the life settlement policy upon maturity minus the purchase price and
the premiums paid by the Sub-Fund.

2.3.6    Units of Classes T and U are exclusively available to Eligible Investors who are
shareholders of the AIFM or have entered into an employment agreement with the
AIFM and who are not resident in any Eligible Country.

2.3.7    Subscriptions for Units shall be dealt as of each Valuation Day (as defined below),
with an offer price per Unit equivalent to the Net Asset Value per Unit of the relevant
Class.

2.3.8    Duly completed, dated and signed Subscription Agreement must be received by the
Central Administration Agent no later than 16h00 (Luxembourg time) five (5)
Business Days before the applicable Valuation Day.

2.3.9    Subscription monies must be collected by the Depositary no later than with value
date as of the applicable Valuation Day. No subscription fees are charged.

2.3.10   Investors for which W8BEN or WBIMY forms are required will provide, at their
own expense, the Central Administration Agent with originals of these forms.

2.4    Lock-up Period

2.4.1    All Classes are subject to a lock-up period of two years as from the date where the
Units have been issued (the **Lock-up Period**)

2.4.2    Where Units are held through an intermediary, the intermediary will contractually
be obliged to apply the Lock-up Period to the respective investors for which it acts
as intermediary.

2.4.3    The AIFM is entitled to shorten the Lock-up Period, provided that fair treatment of
Unitholders is maintained.

85

2.5      Redemption of Units

*Redemption Day – Delay to submit redemption requests*

2.5.1    Subject to the restrictions set forth below, Units may be redeemed as of the last day
         of each calendar quarter (March, June, September and December) which is a bank
         business day in Luxembourg after the end of the Lock-up Period (the **Redemption
         Day**).

2.5.2    Redemption requests must be received by the Central Administration Agent 90
         (ninety) days before the applicable Redemption Day at 16h30 (Luxembourg time).
         Requests received after the applicable cut-off day and cut-off time will be carried
         out as of the following applicable Redemption Day.

*Payment of redemption proceeds*

2.5.3    Redemption proceeds shall be paid in the currency of the relevant Class within 30
         (thirty) calendar days after the applicable Redemption Day, subject to the availability
         of funds, provided that the original formal redemption request has been received by
         the Central Administration Agent.

*General Liquidity Reserve – Redemption Liquidity Reserve and right of the AIFM to
suspend the redemption of Units*

2.5.4    A liquidity reserve is maintained for LTGF (2021) to secure the payment of
         premiums and to generally cover operational expenses (the **General Liquidity
         Reserve**). The amount to be held in the General Liquidity Reserve is determined in
         accordance with the liquidity risk management policy of the AIFM and shall not be
         used for redeeming Units.

2.5.5    In addition to the General Liquidity Reserve, an additional liquidity reserve is
         exclusively available for redeeming Units (the **Redemption Liquidity Reserve**).
         Where the amount in the Redemption Liquidity Reserve is considered by the AIFM
         insufficiently capitalized, the AIFM is entitled to partially or entirely suspend the
         redemption of Units until the AIFM considers that the Redemption Liquidity Reserve
         is again adequately capitalized for redeeming Units. The beginning and the end of
         the suspension period (the **Suspension Period**) will be notified to the Unitholders
         which submitted the request to redeem Units. In determining the Suspension Period
         and the level of the adequate capitalization of the Redemption Liquidity Reserve, the
         AIFM will take into account (i) the pending amount for redeeming units, (ii) any
         upcoming circumstances which may affect LTGF (2021) (including, for instance, the
         end of the Lock-up Period for a relevant Class), (iii) the level of liquidity of the
         secondary and tertiary markets of life insurance policies and (iv) the general
         economic and political circumstances as assessed or anticipated by the AIFM
         including the occurrence or the anticipation of any abnormal event which might have
         an impact on LTGF (2021).

*Gating*

2.5.6    As an alternative to suspend the execution of redemption requests under Section
         2.5.5, the AIFM is entitled, in case where total requests for redemptions as of any
         Redemption Day exceed 10% of the Net Asset Value of LTGF (2021), to reduce

proportionally the redemption requests as of the applicable Redemption Day. The portion of the non-proceeded redemption requests will then be proceeded by priority to later redemption requests as of the subsequent Redemption Day subject always to the foregoing 10% limit.

*Redemption fee*

2.5.7    The redemption fee charged by the AIFM per Class is as follows:

| Classes | Redemption Fees |
|---------|-----------------|
| Class A | 6% during twelve months following the second anniversary of the subscription date; |
| | 4% during twelve months following the third anniversary of the subscription date; and |
| | After the fourth anniversary of the subscription date, no redemption fee is payable. |
| Classes G, H, I and O | 3% during twelve months following the second anniversary of the subscription date; |
| | 2% during twelve months following the third anniversary of the subscription date; |
| | 2% during twelve months following the fourth anniversary of the subscription date; and |
| | After the fifth anniversary of the subscription date, no redemption fee is payable. |
| Classes B, D, K, L, M, Q, R, T and U | No redemption fee after the Lock-up Period. |

2.5.8    The AIFM has the right to reduce or to waive the redemption fee, where applicable.

*Compulsory redemption of Units*

2.5.9    A Unitholder who is subsequently determined by the AIFM not to be an Eligible Investor in the Units (or not otherwise authorised to own Units) is subject to the compulsory redemption of its Units in accordance with the Management Regulations and Section 14 of Part A.

*Dissolution of the Sub-Fund in case of important redemption requests*

2.5.10    Where an important number of redemption requests are received by the Administrator for the Sub-Fund, the AIFM will assess at its entire discretion by taking into account the prevailing market conditions whether a dissolution of the Sub-Fund should be envisaged. Where the AIFM concludes to dissolve the Sub-Fund, the CSSF and the Unitholders will be notified of the dissolution decided by the AIFM. Any redemption right granted to Unitholders under the Placement Memorandum are cancelled as from the date where the dissolution of the Sub-Fund has been notified to the Unitholders. Subject to the fair treatment of all Unitholders of the Sub-Fund, Units will be redeemed upon the decision of the AIFM to distribute

87

the net proceeds collected from the disposal of the assets of the Sub-Fund. The timeline to close the dissolution of the Sub-Fund depends on the size of the Sub-Fund's portfolio and the conditions prevailing on the secondary and tertiary markets.

2.6     Conversions of Units

Units from one Class can be converted into Units of another Class, provided (i) the Investor fulfils the conditions for being admitted to the Class and (ii) the AIFM agrees and resolves to convert the Units.

2.7     Distribution policy

The net income collected by LTGF (2021) is accumulated for the account of the relevant Classes. No distribution will be made to the Unitholders.

**3.     REFERENCE CURRENCY**

The reference currency of LTGF (2021) is USD.

**4.     VALUATION DAY – NET ASSET VALUE CALCULATION – VALUATION**

4.1     Net Asset Value Calculation – Valuation Day

4.1.1     The Net Asset Value per Unit is calculated, under the overall responsibility of the AIFM, as of the last day of each month which is a bank business day in Luxembourg (each a **Valuation Day**).

4.1.2     The Net Asset Value per Unit of each Class in LTGF (2021) will be available at the registered office of the Central Administration Agent.

4.2     Valuation Policy

4.2.1     Each Life Settlement within this Sub-Fund will be valued using a formula designed to achieve a smooth emergence of growth between the point of purchase and the point of maturity/sale. Each Life Settlement will be valued using the U.S. Society of Actuaries 2015 Valuation Basic Table as adjusted by the External Valuer under the supervision of the AIFM, or later table as becomes generally available and adopted (the **Valuation Basis**). The Valuation Basis presumes that since the life insured/owner and/or the insured/owner's benefactors chose to sell the policy rather than waiting for a claim, then the life insured is presumed to be in relatively better health than if the life insured did not have the freedom of choice to the sale. The Valuation Basis therefore values the Life Settlement at various mortality probabilities of a rate implied by the independent medically-assessed life expectancies used to price the policy at the bidding stage. The Life Settlement will then be valued in accordance with these probabilities using a discount rate set such that the Life Settlement is valued at the total acquisition cost as at the purchase date. Such valuation will be carried out monthly for the determination of the Net Asset Value.

4.2.2     The AIFM (or any authorised agent thereof) may make any necessary adjustment on a quarterly basis to the value of a Life Settlement after assessing the latest health condition of the life insured. Any such adjustment made to the valuation of an

88

individual Life Settlement is subject to review by appointed actuarial consulting firm
as part of their quarterly actuarial review and report to the Board of Managers.

**5.      FEES CHARGED TO LTGF (2021)**

5.1     Remuneration of the AIFM

      5.1.1     In consideration for its services applicable to each Class of Units in LTGF (2021),
the AIFM shall receive out of LTGF (2021)'s assets service fees composed of a
Management Fee and a Performance Fee.

      5.1.2     Any fees payable to the AIFM, the Investment Adviser, and any placement agents,
will be paid by the AIFM out of its own fees.

5.2     Management Fee

In payment of its services, the AIFM receives, out of the assets of LTGF (2021), the following
fees per annum, computed and payable monthly on the basis of the Net Asset Value of each
Class of LTGF (2021) as at the end of each month.

| Classes | Management Fee during the Lock-up Period | Management Fee after the Lock-up Period |
|---|---|---|
| A, B and D | 1.75% | 2.00% |
| G, H, I, K, L and M | 1.5% | 1.75% |
| O | 1.5% | 1.75% |
| Q | 1.5% | 1.75% |
| R, T and U | None | None |

5.3     Performance Fee

      5.3.1     In addition to the above mentioned Management Fee, the AIFM shall be entitled to
receive a Performance Fee out of the assets of LTGF (2021), equivalent to 20 % of
the performance of the Net Asset Value relative to the high watermark Net Asset
Value (as defined hereafter) with a hurdle rate equal to 8% p.a. (based on the entire
annualized return).

      5.3.2     No Performance Fee shall be paid by the Classes R, T and U.

      5.3.3     The Performance Fee is calculated on the basis of the Net Asset Value after
deduction of all expenses, liabilities, and Management Fee (but not the Performance
Fee), and is adjusted to take account of all subscriptions and redemptions.

      5.3.4     The high watermark Net Asset Value corresponds to the last Net Asset Value on
which a Performance Fee has been paid, adjusted by the subscriptions and the

89

redemptions since the last Performance Fee payment. Furthermore, the hurdle rate is taken into account since the last Performance Fee's payment.

5.3.5    Provision will be made for this Performance Fee on each Valuation Day. In the event of a downturn in performance of the Net Asset Value during any calculation period, the provisions made in respect of the Performance Fee will be reduced accordingly. If these provisions fall to zero, no Performance Fee will be payable.

5.3.6    If Units are redeemed on a date other than that on which a Performance Fee is paid while provision has been made for Performance Fee, the Performance Fee for which provision has been made and which are attributable to the Units redeemed will be paid at the end of the period even if provision for Performance Fee is no longer made at that date.

5.3.7    The Performance Fee will be calculated and accrued as an expense of the relevant Class of Units on a monthly basis as of each Valuation Day and will be payable to the AIFM within 10 days of the quarter end calculation of the Net Asset Value.

5.3.8    During the Lock-Up Period, Classes A, B, D, G, H, I, K, L, M, O and Q will be subject to the Performance Fee calculated on a monthly basis as of each Valuation Day and accrued as a payable expense within the relevant Class. The Performance Fee will be paid to the AIFM as of the first Business Day after the end of the Lock-Up Period. In case of dissolution of a relevant Class before the end of the Lock-Up Period, the Performance Fee will be paid to the AIFM as of the closing of the dissolution of the relevant Class. In case of compulsory redemption of Units in accordance with this Placement Memorandum, the applicable portion of the Performance Fee will be paid to the AIFM as of the applicable Redemption Day of these Units.

5.3.9    Where Unitholders of the Classes A, B, D, G, H, I, K, L, M, O and Q have not redeemed their Units as of the first Redemption Day after the end of the Lock-up Period, the AIFM will reimburse the proportional amount of the Performance Fee to the relevant Class.

5.4    Remuneration of the Depositary, the Central Administration Agent and Other Parties

5.4.1    The US Custodian will be paid, out of the assets of LTGF (2021), fees that are within the customary range for the services provided.

5.4.2    The Depositary is entitled to (i) a variable custody fee of 0.020% of the average net assets of LTGF (2021) payable monthly in arrears and (ii) a variable annual supervisory fee of 0.004% of the average net assets of LTGF (2021) payable monthly in arrears.

5.4.3    The Central Administration Agent is entitled to a variable fee of up to 0.09% of the average net assets of LTGF (2021) and payable monthly in arrears.

5.4.4    The Paying Agent, Securities Intermediary, Escrow Agent and Servicing Agent will be paid, out of the assets of LTGF (2021), fees corresponding to up to 0.1% of the average net assets of LTGF (2021).

90

5.4.5    Notwithstanding such fees, the Depositary and other parties will receive customary banking fees for transactions.

5.4.6    Any reasonable disbursements and out-of-pocket expenses (including telephone, telex, cable, and postage expenses) necessarily incurred in the ordinary course of business by the Depositary, Central Administration Agent, and any custody charges of banks and financial institutions to which custody of assets of LTGF (2021) is entrusted, will be borne by LTGF (2021).

## 6.    SPECIFIC RISKS APPLICABLE TO LTGF (2021)

There are a number of significant risks associated with an investment in an entity with the objectives of LTGF (2021). Prospective investors in LTGF (2021) should understand that all investments involve risks and there can be no guarantee against losses resulting from an investment in LTGF (2021), neither can there be any assurance that LTGF (2021) will be successful in achieving its objectives. In addition to the factors set forth elsewhere in this Placement Memorandum, prospective investors in LTGF (2021) should carefully consider all of the factors below.

**Hedging risk:** If applicable, the use of hedging instruments involves certain special risks including dependence on the ability to predict movements in interest and currency rates, the price of investment assets and cash instruments being hedged, imperfect correlation between the hedging instruments and the investment assets, cash instruments, and interest and currency rates being hedged, and the fact that the skills needed to use hedging instruments are different from those needed to select the investments. Whilst such techniques can improve the return on invested capital, their use also increases the costs and the risk of losses to LTGF (2021).

## 7.    NO LISTING OF UNITS

The AIFM does not currently contemplate applying for a listing of the Classes of LTGF (2021) on the Luxembourg or any other stock exchange but reserves the possibility to do so at a future date.

## 8.    DURATION

LTGF (2021) has an unlimited duration.

91

## LUXEMBOURG LIFE FUND – ABSOLUTE RETURN FUND I

### (hereafter "**Absolute Return Fund I**")

**1.    INVESTMENT OBJECTIVE, POLICY, STRATEGY AND RESTRICTIONS**

1.1    Investment Objective, Policy and Strategy

1.1.1    The investment policy of the Absolute Return Fund I is to principally invest in a diversified portfolio of US-domiciled life insurance policies and on an ancillary basis in other mortality related products (such as but not limited to annuities, structured products with derivatives) insuring individuals of an advanced age. Such policies are widely known as Life Settlements. Life Settlements offer a known, pay-out structure upon the death of the life insured, which results in a total return on the invested policy. The Absolute Return Fund I will purchase Life Settlements, or portfolios of Life Settlements, in the secondary and tertiary markets at a discount to their known, final maturity values. A well-structured and properly diversified portfolio of Life Settlements can provide an attractive risk-return ratio to investors.

1.1.2    The strategy of the Absolute Return Fund I is to purchase carefully selected life insurance policies that are beyond the contestability period. The Absolute Return Fund I seeks to build a large diversified portfolio. Diversification should be done across different characteristics including but not limited to: carrier concentration, expected maturities, gender, age, medical impairment, geography and face value size. The primary risk in the strategy is longevity, which creates an investment with very little correlation to the returns of other asset classes. The Absolute Return Fund I may seek to enhance yield and liquidity by selling life insurance policies. The Absolute Return Fund I can additionally seek to enhance yield by purchasing policies that have been premium financed and policies issued by insurance companies with lower ratings. The Absolute Return Fund I will seek to build a strong smooth long term performance with little return volatility or correlation to other asset classes.

1.2    Investment Restrictions

1.2.1    The following investment restrictions will apply to the Absolute Return Fund I. The Sub-Fund:

(a)    will **not** purchase a Life Settlement which has not yet passed the suicide and contestability period, unless covered by protection commensurate with the risk that the issuing life insurance company successfully contests the payment of a policy's maturity value should maturity occur during the policy's contestability period as defined within the policy contract (usually a period of 2 years from issuance);

(b)    will **not** purchase Life Settlements issued by one single insurance company, the aggregate face value of which is more than 20% of the total face value of the policies held by the Absolute Return Fund I. The total face value of the Absolute Return Fund I applies from the 75th Life Settlement onwards;

(c)    will **not** purchase a Life Settlement where the insured's age is less than 65 years;

(d)    will **not** purchase a Life Settlement from a non-United States resident unless the policy was issued under US law and meets all other conditions listed, and is approved by the AIFM;

(e)    will **not** purchase a Life Settlement where the face value exceeds 10% of the aggregate face value of the Absolute Return Fund I. The total face value of the Absolute Return Fund I applies from the 75th Life Settlement onwards;

(f)    will **not** purchase any Life Settlements where the insured has the primary diagnosis of having AIDS or being HIV positive;

(g)    will **not** purchase any Life Settlements whereby the insured has an average estimated life expectancy, as assessed by multiple independent medical experts, of less than 2 years (commonly referred to as "viaticals"); and

(h)    will **not** purchase a Life Settlement where there is less than one life expectancy assessment produced by the following independent life assessment companies as used to determine the Pricing Life Expectancy: 21st Services, American Viatical Services ("AVS"), Fasano and Associates, Predictive Resources, Elevation ISC. The Absolute Return Fund I may use life expectancy assessments from companies not listed above if the company producing such assessment is deemed equivalent or superior to those listed above;

(i)    **may** invest in foreign exchange forward contracts, futures contracts, and options, for the purpose of hedging of the investments only.

1.2.2    The limits set out in (b) and (e) above shall not apply during the first six months, or until a minimum of 75 Life Settlements have been purchased by the Absolute Return Fund I. If the excess in the limits set out in (b) or (e) above results from a subsequent change in the total face value of the underlying life insurance policies held, the excess shall not be treated as a breach of such restrictions, and the AIFM shall take necessary steps within a reasonable time to remedy the situation taking due account of the interests of the Unitholders.

1.2.3    When using financial derivative instruments, the Absolute Return Fund I will ensure, via diversification of the underlying assets, an appropriate level of risk-spreading in accordance with CSSF Circular 07/309. Similarly, in relation to investments in derivatives such as but not limited to, those provided for in (i) above, the counterparty risk in an OTC transaction will, where applicable, be limited having regard to the quality and qualification of the counterparty, which shall always be a first class professional specialised in this type of transactions.

1.3    Hedging Policy

The AIFM has the discretion to enter into foreign exchange forward contracts, futures contracts and options for hedging the fluctuation in the value of Life Settlements.

1.4    Borrowing Policy/Leverage policy

1.4.1    The Absolute Return Fund I may borrow to provide liquidity for payment of premiums due on the Life Settlements and for payment of expenses. The Absolute Return Fund I may not, at any point in time, incur a level of borrowing, in excess of

93

50% of its Net Asset Value. The Absolute Return Fund I will only borrow from financial institutions active in the life settlement space. The term of borrowings incurred by the Absolute Return Fund I will be in line with the estimated maturities of the Life Settlements. Borrowings will be repaid by the Absolute Return Fund I based on a schedule agreed with the lender.

1.4.2    It is not the policy of the Absolute Return Fund I to borrow directly for the purpose of leveraging its own investments.

1.4.3    The maximum total leverage of the Absolute Return Fund I, achieved by the use of financial derivative instruments will not exceed 100% of the Absolute Return Fund I's Net Asset Value calculated under both the gross (according to article 7 of the AIFMD-CDR) or commitment (according to article 8 of the AIFMD-CDR) method, at any given time.

1.5    Securities Financing Transactions

The AIFM currently does not intend to engage in securities lending and/or repurchase (or reverse repurchase) transactions and to invest in total return swaps. If the AIFM decides to make use of such techniques and instruments, this Placement Memorandum will be updated accordingly to comply with the disclosure requirements of Regulation (EU) 2015/2365 of the European Parliament and of the Council of 25 November 2015 on transparency of securities financing transactions and of reuse and amending Regulation (EU) No 648/2012.

## 2.    CLASSES OF UNITS – SUBSCRIPTION OF UNITS – LOCK-UP PERIOD – REDEMPTION OF UNITS

2.1    Classes of Units – Subscription of Units

2.1.1    The AIFM will issue the Classes indicated in Section 2.1.2. Units of each Class may only be subscribed by Eligible Investors. The relevant currency shall be applied for payment of the subscription amount as well as for the payment of redemption amount. Each Class will capitalise income.

2.1.2    As of the date of this Placement Memorandum, the AIFM has opened Classes A1, B1, C1, D1, E1 and F1 for subscription on 1 September 2018. The initial offering period for these Classes has been closed on 29 March 2019. Classes A2, B2, C2, D2, E2 and F2 were opened for subscription on 1 November 2018 and their initial offering period has been closed on 30 April 2019. Classes A3, B3, C3, D3, E3 and F3 were opened for subscription on 2 May 2019 and their initial offering period has been closed on 31 July 2019. No new investors will be admitted to these Classes after the closing of the relevant Initial Subscription Period. The AIFM is entitled without the Unitholders' consent to open additional classes for subscription in which case the AIFM will update the Placement Memorandum. The AIFM can also decide to set the closing of an Initial Subscription Period earlier in which case investors who subscribed to the relevant Class will be informed by the AIFM accordingly.

28558437.2.EU_BUSINESS

| Classes | Currency | Tax status | Minimum subscription amount | Issuance price per Unit | Income |
|---|---|---|---|---|---|
| A1, A2 and A3 | USD | Non-taxable | USD 1,000,000 | USD 100 | Capitalised |
| B1, B2 and B3 | EUR | Non-taxable | EUR 1,000,000 | EUR 100 | Capitalised |
| C1, C2 and C3 | CHF | Non-taxable | CHF 1,000,000 | CHF 100 | Capitalised |
| D1, D2 and D3 | USD | Taxable | USD 1,000,000 | USD 100 | Capitalised |
| E1, E2 and E3 | EUR | Taxable | EUR 1,000,000 | EUR 100 | Capitalised |
| F1, F2 and F3 | CHF | Taxable | CHF 1,000,000 | CHF 100 | Capitalised |

2.1.3   Units of A1, A2, A3, B1, B2, B3, C1, C2 and C3 are exclusively available to Eligible Investors that are resident in a jurisdiction qualified as "Eligible Country" by the AIFM. The AIFM will main a list of "Eligible Country" where the AIFM may add jurisdictions. Any amendment to this list is subject to a prior tax opinion provided by the Fund's tax counsel.

2.1.4   Prior to registration of Units in the name of an investor who is a resident of an Eligible Country such investor must provide, at its own expense, the Central Administration Agent with valid and properly completed US tax documentation (which will ordinarily consist of an original IRS Form W-8BEN or W-8IMY) certifying its ability to claim benefits under the double tax treaty between the United States of America and the Eligible Country of which such investor is a resident. Any subscription order belonging to an investor of the A1, A2, A3, B1, B2, B3 and C1, C2 and C3 that does not comply with the certification requirements required by the AIFM shall be rejected. Any subscription-related documentation (including U.S. tax documentation) received by the Central Administration Agent shall be forwarded by the Central Administration Agent to the AIFM or an agent thereof for monitoring and acceptance or refusal of the application. The Central Administration Agent shall not be responsible for verifying the validity, accuracy, genuineness or completeness of any subscription-related documents received from a potential investor. Investors for which W8BEN or WBIMY forms are required will provide, at their own expense, the Central Administration Agent with originals of such forms.

2.1.5   Units of D1, D2, D3, E1, E2, E3, F1, F2 and F3 ("**Taxable Units**") of the Sub-Fund are available to Eligible Investors that are **not** resident in any "Eligible Countries". From the net realised gain allocable to investors of the Taxable Units, 30% non-resident alien tax will be withheld by the Withholding Agent. Net realised gain is defined as the face value of the life settlement policy upon maturity minus the purchase price and the premiums paid by the Sub-Fund.

2.1.6   After the closing of the relevant Initial Offering Period, Units may be subscribed by existing investors as of each Valuation Day (as defined below), with an issuance

95

price per Unit equivalent to the Net Asset Value per Unit of the relevant Class plus a marketing fee of maximum 5% of the Net Asset Value per Unit of the relevant Class, which shall be allocated to the AIFM. Subscription forms must be received by the Central Administration Agent no later than 16:00 (Luxembourg time) five (5) Business Days before the applicable Valuation Day. The subscription amount must paid in at the Depositary no later than on the applicable Valuation Day. No subscription fee is levied in the Absolute Return Fund I.

2.2     Transfer of Units

2.2.1     Units may not be transferred unless permitted by the AIFM, after having satisfactorily identified the transferee and verified its eligibility to become a Unitholder.

2.2.2     No sale, assignment, transfer, grant of a participation in, pledge, hypothecation, encumbrance or other disposal (each a **Transfer**) of all or any portion of any Units, whether voluntary or involuntary, shall be valid or effective if:

(a)     The Transfer would result in a violation of any Luxembourg Law or the laws and regulations of any other jurisdiction (including, without limitation, the Securities Act, any securities laws of the individual states of the United States, or ERISA) or submit the AIFM, a Sub-Fund or an intermediary vehicle to any other adverse tax, legal or regulatory consequences as determined by the AIFM;

(b)     The Transfer would result in a violation of any term or condition of the Management Regulations or of this Placement Memorandum; and

(c)     The Transfer would result in the AIFM being required to register as an investment company under the Investment Company Act, as amended.

2.2.3     It is a condition for any Transfer (whether permitted or required)

(a)     To be approved by the AIFM (prior to the Transfer, through the General Partner), such approval not to being unreasonably withheld;

(b)     That the transferee is an Eligible Investor;

(c)     Not to violate any laws or regulations (including, without limitation, any securities laws) applicable to it; and

(d)     That the transferee enters into a Subscription Agreement in respect of the relevant Units so transferred.

2.2.4     The AIFM, in its sole and absolute discretion, may condition such Transfer upon the receipt of an opinion of responsible counsel which opinion shall be reasonably satisfactory to the AIFM.

2.2.5     The transferor shall be responsible for and pay all costs and expenses (including any taxation) arising in connection with any such permitted Transfer, including reasonable legal fees arising in relation thereto incurred by the AIFM or its affiliates and stamp duty or stamp duty reserve tax (if any) payable. The transferor and the

96

transferee must indemnify the indemnified persons, in a manner satisfactory to the AIFM against any claims and expenses to which the indemnified persons may become subject arising out of or based upon any false representation or warranty made by, or breach or failure to comply with any covenant or agreement of, such transferor or transferee in connection with such Transfer. In addition, each Unitholder agrees to indemnify the AIFM and each indemnified person from any claims and expenses resulting from any Transfer or attempted Transfer in violation of the Management Regulations, this Placement Memorandum (and the terms of their Subscription Agreement or any applicable side letter).

2.2.6    No Transfer of all or any part of any Units of this Sub-Fund, whether direct or indirect, voluntary or involuntary, shall be valid or effective if in breach of the additional restrictions (if any) on such a Transfer as set out in the applicable Special Section.

2.3    Lock-up Period

2.3.1    Except as otherwise decided by the AIFM, a Unitholder shall not have the right to redeem such Unitholder's investment for a period of ten (10) years from the end of the Initial Offering Period (the "**Lock-up Period**"). Upon expiration of the lock-up period, Unitholders will be allowed to request redemption of their Units subject to the conditions set under Section 2.4.

2.3.2    During the Lock-up Period, Unitholders will not be allowed to request the redemption of any Units.

2.4    Redemption Procedure

2.4.1    Subject to the restrictions set forth below, Units may be redeemed with reference to the last Business Day of each calendar quarter (being March, June, September and December) (the "**Redemption Day**"), following their Lock-up Period.

2.4.2    Redemption requests must be received by the Central Administration Agent ninety (90) calendar days before the applicable Redemption Day. Requests received after the deadline will not be effective until the next succeeding Redemption Day.

2.4.3    Redemption proceeds shall be paid in the currency of the Class within thirty (30) calendar days after the applicable Redemption Day, subject to the availability of funds, provided that the original formal redemption request has been received by the Central Administration Agent.

2.4.4    However, in case of significant redemption requests or in case of a lack of liquidity, the AIFM reserves the right to finalise the Net Asset Value of the Units only after having carried out the sale of certain Life Settlements as necessary. In that case, the redeeming Unitholder may receive a partial payment of its redemption proceeds, to be considered as an advance on the final redemption amount that will be determined once the relevant sales of Life Settlements have been finalised.

2.4.5    If total requests for redemption on any Redemption Day exceed 10% of the total assets attributable to the Units of the Absolute Return Fund I, each redemption request may, at the sole discretion of the AIFM, be reduced pro-rata so that the maximum of 10% of the total value of issued Units of the Absolute Return Fund I is

97

redeemed in aggregate. Any redemption request, so reduced shall be deferred to the extent of such reduction and then effected, in respect of the number of Units by which it has been reduced, in priority to subsequent redemption requests on the following Redemption Day (subject to further deferral, if the deferred requests themselves exceed the 10% limit described).

2.4.6    The AIFM is entitled not to proceed with the redemption of Units in the event the net assets of the Fund would fall below the minimum capital under article 21 of the SIF Law as a result of this redemption.

2.4.7    No redemption fee will be charged by the AIFM.

2.4.8    Redemptions will be processed on the NAV methodology as described in section 4.

2.5    Reserve for Contingent Liabilities

The AIFM has the right to establish a reserve for contingent liabilities and, upon any redemption of Units (or portion thereof), to withhold a certain portion of the redeeming Unitholders' redemption proceeds. Any amounts so withheld will be held in money market bank accounts until either used by the AIFM or returned to the Unitholders.

2.6    Redemptions by the Absolute Return Fund I

A Unitholder who is subsequently determined by the AIFM not to be an Eligible Investor in the Units (or not otherwise authorised to own Units) is subject to mandatory redemption and the amount received by such Unitholder in respect of such redemption will be as set forth above under "Restrictions on the Ownership of Units".

2.7    Distributions by the Absolute Return Fund I

2.7.1    The AIFM does not envision reinvesting proceeds as the Absolute Return Fund I is meant to be a finite investment and will distribute excess net investment income and realized capital gains minus expenses in the form of mandatory redemptions and the amount received by such Unitholder in respect of such will be as set forth above under "Restrictions on the Ownership of Units". These mandatory redemptions initiated by the AIFM are also allowed during the Lock-up Period.

2.7.2    The net investment income and realized capital gains of the Absolute Return Fund I related to the Units is attributed to each Unit outstanding, after liquidity reserves are maintained. The Fund will distribute excess net investment income and realized gains in the form of mandatory redemption and the amount received by such Unitholder in respect of such redemption will be as set forth above under "Restrictions on the Ownership of Units".

2.8    Conversion of Units

2.8.1    Conversion of Units from any Class in another Class within the Absolute Return Fund I is permitted subject to the eligibility requirements and/or other specific conditions attached to the relevant Class.

2.8.2    Conversion of Units from the Absolute Return Fund I in another Sub-Fund is not allowed during the Lock-up Period. Conversion of Units from another Sub-Fund in

28558437.2.EU_BUSINESS

the Absolute Return Fund I is only permitted for those investors who participated in one of the Initial Offering Periods of the Absolute Return Fund I.

**3.      REFERENCE CURRENCY**

The reference currency of the Absolute Return Fund I is the USD.

**4.      NET ASSET VALUE CALCULATION AND VALUATION DAY – SPECIFIC VALUATION POLICY**

4.1      Net Asset Value Calculation – Valuation Day

     4.1.1      The Net Asset Value per Unit of the Absolute Return Fund I is calculated, under the overall responsibility of the AIFM, as of the last Business Day of each quarter, such day being referred to as a **"Valuation Day"**.

     4.1.2      The Net Asset Value per Unit of each Class in the Absolute Return Fund I will be available at the registered office of the Central Administration Agent.

4.2      Specific Valuation Policy Applied On Life Settlements During the Lock-Up Period

     4.2.1      The initial investment in Life Settlements shall be recognized at the transaction price plus all initial direct external costs. Continuing costs (policy premiums and direct external costs, if any) to keep the policy in force shall be capitalized as part of the Life settlement Costs. No gains will be recognized during the term of the Life Settlements until the insured dies, at which time the Absolute Return Fund I shall recognize as realized gain the difference between the carrying amount of a Life Settlement and the life insurance proceeds of the underlying life insurance policy.

     4.2.2      This valuation methodology is not specifically mentioned for this type of assets in IFRS. The AIFM has decided that a cost plus method is a proper valuation method representing the investment objective and long term nature of the Sub-Fund. However, since the financial statements of the Fund are prepared under IFRS, a reconciliation will be included in the annual accounts to show the difference between the accounting policy for NAV reporting purposes and IFRS.

4.3      Specific Valuation Policy Applied On Life Settlements After Expiry of the Lock-Up Period

     4.3.1      Following expiry of the Lock-up Period, each Life Settlement will be valued using the U.S. Society of Actuaries 2015 Valuation Basic Table as adjusted by the External Valuer under the supervision of the AIFM, or later table as becomes generally available and adopted (the **"Valuation Basis"**). The Valuation Basis presumes that since the life insured/owner and/or the insured/owner's benefactors chose to sell the policy rather than waiting for a claim, then the life insured is presumed to be in relatively better health than if the life insured did not have the freedom of choice to the sale. The Valuation Basis therefore values the Life Settlement at various mortality probabilities of a rate implied by the independent medically-assessed life expectancies used to price the policy at the bidding stage. The Life Settlement will then be valued in accordance with these probabilities using a discount rate set such that the Life Settlement is valued at the total acquisition cost as at the purchase date. Such valuation will be carried out monthly for the determination of the Net Asset Value.

99

4.3.2    The AIFM (or any authorised agent thereof) may make any necessary adjustment on a quarterly basis to the value of a Life Settlement after assessing the latest health condition of the life insured.

4.3.3    Any such adjustment made to the valuation of an individual Life Settlement is subject to review by appointed actuarial consulting firm as part of their quarterly actuarial review and report to the AIFM.

## 5.    PORTFOLIO MANAGEMENT

The AIFM will manage the portfolio of the Absolute Return Fund I without delegating the portfolio management or appointing an investment advisor.

## 6.    FEES CHARGED TO THE ABSOLUTE RETURN FUND I

6.1    Fees paid to the AIFM

6.1.1    In consideration for its services applicable to each Class of Units, the AIFM shall receive out of the assets of Absolute Return Fund I a Management Fee and a Performance Fee.

6.1.2    Any fees payable to the AIFM, the Investment Adviser, and any placement agents, will be paid by the AIFM out of its own fees.

6.1.3    The Management Fee is 1.5% of the Net Asset Value of each Class computed and payable quarterly as at the end of each quarter.

6.1.4    In addition to the Management Fee, the AIFM shall be entitled to receive a Performance Fee of 20% of the performance of the Net Asset Value of each Class above a soft hurdle rate of 6% p.a. accrued quarterly subject to the high watermark under Section 6.1.6.

6.1.5    The Performance Fee is calculated on the basis of the Net Asset Value of each Class after deduction of all expenses, liabilities, and Management Fee (but not the Performance Fee) and is adjusted to take account of all subscriptions and redemptions of Units.

6.1.6    The high watermark corresponds to the last Net Asset Value on which a Performance Fee has been accrued, adjusted by the subscriptions and the redemptions of Units since the last Performance Fee accrual. Furthermore, the hurdle rate is taken into account since the last Performance Fee accrual.

6.1.7    Provision will be made for this Performance Fee on each Valuation Day. In the event of a downturn in performance of the Net Asset Value during any calculation period, the provisions made in respect of the Performance Fee will be reduced accordingly. If these provisions fall to zero, no Performance Fee will be payable.

6.1.8    If Units are redeemed on a date other than that on which a Performance Fee is paid while provision has been made for Performance Fee, the Performance Fee for which provision has been made and which are attributable to the Units redeemed will be paid at the end of the period even if provision for Performance Fee is no longer made at that date.

100

6.1.9    The Performance Fee will be calculated and accrued as an expense of the relevant Class on a quarterly basis as of each Valuation Day and will be payable to the AIFM based on the schedule of free cash flows as determined by the AIFM.

6.2    Fees Paid to the Depositary, the Central Administration Agent and Other Parties

6.2.1    The Depositary is entitled to (i) a variable custody fee of 0.02% of the Absolute Return Fund I's average net assets and payable monthly in arrears and (ii) a variable annual supervisory fee of 0.004% of the Absolute Return Fund I's average net assets and payable monthly in arrears.

6.2.2    The Central Administration Agent is entitled to a variable fee of up to 0.06% of the Absolute Return Fund I's average net assets and payable monthly in arrears.

6.2.3    The Paying Agent, Securities Intermediary, Escrow Agent and Servicing Agent will be paid, out of the assets of the Sub-Fund, fees that are within the customary range for the services provided.

6.2.4    The US Custodian will be paid, out of the Absolute Return Fund I's assets, fees that are within the customary range for the services provided.

6.2.5    Notwithstanding such fees, the Depositary and other parties will receive customary banking fees for transactions.

6.2.6    Any reasonable disbursements and out-of-pocket expenses (including telephone, cable, and postage expenses) necessarily incurred in the ordinary course of business by the Depositary, Central Administration Agent, and any custody charges of banks and financial institutions to which custody of assets of the Sub-Fund is entrusted, will be borne by the Absolute Return Fund I.

7.    **SPECIFIC RISKS APPLICABLE TO THE ABSOLUTE RETURN FUND I**

There are a number of significant risks associated with an investment in the Absolute Return Fund I. Prospective investors in the Absolute Return Fund I should understand that all investments involve risks and there can be no guarantee against losses resulting from an investment in the Absolute Return Fund I, neither can there be any assurance that the Absolute Return Fund I will be successful in achieving its objectives. In addition to the factors set forth elsewhere in this Placement Memorandum, prospective investors in the Absolute Return Fund I should carefully consider all of the factors below.

**Hedging risk:** If applicable, the use of hedging instruments involves certain special risks including dependence on the ability to predict movements in interest and currency rates, the price of investment assets and cash instruments being hedged, imperfect correlation between the hedging instruments and the investment assets, cash instruments, and interest and currency rates being hedged, and the fact that the skills needed to use hedging instruments are different from those needed to select the investments. Whilst such techniques can improve the return on invested capital, their use also increases the costs and the risk of losses to the Absolute Return Fund I.

28558437.2.EU_BUSINESS

8.    **NO LISTING OF UNITS**

The AIFM does not contemplate applying for a listing of the Classes of Absolute Return Fund I on the Luxembourg or any other stock exchange.

9.    **DURATION**

The Absolute Return Fund I has been established for an unlimited duration but the AIFM will distribute net profit after reserves and is envisioning an exit strategy ten years after the end of the relevant Initial Offering Period by way of forced redemptions in proportion of the net profit after reserve attributed to each Unitholder.

102